# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**GABRIEL PAUL HALL,**
     Petitioner,

  *v.*

**ERIC GUERRERO, Director,**
     Texas Department of
Criminal Justice,
Correctional Institutions Division,
     Respondent.

Case No. 4:24-CV-627

District Judge George C. Hanks, Jr.

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS (TX 24084578)
Supervisor, Capital Habeas Unit

Rachel G. Schaefer (CA 298354)**
Joe Hamrick (FL 47049)
Adriana Victoria Inojosa (VA 94813)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746 (phone) 214-767-2886 (fax)
rachel_schaefer@fd.org
** *designates lead counsel*

## THIS IS A CAPITAL CASE

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

Petitioner Gabriel Paul Hall, through counsel and pursuant to all rights available under the Constitution, laws, or treaties of the United States, respectfully petitions this Court for a writ of habeas corpus declaring unconstitutional and invalid his conviction for capital murder as well as the resulting death sentence.

# RECORD CITATION CONVENTION[1]

<u>*Record of trial proceedings*</u>, No. AP-77,062:

| | |
|---|---|
| 100 volumes of Reporter's Record | ___ RR ___ |
| 28 volumes of Exhibits (101 RR–128 RR) | ___ RR ___** |
| **(page numbers reflect PDF page numbers) | |
| 13 volumes of Clerk's Record | ___ CR ___ |
| 16 volumes of Amended Clerk's Record | ___ Amend. CR ___ |
| 1 volume First Supplemental Clerk's Record | 1 Supp. ___ CR ___ |
| 28 volumes Second Supplemental Clerk's Record | 2 Supp. ___ CR ___ |
| 2 volumes corrected | 2 Corr. Supp. ___ CR ___ |
| 12 volumes Third Supplemental Clerk's Record | 3 Supp. ___ CR ___ |
| 1 volume Fourth Supplemental Clerk's Record | 4 Supp. ___ CR ___ |
| 1 volume Fifth Supplemental Clerk's Record | 5 Supp. ___ CR ___ |

---

[1] Portions of the record, not exemplified herein, are cited individually by pleading.

*Record of state habeas proceedings*, No. WR-86,568-01:

| | |
|---|---|
| Clerk's Record dated May 23, 2023 | SHCR ___ |
| Supplemental Clerk's Record dated June 29, 2023 | 1 Supp. SHCR ___ |
| Supplemental Clerk's Record dated January 17, 2024 | 2 Supp. SHCR ___ |
| Reporter's Record, January 30, 2023 proceedings | SHRR ___ |
| 4 volumes Reporter's Record, April 25, 2023 proceedings | ___ SHRR ___ |

# TABLE OF CONTENTS

RECORD CITATION CONVENTION.................................................................ii

TABLE OF CONTENTS..................................................................................iv

TABLE OF AUTHORITIES ............................................................................xi

JURISDICTION AND VENUE.........................................................................1

PARTIES ........................................................................................................1

PROCEDURAL HISTORY ..............................................................................1

STATEMENT OF FACTS ................................................................................4

CLAIMS FOR RELIEF ..................................................................................10

CLAIM ONE: THE TRIAL COURT ALLOWED THE JURY TO HEAR STATEMENTS FROM MR. HALL THAT THE STATE OBTAINED IN VIOLATION OF THE SIXTH AMENDMENT. ...............................................................................................10
  A.  Statement of Facts.................................................................................11
    1.  Defense counsel sent Brazos County Jail a no-contact letter. ........11
    2.  The jail allowed Jeff Ross to film a stand-up Comedy Central special inside the facility..................................................................11
    3.  The jail informed inmates of the stand-up Comedy Central special.........................................................................................13
    4.  Mr. Ross and his Comedy Central crew entered the jail dorms and filmed an interview with Mr. Hall.............................................14
    5.  Jail staff watched Mr. Ross interview Mr. Hall. ............................17
    6.  Mr. Hall was the only capital defendant barred from attending the comedy show. .........................................................................18
    7.  The State obtained Mr. Ross's interview footage. ..........................19
    8.  The taped special showed Mr. Ross discussing the death penalty and information about violent offenders with Warden Dicky and Quartermaster Waller, respectively...............................................20
    9.  The State presented the tape to show future dangerousness........20
  B.  Legal Standard ...................................................................................21
  C.  Argument ...........................................................................................25
    1.  Mr. Ross's interview of Mr. Hall was a confrontation within the meaning of the Sixth Amendment...................................................26
    2.  The State failed to provide Mr. Hall adequate notice of the pending confrontation..................................................................28
    3.  Mr. Ross was a government agent. ................................................29
    4.  Mr. Hall never waived his Sixth Amendment right to consult with counsel............................................................................................31

5.   Admitting the video at punishment was harmful. ......................... 32

D.   This Court can review the merits of this claim de novo. .................... 33

CLAIM TWO: MR. HALL'S DEATH SENTENCE VIOLATES THE FOURTEENTH
AMENDMENT'S DUE PROCESS CLAUSE BECAUSE THE STATE PREMISED THE
COMEDY CENTRAL TAPE'S ADMISSIBILITY ON FALSE TESTIMONY FROM JAIL
EMPLOYEES. ................................................................................... 33

A.   Statement of Facts ................................................................. 34

1.   Warden Dicky and Quartermaster Waller falsely testified that no
one influenced the Comedy Central crew to talk to Mr. Hall. ....... 34

2.   Warden Dicky and Quartermaster Waller falsely characterized
that, outside of safety escorts, they acted as neutral observers
during the Comedy Central filming. ............................................. 35

3.   Warden Dicky falsely testified that Mr. Hall had notice as to
whether he wanted to be interviewed. ........................................... 36

B.   Legal Standard ...................................................................... 37

C.   Argument ............................................................................... 38

D.   This Court can review the merits of the claim de novo. ..................... 39

CLAIM THREE: THE TRIAL COURT VIOLATED MR. HALL'S EIGHTH AND
FOURTEENTH AMENDMENT RIGHTS WHEN IT ADMITTED THE COMEDY
CENTRAL VIDEO AS EVIDENCE OF FUTURE DANGEROUSNESS. ......................... 40

A.   Statement of Facts ................................................................. 41

B.   Legal Standard ...................................................................... 41

C.   Argument ............................................................................... 44

1.   The Comedy Central video injected racial prejudice into the
punishment-phase proceedings. ..................................................... 45

2.   The Comedy Central video inserted Mr. Ross's opinions of Mr. Hall
into punishment-phase proceedings. ............................................. 46

3.   The State's interests cannot justify the tape's admission ............. 47

4.   The video had a substantial and injurious effect on punishment-
phase proceedings ......................................................................... 49

D.   The Court can review the merits of this claim de novo. ..................... 49

CLAIM FOUR: COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION OF
THE SIXTH AMENDMENT WHEN THEY FAILED TO ADEQUATELY INVESTIGATE
AND PRESENT MITIGATING EVIDENCE AND REBUT THE STATE'S FUTURE-
DANGEROUSNESS CASE AT MR. HALL'S PUNISHMENT PHASE. ........................ 50

A.   Statement of Facts ................................................................. 50

B.   Legal Standard ...................................................................... 52

C.   Argument ............................................................................... 54

1.  Deficiency: Trial counsel failed to conduct a thorough and constitutionally adequate investigation and failed to provide Mr. Hall with an individualized mitigation presentation and rebuttal to the State's case. ............................................................... 54

   a.  Failure to Conduct a Thorough, Culturally Sensitive, and Constitutionally Adequate Investigation ..................................... 55

   b.  Failure to Investigate Mental-Health Diagnoses and Retain and Then Consult with Relevant and Qualified Experts ................... 60

   c.  Failure to Investigate and Challenge the State's Future-Dangerousness and Mitigation-Rebuttal Evidence at Punishment by Consulting with Appropriate Experts ...................................... 64

   d.  Failure to Adequately Investigate and Impeach State Future-Dangerousness Witnesses ............................................. 68

2.  Prejudice: There is a reasonable probability that at least one juror would have voted for life had trial counsel performed effectively. 70

   a.  Failure to Conduct a Thorough, Culturally Sensitive, and Constitutionally Adequate Investigation ..................................... 71

   b.  Failure to Adequately Investigate, Prepare Witnesses, and Present Evidence Related to Mental Illness, Neurodevelopment, and Brain Functioning ................................................ 73

   c.  Failure to Investigate and Prepare to Rebut State Experts. ...... 75

   d.  Failure to Adequately Investigate and Impeach State Jailhouse Witnesses for Future Dangerousness ........................................... 78

3.  Cumulative Prejudice .................................................................... 83

D.  This claim is unexhausted. ................................................................. 84

CLAIM FIVE: THE STATE VIOLATED MR. HALL'S DUE PROCESS RIGHTS WHEN IT ELICITED TESTIMONY FROM DR. PROCTOR THAT IT KNEW OR SHOULD HAVE KNOWN WAS FALSE AND MISLEADING. ............................................................... 84

A.  Statement of Facts ............................................................................ 85

B.  Legal Standard ................................................................................. 89

C.  Argument ......................................................................................... 90

1.  Dr. Proctor's testimony was false. .................................................. 90

2.  The State knew or should have known that Dr. Proctor's testimony was false. ............................................................................. 93

3.  Dr. Proctor's false testimony was material. ..................................... 93

D.  This claim is unexhausted. ................................................................. 95

CLAIM SIX: THE STATE SUPPRESSED FAVORABLE EVIDENCE OF MR. HALL'S MENTAL CONDITION. ............................................................................................. 96

A.  Statement of Facts ............................................................................ 96

B.  Legal Standard ................................................................. 98
C.  The State suppressed favorable evidence about Mr. Hall's mental
     condition. ..................................................................... 98
D.  Evidence that at least one of Mr. Hall's former teachers believed he
     had autism spectrum disorder and/or a learning disability was
     material. .................................................................... 101
E.  This claim is unexhausted. ............................................... 103

CLAIM SEVEN: COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION
OF THE SIXTH AMENDMENT WHEN THEY FAILED TO MOVE TO SUPPRESS MR.
HALL'S CONFESSION. ............................................................... 103
A.  Statement of Facts........................................................... 104
    1.  Gabriel Hall lacked prior experience with law enforcement, in
        contrast with his adoptive father. ................................. 104
    2.  Wes orchestrated Gabriel's confession to the crime. .................... 105
    3.  Police relied on Gabriel's confession to obtain additional physical
        evidence....................................................................... 106
B.  Legal Standard ............................................................... 107
C.  Argument ..................................................................... 111
    1.  Trial counsel was deficient in failing to move to suppress Gabriel's
        confession...................................................................... 111
    2.  Trial counsel's failure to move to suppress the confession
        prejudiced Gabriel. ......................................................... 114
D.  This claim is unexhausted. ............................................... 115

CLAIM EIGHT: THE STATE UNCONSTITUTIONALLY STRUCK PEOPLE OF COLOR
FROM THE JURY, AND THE STATE COURTS FAILED TO SCRUTINIZE THE
RATIONALES PROFFERED FOR THESE STRIKES AS REQUIRED BY BATSON V.
KENTUCKY. ...................................................................... 116
A.  Statement of Facts........................................................... 117
B.  Legal Standard ............................................................... 120
C.  Argument ..................................................................... 122
    1.  In response to Mr. Hall's Batson claims, the State repeatedly
        misrepresented the record. .............................................. 122
    2.  Comparative juror analysis shows the State exercised its strikes on
        racial grounds. ............................................................. 129
    3.  Other relevant circumstances further support a finding of
        invidious intent............................................................ 132
    4.  The trial court's step-three rubberstamping of the State's proffered
        rationales fell short of constitutionally required scrutiny. .......... 134
D.  The Court can review the merits of this claim de novo................... 137

CLAIM NINE: COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION OF
THE SIXTH AMENDMENT WHEN THEY FAILED TO OBJECT TO THE STATE'S
GENDER-BASED PEREMPTORY STRIKES. ........................................................ 139
  A.  Statement of Facts.......................................................................... 139
  B.  Legal Standard ............................................................................... 140
  C.  Argument ........................................................................................ 141
      1.  Trial counsel was deficient in failing to make J.E.B. objections.  141
      2.  Mr. Hall's J.E.B. claim was meritorious. ..................................... 143
          a. The State used an accusatory script with female jurors.......... 143
          b. Comparison of struck female to seated male jurors shows
          discriminatory intent ......................................................... 150
  D.  This claim is unexhausted. ............................................................ 154

CLAIM TEN: ALTERNATE JURORS PARTICIPATED IN DELIBERATIONS IN
VIOLATION OF MR. HALL'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS.  154
  A.  Statement of Facts.......................................................................... 155
  B.  Legal Standard ............................................................................... 156
  C.  Argument ........................................................................................ 156
  D.  This claim is unexhausted. ............................................................ 157

CLAIM ELEVEN: COUNSEL RENDERED INEFFECTIVE ASSISTANCE IN VIOLATION
OF THE SIXTH AMENDMENT WHEN COUNSEL MISTAKENLY BELIEVED THAT THE
LAW PREVENTED MR. HALL FROM PLEADING GUILTY.................................... 157
  A.  Statement of Facts.......................................................................... 158
  B.  Legal Standard ............................................................................... 159
  C.  Argument ........................................................................................ 160
      1.  Counsel's mistake of law constitutes deficient performance. ...... 160
      2.  Mr. Hall was prejudiced by trial counsel's mistake of law. ......... 161
  D.  This claim is unexhausted. ............................................................ 162

CLAIM TWELVE: COUNSEL'S STATEMENT TO THE JURY PANEL THAT MR. HALL
"KILLED MR. SHAAR" VIOLATED MR. HALL'S SIXTH AMENDMENT RIGHT TO
COUNSEL; COUNSEL DID NOT HAVE MR. HALL'S CONSENT TO CONCEDE GUILT.
.................................................................................................................... 163
  A.  Statement of Facts.......................................................................... 163
  B.  Legal Standard ............................................................................... 163
  C.  Argument ........................................................................................ 164
  D.  This claim is unexhausted. ............................................................ 166

CLAIM THIRTEEN: COUNSEL TOLD THE JURY PANEL THAT MR. HALL WAS
GUILTY OF CAPITAL MURDER, IN VIOLATION OF MR. HALL'S SIXTH
AMENDMENT RIGHT TO COUNSEL. ............................................................... 167

A.  Statement of Facts.......................................................................... 167

B.  Legal Standard ............................................................................... 168

C.  Argument ....................................................................................... 170

    1.  Counsel's statement effectively deprived Mr. Hall of counsel in violation of the Sixth Amendment................................................. 170

    2.  Prejudice is presumed because Mr. Hall was in effect deprived of counsel............................................................................. 171

    3.  In the alternative, Mr. Hall can show he was prejudiced............ 171

D.  This claim is unexhausted. ............................................................ 172

CLAIM FOURTEEN: COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT IN FAILING TO MOVE FOR A CHANGE OF VENUE BASED ON THE EFFECT OF PRE-TRIAL PUBLICITY ON POTENTIAL JURORS. ....................................................................... 172

A.  Statement of Facts.......................................................................... 173

B.  Legal Standard ............................................................................... 177

C.  Argument ....................................................................................... 178

    1.  Trial counsel was deficient in failing to investigate and file a motion for change of venue ......................................................... 178

    2.  Mr. Hall was prejudiced by counsel's failure to litigate a change of venue ........................................................................ 179

D.  This claim is unexhausted. ............................................................ 187

CLAIM FIFTEEN: TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN THEY FAILED TO ADEQUATELY CONSULT WITH AND CALL FOR THE TESTIMONY OF RETAINED EXPERT DR. RUBEN GUR....................................................... 187

A.  Statement of Facts.......................................................................... 188

B.  Legal Standard ............................................................................... 190

C.  Argument ....................................................................................... 190

    1.  Trial counsel failed to investigate and consider whether Dr. Gur's testimony became necessary as trial unfolded. ........................... 190

    2.  Mr. Hall was prejudiced by trial counsel's failures.................... 192

D.  The Court can review the merits of this claim de novo.................. 195

CLAIM SIXTEEN: MR. HALL'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE SCIENCE AND STATISTICS SHOW THAT THE FUTURE-DANGEROUSNESS ASSESSMENT IS FUNDAMENTALLY UNRELIABLE. ...................................................................................... 196

A.  Statement of Facts.......................................................................... 197

B.  Legal Standard ............................................................................... 200

C.  Argument ....................................................................................... 201

D.  The Court can review the merits of this claim de novo.................. 204

CLAIM SEVENTEEN: MR. HALL'S JURY WAS UNCONSTITUTIONALLY
INSTRUCTED THAT IT SHOULD NOT CONSIDER MITIGATION LACKING A NEXUS TO
THE CRIME...................................................................................................... 204
    A.   Statement of Facts........................................................... 205
    B.   Legal Standard ................................................................ 209
    C.   There is a reasonable likelihood that Mr. Hall's jury understood the
       scope of mitigation to be limited to evidence with a nexus to the
       crime. .............................................................................. 211
    D.   This Court can review the merits of this claim de novo.................. 213

PRAYER FOR RELIEF ................................................................................... 214

EXHIBIT INDEX ........................................................................................... 216

VERIFICATION BY ATTORNEY ................................................................... 217

CERTIFICATE OF SERVICE ........................................................................ 218

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Adams v. United States ex rel. McCann,*
   317 U.S. 269 (1942) ............................................................. 24, 31

*Addington v. Texas,*
   441 U.S. 418 (1979) ................................................................. 203

*Ake v. Oklahoma,*
   470 U.S. 68 (1985) ..................................................................... 68

*Anaya v. Lumpkin,*
   976 F.3d 545 (5th Cir 2020) .................................................... 160

*Andrus v. Texas,*
   590 U.S. 806 (2020) ...................................................... 55, 61, 69

*Arizona v. Fulminante,*
   499 U.S. 279 (1991) ................................................................... 81

*Arlington Heights v. Metro. Housing Dev. Corp.,*
   429 U.S. 252 (1977) ................................................................. 134

*Atkins v. Virginia,*
   536 U.S. 304 (2002) ................................................................... 44

*Ayestas v.* Davis,
   584 U.S. 28 (2018) .............................................................. 55, 56

*Barbee v. Davis,*
   728 Fed. App'x 259 (5th Cir. 2004) ........................................ 165

*Barefoot v. Estelle,*
   463 U.S. 880 (1983) ........................................................*passim*

*Batson v. Kentucky,*
   476 U.S. 79 (1986) ..........................................................*passim*

*Berger v. United States,*
   295 U.S. 78 (1935) ..................................................................... 48

*Blackburn v. Alabama,*
   361 U.S. 199 (1960) ................................................................................ 109

*Blue v. Thaler,*
   665 F.3d 647 (5th Cir. 2011) .......................................................... 211, 212

*Bobby v. Van Hook,*
   558 U.S. 4 (2009) ...................................................................................... 55

*Brady v. Maryland,*
   373 U.S. 83 (1963) .............................................................................. 96, 98

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993) ................................................................... 25, 44, 49

*Buck v. Davis,*
   580 U.S. 100 (2017) ....................................................................... 46, 58, 81

*Cafeteria Workers v. McElroy,*
   367 U.S. 886 (1961) .................................................................................. 42

*Caldwell v. Mississippi,*
   472 U.S. 320 (1985) .................................................................................. 44

*California v. Brown,*
   479 U.S. 538 (1987) .................................................................................. 44

*Coleman v. Thompson,*
   501 U.S. 722 (1991) ..........................................................................*passim*

*Colorado v. Connelly,*
   479 U.S. 157 (1986) ................................................................................ 109

*Crawford v. Epps,*
   531 Fed. App'x. 511 (5th Cir. 2013) ...................................................... 23

*Cullen v. Pinholster,*
   563 U.S. 170 (2011) .................................................................................. 94

*Davis v. Alaska,*
   415 U.S. 308 (1974) .................................................................................. 78

*Deck v. Missouri,*
   544 U.S. 622 (2005) ............................................................................ 43, 47

*Dodson v. Stephens,*
    611 F. App'x 168 (5th Cir. 2015) ................................................................ 83

*Eagle v. Linahan*
    279 F.3d 926 (11th Cir. 2001) .................................................................. 141

*Estelle v. Smith,*
    451 U.S. 454 (1981) ..............................................................................*passim*

*Faretta v. California,*
    422 U.S. 806 (1975) ................................................................. 24, 31, 164

*Florida v. Nixon,*
    543 U.S. 175 (2004) ................................................... 162, 164, 165

*Flowers v. Mississippi,*
    588 U.S. 284 (2019) ............................................................*passim*

*Foster v. Chatman,*
    578 U.S 488 (2016) ................................................... 120, 121, 133

*Franklin v. Lynaugh,*
    487 U.S. 164 (1988) ............................................................... 211

*Furman v. Georgia,*
    408 U.S. 238 (1972) ............................................................... 202

*Gallegos v. Colorado,*
    370 U.S. 49 (1962) ................................................................ 109

*Gardner v. Florida,*
    430 U.S. 349 (1977) ......................................................... 42, 47

*Gholson v. Estelle,*
    675 F.2d 734 (5th Cir. 1982) .................................................. 23

*Giglio v. United States,*
    405 U.S. 150 (1972) ......................................... 37, 38, 39, 93

*Gregg v. Georgia,*
    428 U.S. 153 (1976) ................................................. 200, 201, 204

*Haynes v. Cain,*
    298 F.3d 375 (5th Cir. 2002) ................................................ 165

*Herrera v. Collins,*
    506 U.S. 390 (1993) ....................................................................... 42

*Hinton v. Alabama,*
    571 U.S. 263 (2014) ..............................................................*passim*

*Hinton v. Alabama,*
    571 U.S. 263,274 (2014) ........................................................... 140

*Hopkins v. Cockrell,*
    325 F.3d 579 (5th Cir. 2003) ............................................. 109, 112

*Hummel v. Davis,*
    908 F.3d 987 (5th Cir. 2018) ..................................................... 211

*Iowa v. Tovar,*
    541 U.S. 77 (2004) ....................................................... 24, 25, 32

*J.E.B. v. Alabama,*
    511 U.S. 127 (1994) ..............................................................*passim*

*Johnson v. California,*
    545 U.S. 162 (2005) ..............................................................*passim*

*Johnson v. Finn,*
    665 F.3d 1063 (9th Cir. 2011) ................................................... 133

*Johnson v. Mississippi,*
    486 U.S. 578 (1988) ..............................................................*passim*

*Johnson v. Texas,*
    509 U.S. 350 (1993) ................................................................. 210

*Jones v. Barnes,*
    463 U.S. 745 (1983) ................................................................. 164

*Jurek v. Estelle,*
    623 F.2d 929 (5th Cir. 1980) ..................................................... 108

*Jurek v. Texas,*
    428 U.S. 262 (1976) ..................................................... 50, 200, 211

*Kimmelman v. Morrison,*
    477 U.S. 365 (1986) ......................................... 140, 141, 177

*Kotteakos v. United States*,
    328 U.S. 750 (1946) .............................................................. 25, 44

*Lafler v. Cooper*,
    566 U.S. 156 (2012) .................................................................. 159

*Lee v. Kemna*,
    534 U.S. 362 (2002) ......................................................... 34, 40, 49

*Lee v. United States*,
    582 U.S. 357 (2017) .................................................................. 159

*Lockett v. Ohio*,
    438 U.S. 586 (1978) ...................................................... 41, 42, 202

*Maine v. Moulton*,
    474 U.S. 159 (1985) .............................................. 22, 23, 29, 33

*Massiah v. United States*,
    377 U.S. 201 (1964) .................................................................... 33

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .............................................. 42, 43, 44, 45

*McCoy v. Louisiana*,
    584 U.S. 414 (2018) ................................................ 163, 164, 165

*McGowen v. Thaler*,
    675 F.3d 482 (5th Cir. 2012) .................................................. 101

*Miller-El v. Cockrell*,
    537 U.S. 322 (2003) ................................................................. 143

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ............................................................*passim*

*Moore v. Johnson*,
    225 F.3d 495 (5th Cir. 2000) .......................................... 178, 186

*Moran v. Burbine*,
    475 U.S. 412 (1986) ................................................................. 109

*Morris v. Thaler*,
    425 Fed. App'x. 415 (5th Cir. 2011) ........................... 108, 111, 114

*Morrissey v. Brewer,*
    408 U.S. 471 (1972)................................................................. 42, 43

*Napue v. Illinois,*
    360 U.S. 264 (1959)................................................................. 37, 89

*Nelson v. Davis,*
    952 F.3d 651 (5th Cir. 2020)............................................................ 141

*Nelson v. Quarterman,*
    472 F.3d 287 (5th Cir. 2006)......................................... 94, 210, 211

*O'Connor v. Donaldson,*
    422 U.S. 563 (1975)..................................................................... 203

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)..................................................... 40, 137, 195

*Parker v. Gladden,*
    385 U.S. 363 (1966)..................................................................... 156

*Patterson v. Ill.,*
    487 U.S. 285 (1998)................................................................. 24, 25

*Penry v. Lynaugh,*
    492 U.S. 302 (1989)..................................................... 44, 100, 202

*Porter v. McCollum,*
    558 U.S. 30 (2009)...................................................................*passim*

*Powell v. Alabama,*
    287 U.S. 45 (1932)....................................................................... 140

*Powers v. Ohio,*
    499 U.S. 400 (1991)..................................................................... 120

*Reed v. Quarterman,*
    555 F.3d 364 (5th Cir. 2009)............................................................ 122

*Rhines v. Weber,*
    544 U.S. 269 (2005)...............................................................*passim*

*Rhodes v. Vannoy,*
    751 Fed. App'x. 524 (5th Cir. 2018) ............................................. 81

*Richards v. Quarterman,*
    566 F.3d 553 (5th Cir. 2009)......................................................... 83

*Rideau v. Louisiana,*
    373 U.S. 723 (1963) ................................................................. 186

*Rockwell v. Davis,*
    853 F.3d 758 (5th Cir. 2017)....................................................... 211

*Rogers v. Richmond,*
    365 U.S. 534 (1961) ................................................................. 109

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ............................................................*passim*

*Sandstrom v. Montana,*
    442 U.S. 510 (1979) ........................................................ 210, 212

*Satterwhite v. Texas,*
    486 U.S. 249 (1988) .......................................................... 23, 29

*Scott v. Hubert,*
    610 Fed. App'x 433 (5th Cir. 2015) ............................................. 141

*Skilling  v. United States,*
    561 U.S. 358 (2010) ................................................. 178, 180, 181

*Smith v. Dugger,*
    911 F.2d 494 (11th Cir. 1990)............................................ 108, 115

*Snyder v. Louisiana,*
    552 U.S. 472 (2008) ................................................. 120, 141, 142

*Spano v. New York,*
    360 U.S. 315 (1959) ......................................................... 109, 112

*Strickland v. Washington,*
    466 U.S. 668 (1984) ............................................................*passim*

*Tennard v. Dretke,*
    542 U.S. 274 (2004) ............................................................*passim*

*United States v. Acevedo,*
    141 F.3d 1421 (11th Cir. 1998)......................................... 156, 157

*United States v. Agurs,*
   427 U.S. 97 (1976) ............................................................... 89

*United States v. Bagley,*
   473 U.S. 667 (1985) ............................................................. 98

*United States v. Cronic,*
   466 U.S. 684 (1984) .......................................................*passim*

*United States v. Henry,*
   447 U.S. 264 (1980) ............................................................. 33

*United States v. Mason,*
   293 F.3d 826 (5th Cir. 2002) ............................................. 89

*United States v. McKown,*
   930 F.3d 721 (5th Cir. 2019) ........................................... 203

*United States v. O'Keefe,*
   169 F.3d 281 (5th Cir. 1999) ....................................... 89, 93

*United States v. Olano,*
   507 U.S. 725 (1993) .......................................................... 156

*United States v. Salerno,*
   481 U.S. 739 (1987) .......................................................... 203

*United States v. Sanfilippo,*
   564 F.2d 176 (5th Cir. 1977) ............................................. 89

*United States v. Skilling,*
   561 U.S. 358 (2010) ............................................. 178, 180, 181

*United States v. Wade,*
   388 U.S. 218 (1967) ............................................. 22, 23, 27, 33

*United States v. Young,*
   470 U.S. 1 (1985) ............................................................... 212

*Virgil v. Dretke,*
   446 F.3d 598 (5th Cir. 2006) ........................................... 169

*Weaver v. Massachusetts,*
   582 U.S. 286 ...................................................................... 172

*Wellons v. Hall,*
  558 U.S. 220 (2010)................................................................. 43

*Whitley v. Albers,*
  475 U.S. 312 (1986)................................................................. 42

*Wiggins v. Smith,*
  539 U.S. 510 (2003)..........................................................*passim*

*Williams v. Taylor,*
  529 U.S. 362 (2000).............................................. 59, 64, 83, 159

*Wong Sun v. United States,*
  371 U.S. 471 (1963).............................................................. 114

*Woodford v. Visciotti,*
  537 U.S. 19 (2002)................................................................. 53

*Woodson v. North Carolina,*
  428 U.S. 280 (1976)............................................ 8, 50, 203, 204

*Zant v. Stephens,*
  462 U.S. 862 (1983)................................................................ 41

**State Cases**

*Casarez v. Texas,*
  913 S.W.2d 468 (Tex. Crim. App. 1994)................................... 133

*Ex parte De La Cruz,*
  466 S.W.3d 855 (Tex. Crim. App. 2015).................................... 40

*Estrada v. Texas,*
  313 S.W.3d 274 (Tex. Crim. App. 2010).................................... 40

*Faulder v. Texas,*
  745 S.W.2d 327 (Tex. Crim. App. 1987)................................... 179

*Fuller v. Texas,*
  253 S.W.3d 220 (Tex. Crim. App. 2008)................................... 160

*Hall v. Texas,*
  663 S.W.3d 15 (Tex. Crim. App. 2021)..............................*passim*

*Ex parte Hall*,
    No. WR-86,568-01, 2024 WL 467871 (Tex. Crim. App. Feb. 7,
    2024) ................................................................................*passim*

*In re M.P.A.*,
    364 S.W.3d 277 (Tex. 2012) ........................................... 40

*Narvaiz v. Texas*,
    840 S.W.2d 415 (Tex. Crim. App. 1992)................................... 177

*Oursbourn v. Texas*,
    259 S.W.3d 159 (Tex. Crim. App. 2008)........................... 110, 113

*Sandoval v. Texas*,
    665 S.W.3d 496 (Tex. Crim. App. 2022)................................... 111

*Texas v. Turner*,
    556 S.W.2d 563 (1977) ................................................... 203

*Williams v. Texas*,
    674 S.W.2d 315 (Tex. Crim. App. 1984)................................... 160

**Federal Statutes**

18 U.S.C. § 3599................................................................4

18 U.S.C. § 4246................................................................ 203

20 U.S.C. § 1401................................................................ 99

28 U.S.C. § 1331................................................................1

28 U.S.C. § 2241................................................................1

28 U.S.C. § 2254................................................................*passim*

**State Statutes**

OR. REV. STAT. 163.150 (amended Sept. 29, 2019)........................... 196

TEX. CODE CRIM. PROC. art. 1.13 ........................................... 160

TEX. CODE CRIM. PROC. art. 26.052 ........................................ 2, 195

TEX. CODE CRIM. PROC. art. 31.03 ......................................... 177, 178

TEX. CODE CRIM. PROC. art. 36.22 ................................................................ 156

TEX. CODE CRIM. PROC. art. 37.071 ..........................................................*passim*

TEX. CODE CRIM. PROC. art. 38.21 ....................................................... 110, 113

TEX. CODE CRIM. PROC. art. 38.22 ....................................................... 111, 114

TEX. CODE CRIM. PROC. art. 39.14 (2014)........................................................ 97

TEX. CODE CRIM. PROC. art. § 37.071 ....................................................... 49, 94

**Rules**

TEX. R. APP. P. 21.3 ..................................................................... 156

**Regulations**

34 C.F.R. 300.8.................................................................. 99, 100

**Constitutional Provisions**

TEX. CONST. art. V § 13 ..................................................... 156

U.S CONST. AMEND. V.................................................................... 108

U.S CONST. AMEND. VI ..........................................................*passim*

U.S CONST. AMEND. VIII ..........................................................*passim*

U.S CONST. AMEND. XIV..........................................................*passim*

**Other Authorities**

12th Man Foundation, *Blue Bell Foundation*,
  https://12thman.com/facilities/blue-bell-park/2 ........................................ 180

American Bar Association, *Supplementary Guidelines for the
  Mitigation Function of Defense Teams in Death Penalty Cases*, 36
  HOFSTRA L. REV. 677 (2008) ......................................................... 52

American Bar Association, *Guidelines for the Appointment and
  Performance of Defense Counsel in Death Penalty Cases*, 31
  Hofstra L. Rev. 913 (2003) ......................................................... 52

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ........................................................ 87, 99

Brittany Fowler, *A Shortcut to Death: How the Texas Death-Penalty Statute Engages the Jury's Cognitive Heuristics in Favor of Death*, 96 TEX. L. REV. 379 (2017) ......................................................... 198

Carla Edmondson, *Nothing is Certain But Death: Why Future Dangerousness Mandates Abolition of the Death Penalty*, 20 LEWIS & CLARK L. REV. 857 (2016) ...................................................... 197

Cleveland Clinic, *Functional MRI (fMRI)*, https://my.clevelandclinic.org/health/diagnostics/25034-functional-mri-fmri (last visited Jan. 4, 2025) ............................................................ 193

*Evidence List Finalized in Capital Murder Trial*, Bryan-College Station Eagle Oct. 5, 2013 ....................................................... 182

George E. Dix, "Voluntariness" and "Intelligence" of Confessions as "Independent" Texas Law Issues, 20 Tex. Tech. L. Rev. 1017 (1989)........... 110

*Grand Jury Indicts Student*, BRYAN-COLLEGE STATION EAGLE, Dec. 21, 2011 ................................................................... 182

Jake Walker, *Adoptive Mother Accused,* Bryan-College Station Eagle, Sept. 24, 2015 .............................................................. 186

Jake Walker, *Evidence in Question*, BRYAN-COLLEGE STATION EAGLE, Aug. 21, 2015 ................................................................. 186

Jake Walker, *Hall Trial Moving Ahead,* Bryan-College Station Eagle, July 1, 2015 .............................................................. 6

James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?* 23 L.& SOC'Y REV. 449 (1989)............. 199

Jaymes Fairfax-Columbo & David DeMatteo, *Reducing the Dangers of Future Dangerousness Testimony: Applying the Federal Rules of Evidence to Capital Sentencing*, 25 WM. & MARY BILL RTS. J. 1047 (2017) ....................................................................... 197

Jessica Contrera, *"Where My Murderers at?": How Jeff Ross and Comedy Central Tried to Make Incarceration Funny*, WASHINGTON POST (Jun. 14, 2015) ................................................................ 12

Jessica L. Roberts, Note, *Futures Past: Institutionalizing the Re-Examination of Future Dangerousness in Texas Prior to Execution*, 11 Tex. J.C.L. & C.R. 101 (2005)................................................ 197

John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 L.& Hum. Behav. 55 (2005) ...................................................................... 198

Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251 (2000).......................................... 197

Maggie Keily, *Travel for Hall Trial in the Works,* BRYAN-COLLEGE STATION EAGLE, July 3, 2013 ...................................................... 184

Maggie Kiely, *County Cuts Ties to Public Defender,* BRYAN-COLLEGE STATION EAGLE, Sept. 22, 2013 ................................................... 183

Maggie Kiely, *Court Appoints Lawyer for Hall,* BRYAN-COLLEGE STATION EAGLE, Nov. 3, 2011 ..................................................... 181

Maggie Kiely, *Defense Wants Delay in Capital Murder Trial,* BRYAN-COLLEGE STATION EAGLE, May 3, 2013 ...................................... 182

Maggie Kiely, *Delay Sought in Murder Trial,* BRYAN-COLLEGE STATION EAGLE, Aug. 6, 2013 ..................................................... 183

Maggie Kiely, *Documents Lay Out Violent Tendencies of Gabriel Hall, Suspect in Murder Trial,* BRYAN-COLLEGE STATION EAGLE, Aug. 25, 2013............................................................................ 182

Maggie Kiely, *Hall Cites "Killer Instinct,"* BRYAN-COLLEGE STATION EAGLE, Oct. 28, 2011................................................................. 182

Maggie Kiely, *Hall Murder Trial Could Be Delayed up to a Full Year,* BRYAN-COLLEGE STATION EAGLE, Aug. 28, 2013 ...................... 183

Maggie Kiely, *Judge Rules on DNA Testing in Murder Case,* BRYAN-COLLEGE STATION EAGLE, Oct. 29, 2013.................................... 182

Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence,* 15 PSYCHOL. PUB. POL'Y & L. 223 (2009) ................................... 199

Medline Plus, *Chlordiazepoxide,* https://medlineplus.gov/druginfo/meds/a682078.html#:~:text=Chlo rdiazepoxide%20is%20used%20to%20relieve,electrical%20activity %20in%20the%20brain. (last visited Jan. 14, 2025)................................... 80

Michelle Casady, *Teen Jailed in Man's Death,* BRYAN-COLLEGE STATION EAGLE, Oct. 22, 2011 .................................... 181

*"Most Dangerous" Roast Yet,* THE HOLLYWOOD REPORTER (May 30, 2015), https://www.hollywoodreporter.com/news/comedian-jeff-ross-goes-inside-798750 ......................................................... 11, 12

Mr. Hall. Jake Walker, *Hall Trial Moving Ahead,* BRYAN-COLLEGE STATION EAGLE, July 1, 2015 .................................... 186

Rosalee Getterman, *Teen Says He Killed CS Man,* BRYAN-COLLEGE STATION EAGLE, Oct. 23, 2011 .................................... 181

Scott's House is a non-profit Child Advocacy Center serving seven Texas counties that reports "collaborat[ing] with Child Protective Services (CPS) and law enforcement officials on every case . . . and providing victims of child abuse and/or neglect with safety, healing, and justice." Scotty's House, https://www.scottyshouse.org/ (last visited Dec. 24, 2024)...................... 131

Texas A&M, Office of Academic and Business Performance Analytics, *Historical Enrollment,* https://abpa.tamu.edu/getattachment/d341b8a7-7925-46b2-9602-6a10ad79cb13/Overall_Enrollment_Historical.pdf................................... 180

Texas A&M University, *History and Development,* https://catalog.tamu.edu/undergraduate/general-information/history-development/............................................. 180

Texas State Library & Archive Commission, *Population Estimates for Texas Counties, 2010-2017: Arranged in Descending Order,* https://www.tsl.texas.gov/ref/abouttx/popcnty201011.html .................... 180

Thomas J. Reidy, Jon R. Sorensen & Mark D. Cunningham,
*Probability of Criminal Acts of Violence: A Test of Jury Predictive
Accuracy*, 31 BEHAV. SCI. L. 286, 292–98 (2013)
........................................................................................................ 199, 200

*Where My Murderers at?" How Jeff Ross and Comedy Central Tried
to Make Incarceration Funny*, WASHINGTON POST (Jun. 14, 2015),
https://www.washingtonpost.com/news/arts-and-
entertainment/wp/2015/06/14/ .................................................................. 46

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241(a), and 2254(a). Venue is proper in the United States District Court for the Southern District of Texas under 28 U.S.C. § 2241(d) because it is the court for the district within which Mr. Hall was convicted and sentenced.

## PARTIES

Petitioner Gabriel Paul Hall is an inmate of the Texas Department of Criminal Justice (TDCJ). Mr. Hall's TDCJ number is 999599, and he is housed at the Polunksy Unit in Livingston, Texas.

Respondent Eric Guerrero is the Director of TDCJ's Correctional Institutions Division and an agent of the state that has custody of Mr. Hall. He has custody pursuant to the judgment and sentence of death entered against Mr. Hall on October 8, 2015, in *Texas v. Gabriel Hall*, No. 11-06185-CRF-272 (Tex. 272nd Dist. Ct.—Brazos County).

## PROCEDURAL HISTORY

Gabriel Hall was convicted of capital murder and sentenced to death in the 272nd District Court of Brazos County, Texas, on October 7, 2015. 100 RR 132. At trial, Mr. Hall was represented by the Regional Public Defender Office (RPDO). He timely filed a brief on direct appeal in the Texas Court of Criminal Appeals (CCA), raising fifteen points of error under the United States Constitution, Texas Constitution, and Texas Code of Criminal Procedure. *See*

1

Brief of Appellant, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 23, 2019). The CCA heard oral argument on September 18, 2019, and affirmed Mr. Hall's conviction and death sentence on December 8, 2021. *Hall v. Texas*, 663 S.W.3d 15 (Tex. Crim. App. 2021).

Mr. Hall filed an Application for Postconviction Writ of Habeas Corpus by a Person Sentenced to Death in the convicting court on October 17, 2019. 1 SHCR 1–105. He raised seven claims for relief. *Id.* On December 29, 2022, the convicting court designated Mr. Hall's sixth ground for relief—ineffective assistance of counsel for failing to call expert Dr. Ruben Gur, *id.* at 73—as raising controverted issues of material fact and ordered that an evidentiary hearing be held on this claim. *Id.* at 307. At that evidentiary hearing, Mr. Hall called trial counsel John Wright and Jim Drummond. *See id.* at 471. Thereafter, the parties each filed Proposed Findings of Fact and Conclusions of Law on March 15, 2023. *Id.* at 314–89, 390–456.

On March 16, 2023, Mr. Hall filed a Motion to Find Applicant's Right to Due Process in This Proceeding Was Violated Due to Article 26.052 of the Texas Code of Criminal Procedure. *Id.* at 457. This motion was based on trial counsel John Wright's statements to the convicting court at the evidentiary hearing that he would be seeking appointment in capital appeals and asking the convicting court to bear him in mind for such appointments. *Id.* at 457–58.

Mr. Hall argued that trial counsel's statements revealed interests adverse to his client because any finding of ineffectiveness by the convicting court in Mr. Hall's case would prohibit his appointment to capital appeals. *See id.* at 462–63. Mr. Hall also filed a motion in the CCA asking that the convicting court be ordered to amend the Reporter's Record from the evidentiary hearing so that it would include Mr. Wright's adverse statements to the convicting court. *See Ex parte Hall*, No. WR-86,568-02, 2023 WL 4874423 (Tex. Crim. App. July 28, 2023).

Following the convicting court's refusal to rule on his Due Process Motion, Mr. Hall sought mandamus from the CCA, and the CCA ordered the convicting court to rule on Mr. Hall's Motion. *See Ex parte Hall*, No. WR-86,568-02, 2023 WL 8798032 (Tex. Crim. App. Dec. 20, 2023). The convicting court denied Mr. Hall's Due Process Motion, and Mr. Hall unsuccessfully appealed that denial. *See Hall v. Texas*, No. AP-77,121, 2024 WL 1295782 (Tex. Crim. App. March 27, 2024). The CCA also found that the state habeas Reporter's Record should not be amended. *Ex parte Hall*, No. WR-86,568-01, 2024 WL 467871, at *2 (Tex. Crim. App. Feb. 7, 2024).

The convicting court signed its Findings of Fact and Conclusions of Law on May 18, 2023. 1 SHCR 596. The CCA adopted the convicting court's Findings and Conclusions with exceptions and denied relief on February 7, 2024. *Ex parte Hall*, 2024 WL 467871, at *3.

3

On March 21, 2024, this Court appointed the Federal Public Defender's Office for the Northern District of Texas (FPD) to represent Mr. Hall pursuant to 18 U.S.C. § 3599. ECF No. 5; *see also* ECF No. 3. In anticipation of seeking federal habeas corpus relief, Mr. Hall sought from this Court an order to compel the Texas Department of Criminal Justice (TDCJ) to uncuff him during an expert visit, in accordance with TDCJ Polunsky Unit's unwritten policy requiring such an order. ECF No. 11. The Respondent opposed Mr. Hall's motion. ECF No. 12. This Court denied Mr. Hall's motion for uncuffing on November 6, 2024. ECF No. 14. This Court has ordered that Mr. Hall shall have 120 days from the date of filing this Petition to file any amended petition. *See* ECF No. 16.

## STATEMENT OF FACTS

"Gabriel Hall killed Mr. Shaar and he badly wounded his wife, Linda Shaar." 44 RR 239. These are some of the first words trial counsel spoke to the jurors who deliberated in Mr. Hall's capital trial. The State objected; these comments directly violated a motion in limine. *Id.* at 239–41. The trial court instructed the jurors to disregard. *Id.* at 242. Trial counsel began seemingly anew: "[W]hat this case is about is what should happen to Gabriel Hall." *Id.* at 242.

From inception, Mr. Hall's case was about what should happen to Mr. Hall—whether he would live or die. On October 20, 2011, police responded to

4

a 9-1-1 call at the Shaar residence. 78 RR 117–18. Once there, they found Edwin Shaar lying dead on his back in the garage. *Id.* at 123. He bore multiple stab wounds and a gunshot wound to the forehead. *Id.* at 165; 79 RR 74. Linda Shaar was in the kitchen, seated in her wheelchair. 78 RR 128. She also bore multiple stab wounds. *Id.* at 128. Her throat had been slit. *Id.*

High-school classmate Forrest King first identified Mr. Hall based on a news description of the suspect as Asian or Hispanic. 78 RR 256–57. Mr. King said that he had seen Mr. Hall heading in the direction of the Shaar residence shortly before the homicide occurred. 4 Amend. CR 753, 758; 78 RR 212, 249–50.

In the early morning hours on October 21, police appeared at the Hall residence to interview Mr. Hall. 78 RR 284. At the time, Mr. Hall was eighteen years old and lived with his adoptive parents, Karen and Wesley (Wes) Hall, both of whom were out of town. *Id.* at 280, 284; 79 RR 68. Wes Hall, a licensed attorney and former justice of the peace, listened to his adopted son's initial interview with police and appeared to safeguard Mr. Hall's rights during questioning. *See* 79 RR 69.

The following day, Wes Hall picked his adopted son up from school and drove him to the Brazos County Sheriff's Office to give a DNA sample and be fingerprinted. *See* 79 RR 75–77, 102. As police questioning of Mr. Hall grew accusatory, Wes Hall encouraged officers to *Mirandize* his son. *Id.* at 82. Wes

Hall did so to ensure that his son's confession was admissible in court. *See* 129 RR 178. After police *Mirandized* his adopted son, Wes Hall abandoned Mr. Hall to police interrogation. 79 RR 82–83; 129 RR 78.

Mr. Hall thereafter gave a series of detailed confessions describing how he had killed Mr. Shaar and attempted to kill Mrs. Shaar. 79 RR 83. At the conclusion of the initial interrogation, law enforcement placed Mr. Hall under arrest. *See* 129 RR 78. Mr. Hall's confessions ultimately led police to the attic of another home that the Halls owned. *See* 79 RR 99. There, Mr. Hall had hidden the weapons he had used in the attack. *Id.* at 96–97.

The trial court appointed the Regional Public Defender Office (RPDO) to represent Mr. Hall on November 2, 2011. 1 Amend. CR 21. At the time, RPDO "provide[d] trial level legal representation of Texas capital defendants for approximately 160 subscribing Texas counties." 2 Amend. CR 292. Brazos County was a new subscriber to RPDO when it first appointed the entity to represent Mr. Hall. *Id.* at 292.

Counsel expended significant funds representing Mr. Hall. Counsel's final accounting indicates counsel expended more than $700,000 in county funds in Mr. Hall's case. The County Auditor placed that total at more than $800,000. Counsel's expenditure was highly publicized. *E.g.*, Ex. 12 at 161, Jake Walker, *Hall Trial Moving Ahead*, Bryan-College Station Eagle, July 1, 2015, at A9. But this dollar amount belies the case's lack of coherence.

6

Counsel's efforts to investigate and prepare for the punishment phase of Mr. Hall's capital trial were chaotic and disorganized. Counsel's trial preparations lacked the coherence necessary to identify or follow up on any leads or red flags unearthed. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 392 (2005).

Because Mr. Hall was adopted from the Philippines when he was eleven, mitigation preparations would have to include investigation of his life there. Counsel's multiple international trips only added to the case's price tag. *See* 2 Amend. CR 304–05, 421–22, 432; 6 Amend. CR 1375. Trial counsel relied on numerous and oft-changing investigators to unpack Mr. Hall's complex and multi-faceted history. Nonetheless, the team lacked a qualified and experienced mitigation specialist to identify themes and potential leads from interactions with Mr. Hall, document review, and interviews with family and other witnesses. See, *e.g.*, 7 Amend. CR 1480.

This fractious effort meant that, among other things—despite multiple memoranda and communications suggesting Mr. Hall had a developmental disorder such as autism spectrum disorder—trial counsel never sought to have him evaluated for this condition. And though trial counsel retained an expert in fetal alcohol spectrum disorder, they failed to adequately investigate whether Mr. Hall's mother consumed alcohol while pregnant with him. *See* 97 RR 110. Trial counsel similarly failed to adequately investigate Filipino culture or otherwise ensure that their team was culturally competent to effectively

7

interview Mr. Hall's biological family. Nor did counsel investigate the cultural displacement of coming to Texas from the Philippines after adoption by a white family, and at a formative age. *See* 2 Amend. CR 422.

As the case approached trial, lead counsel was absent and unavailable for prolonged periods of time due to other capital proceedings and personal-health issues. *E.g.*, 8 Amend. CR 1681–88, 1712. Importantly, lead counsel was the sole capitally qualified attorney on Mr. Hall's case. Other counsel gave little direction to the rest of the trial team.

On top of this, RPDO limited stateside travel funding. Much of the investigation needed in College Station and elsewhere screeched to a standstill. As a result, counsel failed to identify, interview, or follow-up with countless witnesses or conducted only truncated interviews on the eve of trial. As trial unfolded, counsel expended the last of their court funding but did not request more. This left the defense team without appropriate expert assistance to scrutinize the State's future-dangerousness and mental-health evidence. The resulting punishment-phase presentation was chaotic, disorganized, and inconsistent. Moreover, it failed to present an individualized picture of Mr. Hall's developmental trajectory and impairments. This picture is "a constitutionally indispensable part of the process of inflicting the penalty of death." *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

The State piled onto a largely unrebutted case for guilt and case future dangerousness. As the case approached trial, inmates incarcerated with Mr. Hall came out of the woodwork to relay statements he had supposedly made in custody. *E.g.*, 7 Amend. CR 1634–37, 1666–67; 11 Amend. CR 2499-500; 3 Supp. 6 CR 1050-51. In all, the State trotted out a line of jailhouse witnesses to urge the to jury find that Mr. Hall was a future danger. 82 RR 235–51; 85 RR 7–24, 46–68; 99 RR 20–33. The State argued that each of these uncorroborated informant statements supported their case for death. 100 RR 34–36, 112-15.

Most glaringly, the State opened wide the doors of the Brazos County Jail to insult comedian Jeff Ross and his video-camera-laden crew. *See* 65 RR 56–57, 78–79, 95. Though the jail had originally admitted Mr. Ross to film a series of stand-up comedy shows and planned interviews, *id.* at 38, 53, it altered this scheme at the last moment, i*d.* at 57–59, 61–62. Without warning, the jail granted Mr. Ross and his crew near-unfettered access to its dormitories and the inmates living there. *Id.*

As part of its standard practice, RPDO had informed the jail that it was to have no contact with Mr. Hall. 65 RR 65–66. Jail staff nonetheless escorted Mr. Ross and the ensuing cameras to Mr. Hall's dormitory. *Id.* at 41, 78, 98; 89 RR 40. Staff stood watching as Mr. Ross approached Mr. Hall and interviewed him on camera. *Id.* at 84, 87–91. Only then did the jail warden decry that Mr. Hall was off limits. *Id.* In the same breath, the warden asked

9

Comedy Central for the interview tape. *Id.* at 46–47. The warden then informed the State, guaranteeing them access to the footage in support of their case. *Id.* at 46–48, 67. The State played this interview footage at trial and relied on it when arguing that Mr. Hall was a future danger and should be sentenced to death. *E.g.*, 100 RR 44, 125.

The crimes charged in Mr. Hall's case are plainly horrific. When one looks only at the price tag of Mr. Hall's capital trial, counsel's failures are similarly inexplicable. But the sticker price hides the chaos and incompetence underneath, along with the countless ways in which trial counsel failed to conduct even the most cursory investigation. The State recognized the lack of an adversary in Mr. Hall's corner and assured a death sentence by building a future-dangerousness case at the expense of Mr. Hall's constitutional rights. Accordingly, Mr. Hall respectfully requests this Court grant the following petition for writ of habeas corpus and order a new trial.

## CLAIMS FOR RELIEF

### Claim One: The trial court allowed the jury to hear statements from Mr. Hall that the State obtained in violation of the Sixth Amendment.

Mr. Hall's Sixth Amendment right to counsel had attached by the time that Jeff Ross entered the Brazos County Jail to film a comedy special. Once this right had attached, the State was barred from knowingly circumventing it. The State nonetheless did exactly that when—without notifying counsel—

10

it invited a celebrity insult comic in to film a special in which its inmates—including Mr. Hall—were the butt of the joke. In doing so, the State violated Mr. Hall's Sixth Amendment right to counsel.

This claim was raised as Claim One on direct appeal. This claim was adjudicated on the merits by the CCA, *Hall v. Texas*, 663 S.W.3d 15, 30 (Tex. Crim. App. 2021), but this Court can review it *de novo* because Mr. Hall can meet 28 U.S.C. § 2254(d).

### A. Statement of Facts

#### 1. Defense counsel sent Brazos County Jail a no-contact letter.

Shortly after being appointed to Mr. Hall's case, the Regional Public Defender Office (RPDO) sent a letter to the Brazos County Jail (the jail) requesting that law enforcement "make no further contact via phone, writing, or in person with Gabriel Hall, without the express written approval of my office." 114 RR 143–44. The letter stated that "all future communication with Gabriel Hall must first be approved by my office." *Id*.

#### 2. The jail allowed Jeff Ross to film a stand-up Comedy Central special inside the facility.

In the year before Mr. Hall's trial, Warden Wayne Dicky responded to a query that Comedy Central producers were looking for a jail to host a comedy special for Jeff Ross. 65 RR 36–37, 40. Jeff Ross is a celebrity insult comic. Seth Abramovitch, *Comedian Jeff Ross Goes Inside Texas Prison for Most*

11

*"Dangerous" Roast Yet*, THE HOLLYWOOD REPORTER (May 30, 2015), https://www.hollywoodreporter.com/news/comedian-jeff-ross-goes-inside-798750. Mr. Ross is known for his "roasts," which are a brand of humor in which a group of people gather to make embarrassing and unflattering jokes about a specific person in front of an audience. *See id.*; Jessica Contrera, *"Where My Murderers at?": How Jeff Ross and Comedy Central Tried to Make Incarceration Funny*, WASHINGTON POST (Jun. 14, 2015), https://www.washingtonpost.com/news/arts-and-entertainment/wp/2015/06/14/where-my-murderers-at-how-jeff-ross-and-comedy-central-tried-to-make-incarceration-funny/?utm_term= .31a3460fb225.

Warden Dicky felt that hosting this show at the jail would incentivize good inmate behavior. 65 RR 37. The Brazos County Sheriff agreed with Warden Dicky's decision to invite Comedy Central and Jeff Ross to the jail. *Id.* at 39–40.

The show's producers toured the jail before agreeing to film the special there. *Id.* at 37. Warden Dicky and Bill Ballard of the Brazos County Attorney's Office reviewed the contract between the jail and the production company Viacom and finalized it on February 16, 2015. *Id.* at 41–42; 10 Amend. CR 2343–50. The contract required Viacom to compensate the jail for any "reasonable, actual, direct, verifiable overtime pay" issued as part of the filming process, but the jail otherwise received no compensation. 65 RR 42; 10

Amend. CR 2344. No one raised concerns regarding inmate access to counsel or possible self-incrimination. 65 RR 42. At no point did Warden Dicky, the Sheriff, or anyone in their agency consider the implications for inmates' right to counsel. *Id.* at 43.

### 3. The jail informed inmates of the stand-up Comedy Central special.

Originally, the jail intended for inmates to attend the show only if both they affirmatively requested to and the jail approved. 65 RR 38. Inmates were informed of the show via dorm officers and posters stating that Mr. Ross planned to roast inmates for the show. *Id.* at 38, 52. The dorm posters additionally stated that "if you are willing to let me interview you on camera, please sign up." 114 RR 142. But although Mr. Ross expected at least 150 inmates to attend per show, only half that number were interested in attending. 65 RR 102–03. Inmates declined to attend out of concern that Mr. Ross was "going to portray me as a horrible person that I'm not." *Id.* at 103.

This low interest spurred Mr. Ross to ask if he could tour the dorms to gin up interest for the special. *Id.* at 102–03. He wanted to explain to the inmates that "he just wanted to make them laugh, try to inspire them, stuff like that." *Id.* The jail approved this new filming plan. *See id.* at 105. But to Warden Dicky's knowledge, no one warned the inmates that statements made during filming could be used against them. *Id.* at 43.

### 4. Mr. Ross and his Comedy Central crew entered the jail dorms and filmed an interview with Mr. Hall.

The stand-up performance took place on February 28, 2015. 65 RR 95. Over the two preceding days, Mr. Ross went into various jail dorms[2] and filmed conversations with inmates there. *Id.* at 62, 95, 102. One of those conversations was with Mr. Hall. *Id.* at 64.

The footage shows that Mr. Ross enters the 64-man dorm and immediately walks to Mr. Hall's table and sits down to Mr. Hall's left. 125 RR 10 at 0:07. The camera is positioned to Mr. Ross's left so that it centers on Mr. Hall's face and captures Mr. Ross in profile. *Id.* Early in the conversation, one of the other men at the table identifies himself as a Dirty White Boy. *Id.* at 1:03–1:18. The Dirty White Boys are a known white supremacist gang. *See* 101 RR 83 (identifying the Dirty White Boys as Aryan Brotherhood affiliates and airing interviews with Nazi inmates at the jail).

Although the other men at the table talk to Mr. Ross for most of the video, Mr. Ross repeatedly directs questions to Mr. Hall. Those questions include several categories of information relevant to the claims raised here:

---

[2] A jail dorm is also referred to as a pod.

1) ***Discussion of Mr. Hall's Case, Including the Death Penalty:***

- Mr. Ross asks Mr. Hall if he is on trial. 125 RR 0:31. Mr. Hall replies that "legally, I can't discuss about the case," but Mr. Ross presses that Mr. Hall "must've done something crazy." *Id.* at 0:34-0:44. Mr. Hall agrees that the allegations against him are serious. *Id.* at 0:46. The camera then zooms in on Mr. Hall, and Mr. Ross confronts him, asking, "Do you ever laugh?" *Id.* at 2:05. Mr. Hall demurs, stating, "On special occasions." *Id.* at 2:10.

- Mr. Ross asks if Mr. Hall was "in here for . . . hacking somebody else's computer?" *Id.* at 15:26–15:34. The other inmates laugh; one states, "Hacking being the operative word!" *Id.* Mr. Hall attempts to play along, stating, "yeah, I used a machete on someone's screen." *Id.* at 15:37.

- Mr. Ross brings up the death penalty. *Id.* at 5:08. Mr. Hall responds that, "They'll hang you . . . well, they'll basically screw you over, over the most petty shit." *Id.* at 5:27–5:35.

- Mr. Ross brings up the death penalty a second time, offering creative ways in which people might be executed. *Id.* at 8:32–9:49.

- Mr. Ross expressly asks Mr. Hall, "what are you in here for?" *Id.* at 15:34.

**2)** *Evidence Suggesting Mr. Hall is a Future Danger:*

- Mr. Ross states that Mr. Hall "seems like a fucking scary dude, I don't know what it is." *Id.* at 15:44. Mr. Hall responds that he "wouldn't hurt a fly," but jokes that "humans are annoying" and should be left "to their own devices." *Id.* at 15:49–16:01.

- Mr. Ross asks Mr. Hall if he has any advice for his show. Mr. Hall replies, "Don't get caught—don't get in trouble, I mean." *Id.* at 6:41–6:46. Confused, Mr. Ross attempts to correct Mr. Hall, stating, "No, I mean for my show." *Id.* at 6:46. Hall laughs. *Id.*

- Mr. Ross hopes aloud that the other inmates have a better sense of humor than Mr. Hall, who hasn't laughed "since fucking God knows when." *Id.* at 6:53. Mr. Hall jokes that he was born frowning. *Id.* at 6:57. Mr. Ross states that Mr. Hall "seems very fucking zen right now." *Id.* at 7:05.

**3)** *Racial Jokes and Stereotypes about Asians:[3]*

- When Mr. Hall states that he laughs "on special occasions," the professed Dirty White Boy repeats "oh-k*asian*," dragging out the

---

[3] Historically, Filipinos have not always considered themselves Asian. Due to significant ethnic and colonial differences, many identify instead as Pacific Islander or even Hispanic. This pleading refers to Mr. Hall as Asian in this instance because the racial jokes directed at him stem from an assumption that he is Asian.

16

ending of the word. "Asian," he then says again. The camera pans to this inmate, who gives Mr. Ross a knowing look. *Id.* at 2:10–2:27.

- One inmate suggests that Mr. Hall share one of his own jokes with Mr. Ross. Mr. Hall then tells a series of pejorative jokes about Asians. *Id.* at 7:37–8:14.

- The Dirty White Boy asks Mr. Ross what he would do "if you was in the woods and you saw an Asian dude wearing a black cowboy hat?" *Id.* at 16:02–17:14. The inmates urge Mr. Hall to recount how he would dress as a cowboy on Fridays to scandalize his high-school classmates, who thought it was "just wrong" for an Asian to dress as a cowboy. *Id.* Mr. Hall then refers to himself as a "yellowneck." *Id.*

- "This guy, Slim Sushi over here?" asks Mr. Ross. The men surrounding Mr. Hall burst out laughing. "Yeah, Slim Sushi!" says one. "Good one!" says another. "That's excellent." *Id.* at 16:07–16:17.

Mr. Ross excuses himself from the group after 17 minutes and 50 seconds of filming.

### 5. Jail staff watched Mr. Ross interview Mr. Hall.

Quartermaster Courtney Waller was responsible for escorting Mr. Ross and his team throughout the jail. 65 RR 95. She informed Warden Dicky of

17

Mr. Ross's filmed interview with Mr. Hall minutes after the conversation occurred. *Id.* at 46. She allegedly did so out of concern that Mr. Hall's trial had "already gotten enough publicity, and it's been pushed back so many times." *Id.* at 84. Although Quartermaster Waller had seen Mr. Ross approach Mr. Hall in the dorm, she did not stop the conversation or filming because it "was not my job description." *Id.* at 87.

This news of Mr. Hall's interview made Warden Dicky uncomfortable. *Id.* at 46. He immediately contacted the film crew and told them that they needed to provide him with the raw footage of the interview with Mr. Hall. *Id.* at 46–47. He did not notify Mr. Hall's counsel that the filmed interview had occurred. *Id.* at 50–51.

### 6. Mr. Hall was the only capital defendant barred from attending the comedy show.

Neither Mr. Hall nor multiple other inmates had signed releases before speaking with Mr. Ross. Quartermaster Waller therefore worked with dorm officer Sergeant Preston to make sure releases were signed for all dorm inmates. 65 RR 81; 101 RR 87–89. Mr. Hall and the other inmates were told that they could not attend Mr. Ross's comedy special unless they signed a release. 65 RR 38–39. In relevant part, the release advised the inmates that the film crew might collect information of a "personal, private, disparaging, embarrassing, and/or unfavorable nature." 101 RR 87–89.

18

Warden Dicky barred Mr. Hall from attending the comedy show, even though he had signed the release. 65 RR 44. Warden Dicky did not think it was in anyone's best interest for Mr. Hall to attend the show because Mr. Hall had "a high-profile case." *Id.*

Warden Dicky nevertheless allowed Christian Olsen, another presumably "high-profile" jail inmate facing capital murder charges, to attend the special. *Id.* at 54. Warden Dicky did not remove Mr. Olsen because he "wanted to make available as many people as possible." *Id.*

### 7. The State obtained Mr. Ross's interview footage.

Viacom refused to provide Warden Dicky with a copy of Mr. Hall's interview footage without a subpoena. 65 RR 47. Warden Dicky forwarded that notice to the District Attorney's Office because he "felt like it was something they needed to be aware of." *Id.* at 47–48. Warden Dicky did not inform Mr. Hall's counsel of the filmed interview, and they did not receive an opportunity to move to quash the subpoena. 71 RR 235.

Warden Dicky stated that, when he notified the District Attorney's Office of the footage, he did not consider whether they might use the footage against Mr. Hall at trial. 65 RR 48–49. Warden Dicky conceded, however, that he was used to providing the District Attorney with material from inmate phone calls and letters. *Id.* Warden Dicky did not inform Mr. Hall's counsel that the State had obtained footage of the interview. *Id.* at 50–51.

19

**8. The taped special showed Mr. Ross discussing the death penalty and information about violent offenders with Warden Dicky and Quartermaster Waller, respectively.**

The final cut of the Comedy Central special aired on June 13, 2015. It included several clips in which Mr. Ross interviewed Warden Dicky and Quartermaster Waller. Warden Dicky told Mr. Ross that "there are people in here who could be subject to the death penalty." 101 RR 83 at 26:08–26:21. Quartermaster Waller told Mr. Ross that dorm 3A "is maximum security inmates" who were incarcerated for "assault with deadly weapons, murder." *Id.* at 5:00–5:38.

**9. The State presented the tape to show future dangerousness.**

The defense moved to suppress the Comedy Central tape on August 10, 2015, 10 Amend. CR 2331–56, and the trial court held a hearing on the motion, *see* 65 RR 1. Both Warden Dicky and Quartermaster Waller testified at the suppression hearing. *Id.* at 36, 77. They testified that, to their knowledge, no one informed Mr. Ross about the charges against Mr. Hall before his interview. *Id.* at 40, 97–98. Warden Dicky stated that he never asked Mr. Ross or another Comedy Central representative to target any particular inmate. *Id.* at 57–58. He and Quartermaster Waller similarly stated that they never asked Mr. Ross or other Comedy Central representatives to gather incriminating evidence. *Id.*

at 61, 97. Warden Dicky also stated that he did only as the producers and crew members requested. *Id.* at 40.

The court denied the motion to suppress on August 26, 2015. In doing so, the court noted that Mr. Ross's conduct and that of the other filmed inmates was "pretty detestable." 71 RR 254–55. It had "a little problem with" the jury hearing Mr. Ross's opinion of Mr. Hall, or the aggravating jokes that other inmates made about him. *Id.* at 262–63. It expressed concern "that some of what they did is going to rub off on [Mr. Hall]," *id.* at 255, and that the video "gets a thought into a jury's mind [*sic*] that is coming from Jeff Ross," *id.* at 261.

The court asked that the State cut down the video to remove the most problematic parts, but otherwise denied the defense's motion to suppress. *Id.* at 263–64. The State offered the video during the punishment phase of trial. 89 RR 45. At closing arguments, the State repeatedly cited to Mr. Hall's comments in the video to show future dangerousness. 100 RR 44, 125–26.

### B. Legal Standard

The Sixth Amendment guarantees that a defendant "need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Estelle v. Smith*, 451 U.S. 454, 470 (1981) (quoting *United States v. Wade*, 388 U.S. 218, 226–27 (1967)) (internal quotation marks omitted). A

21

"critical stage[]" of prosecution is any confrontation in which a defendant's rights may be inherently and substantially prejudiced, and where counsel could help prevent that prejudice. *Wade*, 388 U.S. at 227. The potential for substantial prejudice arises when suggestive influences are inherent to the context of the confrontation. *Id*.

This stands in contrast to non-critical stages like the collection or analysis of the defendant's fingerprints, blood, clothing, or hair. *Id*. These stages are non-critical because variations in techniques for carrying out those analyses are "few enough[] that the accused has the opportunity for a meaningful confrontation of the Government's case at trial" through cross-examination and rebuttal evidence. *Id*. at 227–28. Put differently, non-critical stages are distinct because there is "a minimal risk that his counsel's absence might derogate from his right to a fair trial." *Id*. at 228.

Once the right to counsel has attached, the Sixth Amendment compels the State to respect and preserve a defendant's choice to seek assistance. *Maine v. Moulton*, 474 U.S. 159, 171 (1985). The State may not circumvent a defendant's choice to seek assistance of counsel. *Id*. at 176. When the State exploits an opportunity to confront a defendant in the absence of counsel, it breaches its Sixth Amendment obligations just as if it had intentionally created that opportunity. *Id*. A defendant will seldom have direct proof that the State knowingly circumvented the right to counsel. *Id*. at 176 n.12 (quoting *United*

*States v. Henry*, 447 U.S. 264, 271 (1980)). It is therefore enough for a petitioner to show that "the State 'must have known' that its agent was likely to obtain incriminating statements from the accused in the absence of counsel." *Id.* (citation omitted).

The State's "affirmative obligation not to act in a manner that circumvents" Sixth Amendment protections gives rise to certain notice requirements. *Moulton*, 474 U.S. at 176. Specifically, the State cannot admit at trial the results of a confrontation with the accused unless the defendant and his counsel received prior notice of the nature and scope of the confrontation. *See Estelle*, 451 U.S. at 470–71; *Wade*, 388 U.S. at 237. The State's notice must be actual, not constructive. *See Satterwhite v. Texas*, 486 U.S. 249, 255 (1988). And the timing and substance of the notice must be sufficient to allow defense counsel the opportunity to consult with the defendant about the uses to which the confrontation could be put. *Id.*; *Crawford v. Epps*, 531 Fed. App'x. 511, 517 (5th Cir. 2013); *see also Gholson v. Estelle*, 675 F.2d 734, 743 (5th Cir. 1982).

Actions can be attributed to the State even if the person eliciting the incriminating statements is not a state agent at the time that they confront the defendant. At the time of the confrontation, it does not matter whether the defendant is questioned by a police officer or by a neutral party facilitated by the State. *Estelle*, 451 U.S. at 467. But once a party goes beyond its originally

23

stated purpose and contributes to the case against the accused, the party's role changes and becomes "essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id*.

Of course, a defendant may waive his right to consult with counsel. *Faretta v. California*, 422 U.S. 806, 835 (1975). But that waiver must be knowing and intelligent. *Id*. The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id*. (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

The sufficiency of a waiver is evaluated pragmatically by asking "what purposes a lawyer can serve at the particular stage of the proceedings in question, and what assistance he could provide to an accused at that stage." *Iowa v. Tovar*, 541 U.S. 77, 90 (2004) (quoting *Patterson v. Ill.*, 487 U.S. 285, 298 (1998)). The kind of admonishment required therefore depends on the totality of the circumstances. *Id*. at 88. A court must consider a defendant's education, sophistication, the complexity of the charge, and the stage of the proceeding when evaluating the sufficiency of a waiver admonishment. *Tovar*, 541 U.S. at 88. This allows a court "to determine the scope of the Sixth Amendment right to counsel, and the type of warnings and procedures that

24

should be required before a waiver of that right will be recognized." *Id*. at 90

(quoting *Patterson*, 487 U.S. at 298).

A Texas court can only sentence a person to death if a jury finds beyond

a reasonable doubt that the defendant would probably "commit criminal acts

of violence that would constitute a continuing threat to society." Tex. Code

Crim. Proc. art. 37.071 § 2(b)(1). The State may present "any evidence that the

court deems relevant" to sentencing, insofar as that evidence does not violate

the federal constitution. Tex. Code Crim. Proc. art. 37.071 § 2(a)(1).

A federal habeas petitioner must show that the trial error resulted in

actual prejudice in order to be entitled to habeas relief. *Brecht v. Abrahamson*,

507 U.S. 619, 637 (1993). The test is "whether the error 'had substantial and

injurious effect or influence in determining the jury's verdict.'" *Id*. (quoting

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## C. Argument

The State violated Mr. Hall's Sixth Amendment right to counsel. It did

so when it allowed Mr. Ross to interview Mr. Hall without warning him or his

counsel, or otherwise permitting them to consult before Mr. Ross entered the

jail. The State cemented that this confrontation was a critical stage of the

proceedings when the State sought possession of the interview footage between

Mr. Ross and Mr. Hall. Because Mr. Hall did not waive his Sixth Amendment

rights, the footage was admitted in violation of his Sixth Amendment right to counsel.

### 1. Mr. Ross's interview of Mr. Hall was a confrontation within the meaning of the Sixth Amendment.

Mr. Ross and his film crew confronted Mr. Hall when they sat at his table with cameras rolling. Although Mr. Hall told Mr. Ross that he did not wish to discuss his case, 125 RR 10 at 0:34, Mr. Ross persisted in asking him questions about the death penalty and the seriousness of the offense with which Mr. Hall was charged, *id.* at 0:07–0:46, 5:08, 15:26–16:01. This confrontation violated Mr. Hall's Sixth Amendment rights. Because the poster was the only information that inmates had before filming, neither Mr. Hall nor his counsel knew that Mr. Ross planned to enter the jail dorms. 65 RR 51; *see also* 114 RR 142. This precluded Mr. Hall and his counsel from consulting about the interview. The effect was that Mr. Hall's counsel did not have the opportunity to prevent the resulting harm.

Indeed, it is hard to imagine how any conversation could be more suggestively influenced than the one that took place between Mr. Ross and Mr. Hall. The quartermaster escorted Mr. Ross into the dorm with a camera crew of nine other people. 65 RR 78. Once in the dorm, Mr. Ross gravitated toward Mr. Hall. Mr. Hall was a very slight Filipino youth in a dorm of older, larger men—many of whom were open white supremacists. 125 RR 10 at 1:03–

26

1:18; 101 RR 83. And critically, Mr. Ross's claim to comedic fame was his ability to insult or mock virtually anything. It is not surprising, then, that Mr. Hall submitted to self-deprecating humor in Mr. Ross's presence. Suggestive influences were therefore inherent to the context of Mr. Ross's confrontation of Mr. Hall.

Mr. Ross's confrontation of Mr. Hall stands in stark contrast to non-critical stages like fingerprint analysis or blood collection. This is because, unlike fingerprints or blood, the permutations under which celebrities can be brought into a jail to elicit inculpatory evidence are not "few enough." *See Wade*, 388 U.S. at 227–28. There are an infinite number of ways in which a jail could bring in celebrity performers to film defendants as "incentives for positive behavior" that would similarly implicate a defendant's rights. 65 RR 37. For example, the jail could bring in Pastor Joel Osteen so that jailed defendants could confess their sins; or documentarian Michael Moore to accuse them; or any number of other political commentators or reality stars could film their own specials.

If Mr. Ross's filmed and unnoticed conversation with Mr. Hall was acceptable, these examples must be acceptable as well. Mr. Ross's entry into the dorms therefore presented a substantial and predictable risk that Mr. Hall's inability to consult with counsel might derogate from his right to a fair trial. Although a defendant is responsible for what he communicates when

he reaches out to the free world, it goes too far to say that the State may bring a flame into a cage of moths and then blame them for burning.

### 2. The State failed to provide Mr. Hall adequate notice of the pending confrontation.

At the time Mr. Ross entered the jail, Mr. Hall had already been indicted and was months away from trial; his Sixth Amendment right to counsel had attached long ago. This meant that the State was compelled to preserve Mr. Hall's ability to avail himself of his Sixth Amendment right to the assistance of counsel. Once the State decided to facilitate Mr. Ross's off-the-cuff interviews with the men in the jail, it was required to provide both Mr. Hall and his counsel with prior notice of the nature and scope of Mr. Ross's presence. It did not do so, and Mr. Hall did not have an opportunity to consult with counsel about how his taped interview with Mr. Ross could be used at trial.

This was not a situation in which the State obtained Mr. Hall's filmed statements by luck or happenstance. Mr. Ross and his film crew appeared because jail officials brought them there. In doing so, the State intentionally created a situation that was likely to induce incriminating information in the absence of counsel. This violates the Sixth Amendment.

The posters announcing Mr. Ross's comedy show as well as his desire to "interview" inmates at the jail did not provide Mr. Hall and his counsel with

adequate notice. The law does not construe notice simply because Mr. Hall's counsel could have theoretically walked past one of these flyers during a visit in the jail. *Cf.* 71 RR 252; *see Satterwhite*, 486 U.S. at 255.

Moreover, the posters informed readers that Mr. Ross would only interview those who signed up. 114 RR 142. This announcement did not provide Mr. Hall with notice that Mr. Ross might enter his dorm with cameras rolling and attempt to interview him. By failing to provide Mr. Hall or his counsel with advance notice of Mr. Ross's filming in the dorm, the State acted in a manner that circumvented Mr. Hall's Sixth Amendment protections.

### 3.  Mr. Ross was a government agent.

The State knowingly exploited the opportunity to film Mr. Hall's misguided attempts at humor and thus obtained evidence in support of its future dangerousness presentation. As the Supreme Court anticipated, Mr. Hall has struggled to obtain direct proof that the State that knew Mr. Ross would likely obtain incriminating statements in the absence of counsel. *See Moulton*, 474 U.S. at 176 n.12. Yet, sufficient evidence shows that the State must have or should have known that Mr. Ross would do so:

- the jail requested a copy of the footage as soon as Mr. Ross finished filming the conversation, 65 RR 46;

- after the conversation was filmed, the jail obtained Mr. Hall's signature on a release as a condition of attending the comedy show,

yet the jail 1) knew Mr. Hall would be barred from attending the
comedy show, *id.* at 44, 81, and 2) immediately admonished the film
crew to refrain from airing the footage, thus obviating any need for a
release, *id.* at 59; and

- the jail regularly forwards materials about inmates to the District
  Attorney's office if it feels it may assist the prosecution of a case, *id.*
  at 48–49.

A person can be a state agent without being a paid government
informant. *See Estelle*, 451 U.S. at 467. Nor need there be an explicit
agreement between the State and the third party for the latter to be deemed a
state agent. Mr. Ross and his film crew were neutral parties at the time the
jail guided them into Mr. Hall's dorm. But the group's role changed and became
"essentially like that of an agent of the State" when Mr. Ross went beyond his
originally stated purpose of creating comedy. *See id*. This moment is apparent
from the footage. There, Mr. Ross:

- repeatedly asks about his charges after Mr. Hall states that he does
  not want to discuss his case, 125 RR 10 at 0:44, 15:26;

- asks Mr. Hall about the death penalty twice, *id.* at 5:08, 8:32–9:49;

- expresses discomfort with Mr. Hall's demeanor at least five times,
  noting that Hall "seems like a fucking scary dude," *id.* at 2:05, 3:34,
  6:53, 15:06, 15:44.

30

Because the film crew was taping the entire conversation, no one needed to testify for the prosecution as to future dangerousness. The tape was admitted instead, accomplishing the same purpose at trial. *See* 89 RR 45; 125 RR 10.

### 4. Mr. Hall never waived his Sixth Amendment right to consult with counsel.

Mr. Hall was not made aware of the scope of the dangers or disadvantages before speaking with Mr. Ross. Mr. Hall attempted to protect his case from the very beginning, when he told Mr. Ross that he couldn't talk about his case. 125 RR 10 at 0:44. Neither the release nor anything else indicated that, by talking to Mr. Ross, Mr. Hall could undermine his case even without talking about charges. *See* 101 RR 87–89. Moreover, Mr. Hall had not seen the release until after he was interviewed by Mr. Ross. He therefore could not have decided to talk to Mr. Ross "with eyes wide open." *Faretta*, 422 U.S. at 835 (quoting *Adams*, 317 U.S. at 279).

As noted *supra*, if Mr. Hall had been able to consult with his defense counsel prior to the encounter with Mr. Ross, counsel could have warned Mr. Hall not to speak to Mr. Ross at all. And, if either counsel or Mr. Hall had been warned, counsel also could have admonished Mr. Hall that anything he said to Mr. Ross could likely be used against him at the punishment phase.

On the totality of the circumstances, the State cannot show that Mr. Hall or his counsel ever received sufficient notice of Mr. Ross's dorm interviews.

Mr. Hall had only recently obtained his GED at time that Mr. Ross entered the jail dorm. Mr. Hall's likely developmental disorder or other neurodivergence means that, despite using sophisticated speech, Mr. Hall has a significantly sub-average understanding of social dangers. Even when the defendant is neurotypical, a significant role for capital-defense counsel is to advise the defendant on the breadth of material that the State may use to show future dangerousness. At minimum, the State was required to provide Mr. Hall with an explicit warning against speaking to Mr. Ross. *See Tovar*, 541 U.S. at 89.

### 5. Admitting the video at punishment was harmful.

To sentence Mr. Hall to death, the jury had to conclude that Mr. Hall would probably commit criminal acts of violence that would constitute a continuing threat to society. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1). But the court erred in allowing the jury to hear Mr. Ross's recorded interview of Mr. Hall. This is because the State violated Mr. Hall's Sixth Amendment right to counsel.

The trial court's erroneous admission of the Comedy Central footage prejudiced Mr. Hall. That is because the Comedy Central footage had a substantial and injurious effect or influence on the jury's decision that Mr. Hall was a probable future danger and that such probability outweighed the mitigation presentation such that Mr. Hall should be sentenced to death.

*Brecht*, 507 U.S. at 637. Mr. Hall is therefore entitled to a new punishment-phase proceeding.

### D. This Court can review the merits of this claim *de novo.*

Mr. Hall raised this claim as Claim One on direct appeal. Brief of Appellant at 29–64, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 23, 2019). Although this claim was adjudicated on the merits, Mr. Hall can meet both § 2254(d)(1) and § 2254(d)(2). He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *Moulton*, 474 U.S. 159; *Estelle*, 451 U.S. 454; *Henry*, 447 U.S. 264; *Wade*, 388 U.S. 218; *Massiah*, 377 U.S. 201. He can also meet § 2254(d)(2) because the state court's decision is based on an unreasonable determination of the facts based on the record before it.

**Claim Two: Mr. Hall's death sentence violates the Fourteenth Amendment's Due Process Clause because the State premised the Comedy Central tape's admissibility on false testimony from jail employees.**

Jail officials testified falsely about the role they played in ensuring that Mr. Ross interviewed Mr. Hall. They also testified falsely as to Mr. Hall's advance notice that the interview would occur. This false testimony violated the Fourteenth Amendment's Due Process Clause.

Mr. Hall raised this as Claim One on state habeas. SHCR 38–59. The CCA dismissed this claim as procedurally barred, stating that it should have been raised on direct appeal. *Ex Parte Hall*, WR-86,568-01, 2024 WL 467871, *2 (Tex. Crim. App. Feb. 7, 2024); *see also* SHCR 144–47. This bar is neither adequate nor independent in that it is neither "firmly established [nor] regularly followed." *Lee v. Kemna*, 534 U.S. 362, 376, 385 (2002). Moreover, Mr. Hall effectively complied with established Texas procedural rules. In the alternative, Mr. Hall can show cause and prejudice to excuse any procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## A.  Statement of Facts

The facts of Claim One, *supra*, are incorporated here by express reference and applied to this claim. Additional relevant facts are reproduced below. Notably, Mr. Hall has never received copies of the rest of Comedy Central's raw footage in the jail, which may include additional evidence of false testimony besides that pleaded here.

### 1. Warden Dicky and Quartermaster Waller falsely testified that no one influenced the Comedy Central crew to talk to Mr. Hall.

At the suppression hearing, Warden Dicky testified that, to his knowledge, Mr. Ross was not informed about the charges against Mr. Hall before he filmed the special. 65 RR 40. But in his aired comedy special interview footage with Mr. Ross, Warden Dicky discussed the use of capital

34

punishment in Texas. 101 RR 83. He also stated that some of the jail inmates are facing the death penalty. *Id.*

Quartermaster Waller testified that nobody asked her to direct Mr. Ross to ask inmates incriminating questions while in the jail. 65 RR 97. She added that she never discussed Mr. Hall with Mr. Ross. *Id.* To her knowledge, neither Mr. Ross nor anyone else at Comedy Central "even knew who Gabriel Hall was." *Id.* at 98. But in her aired interview footage with Mr. Ross for the comedy special, Quartermaster Waller told him about the various units and the types of inmates they contained. 101 RR 83.

> ### 2. Warden Dicky and Quartermaster Waller falsely characterized that, outside of safety escorts, they acted as neutral observers during the Comedy Central filming.

When asked if he conferred "in detail about the content of the program and the format of the program with Mr. Ross or any other crew member," Warden Dicky stated that "we were doing what they asked us to do." 65 RR 40. He added that, once the crew arrived, Warden Dicky "didn't have any particular agenda" and listened to the crew's conversations with inmates "[j]ust to see how things were going." *Id.* at 41.

When asked whether he was personally present during filming, Warden Dickey only described "walk[ing] down into the special housing unit when they were shooting a piece of footage." *Id.* at 40. He detailed that he "just watched

[the crew] move around." *Id.* He stated that none of the guards or personnel under his command were advised to listen to inmate responses "in case information about crimes came out in any interviews." *Id.* But Warden Dickey's testimony elided that he was present during filming because he provided an interview to Mr. Ross and the crew. 101 RR 83.

In her testimony, Quartermaster Waller indicated that she immediately understood the import of Mr. Ross's interview with Mr. Hall. When she saw the interview occurring, she understood that it might make "Comedy Central . . . part of his trial." 65 RR 84. In the suppression hearing, she testified that she was concerned that this would also further delay Mr. Hall's trial. *Id.* at 84–85.

Nonetheless, Quartermaster Waller did not stop the interview. *Id.* at 87. She instead waited until the interview concluded before reporting the interview to Warden Dicky. *Id.* at 88–89. This testimony was false—both Warden Dicky and Quartermaster Waller, as detailed below, had far more significant interactions than their testimony disclosed.

### 3. Warden Dicky falsely testified that Mr. Hall had notice as to whether he wanted to be interviewed.

Warden Dicky testified that "the releases were provided so people could have the opportunity review those and decide whether they wanted to participate in the show or not." 65 RR 74–75. But in her testimony,

Quartermaster Waller stated that she made "sure that the officer in the dorm had release forms for the other inmates that Jeff Ross was trying to get to come [to the comedy show]." *Id.* at 81. She stated that she did this after Mr. Ross had arrived at the jail. *Id.* Indeed, many inmates in fact had neither seen nor signed a release until after speaking with Mr. Ross in the dorms.

Moreover, the posters put up around the jail stated that prisoners who wished to be interviewed should sign up. 114 RR 142. These posters were "the primary way" that the jail informed prisoners and jail officers about the show. 65 RR 38. The posters did not say anything about Mr. Ross entering the dorms and filming impromptu interviews with any inmate who happened to be there. *Cf.* 114 RR 142.

### B. Legal Standard

A state may not knowingly use or fail to correct false testimony to obtain a conviction or sentence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citations omitted). Doing so violates the Fourteenth Amendment's Due Process Clause. *Id.* To establish a *Napue* violation, a petitioner must show that 1) the witness testified falsely, 2) the government knew or should have known that the testimony was false, and 3) the testimony was material. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972).

Knowledge of falsity is imputed to the State. *Id.* False testimony is material if there is a reasonable likelihood that it affected the jury's judgment.

*Id.* at 154. A reasonable likelihood exists if "the nondisclosure places the case in a different light as to undermine confidence in the verdict." In that case, a new trial is required. *Id.*

### C. Argument

The State violated the Fourteenth Amendment's Due Process Clause when it used false testimony to secure the admissibility of the Comedy Central footage as evidence of Mr. Hall's future dangerousness. The State used false testimony on three occasions to argue that the tape did not violate Mr. Hall's Sixth Amendment rights. First, the State used false testimony to claim that jail employees never informed the Comedy Central crew about the charges of specific inmates. Second, the State used false testimony to claim that jail employees acted as neutral observers while the Comedy Central team collected footage in the jail. Third, the State used false testimony to claim that Mr. Hall had advance notice of Mr. Ross's jail interviews and had time to decide if he wanted to participate in them.

The State knew or should have known that this testimony was false. Jail employees are part of the Brazos County Sheriff's Office, which investigated and assisted in Mr. Hall's prosecution. The State was therefore responsible for learning of these falsities. The State should have known that it had presented false testimony regarding the creation of the Comedy Central video, and it was required to correct that testimony.

It is also reasonably likely that the Comedy Central interview of Mr. Hall would have been suppressed in the absence of this false testimony. Information that jail officials orchestrated his interview was material to whether the State had violated Mr. Hall's Sixth Amendment rights. *See* Claim One, *supra.* Moreover, evidence that Mr. Hall did not have advance warning of Mr. Ross's dorm appearance was material to questions of whether Mr. Hall could have consulted with counsel beforehand or knowingly and voluntarily waived his right to counsel. *See* Claim One, *supra.*

The State relied on Mr. Hall's videotaped statements during his interview with Mr. Ross to demonstrate future dangerousness, rebut the defense's mitigation case, and urge the jury that the mitigation did not outweigh future dangerousness such that Mr. Hall should be sentenced to death. *See* Claim One, *supra.* Because the State relied on the fruits of this false testimony—namely, the tape—to obtain a death sentence, there is a reasonable likelihood that the false testimony affected the outcome. *See Giglio,* 405 U.S. at 154. Mr. Hall is entitled to a new punishment-phase proceeding

### D. This Court can review the merits of the claim *de novo.*

The state habeas court dismissed this claim as procedurally barred on grounds that this claim could have been raised on direct appeal. See *Ex Parte Hall,* 2024 WL 467871, at *2. But 28 U.S.C. § 2254(d) deference does not apply to this claim because the state court did not afford Mr. Hall a full and fair

opportunity for review. *See Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). He is therefore entitled to *de novo* review of this claim.

Alternatively, the state procedural bar is not adequate in that it is neither "firmly established [nor] regularly followed," and Mr. Hall effectively complied. *See Lee v. Kemna*, 534 U.S. 362, 376, 385 (2002). The CCA often allows petitioners to bring false-testimony claims on state habeas. *See Ex parte De La Cruz*, 466 S.W.3d 855, 865 (Tex. Crim. App. 2015); *In re M.P.A.*, 364 S.W.3d 277, 284–85 (Tex. 2012) (citations omitted); *Estrada v. Texas*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010). Should this Court determine that this claim is nevertheless procedurally defaulted, Mr. Hall can also show cause and prejudice sufficient to excuse any procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

**Claim Three: The trial court violated Mr. Hall's Eighth and Fourteenth Amendment rights when it admitted the Comedy Central video as evidence of future dangerousness.**

The Comedy Central video rendered the punishment phase inherently unreliable and demeaned Mr. Hall's human dignity in violation of the Eighth Amendment. It also rendered the punishment proceedings fundamentally unfair in violation of the Fourteenth Amendment.

This claim was raised as Claim Three on direct appeal. Brief of Appellant at 83–86, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 23, 2019). The

40

CCA dismissed Mr. Hall's due process claim in full and partly dismissed his Eighth Amendment claim as inadequately briefed. *Hall v. Texas*, 663 S.W.3d 15, 34–35 (Tex. Crim. App. 2021). It dismissed the remainder of the Eighth Amendment claim on the grounds that it was not preserved at trial. *Hall*, 663 S.W.3d at 34–35. Mr. Hall can demonstrate that both proffered procedural bars were neither adequate nor independent. This Court can therefore review this claim on the merits *de novo*.

### A.  Statement of Facts

The facts of Claim One, *supra*, are incorporated here by reference and applied below. Trial counsel objected to the admission of the video on Eighth Amendment and due process grounds, and the trial court granted them a running objection. 87 RR 37–38.

### B. Legal Standard

"[T]here is no perfect procedure for deciding in which cases" a government may impose death. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). But because death is different, capital-sentencing procedures are subject to heightened standards of reliability. *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (internal citations omitted); *Zant v. Stephens*, 462 U.S. 862, 884–85 (1983) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).

Within the body of law outlining permissible capital-sentencing procedure, the Eighth and Fourteenth Amendments are often cited together

and are best understood as operating in tandem. *See, e.g. Herrera v. Collins*, 506 U.S. 390 (1993); *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *Lockett*, 438 U.S. at 604–06. The Fourteenth Amendment's Due Process Clause establishes when process is due and the minimum contours of that protection. Because death sentences must meet higher standards of reliability, the Eighth Amendment establishes a floor of permissible behavior within the contours of the Fourteenth Amendment's Due Process Clause.

A defendant "has a legitimate interest in the character of the procedure" leading to the death penalty, even if he has "no right to object to a particular result of the sentencing process." *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (citations omitted). Unlike some legal rules, due process "is not a technical conception with a fixed content unrelated to time, place and circumstance." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961) (citations omitted). Due process is flexible and calls for whatever procedural protections a situation demands. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

In identifying what process the Constitution requires, courts must consider 1) the private interest at stake, 2) the risk that a person will be erroneously deprived of that interest, and 3) the value of additional procedural safeguards. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Under the Eighth Amendment, a decision to impose death "cannot be predicated on mere caprice or factors that are constitutionally impermissible or totally irrelevant

to the sentencing process." *Johnson*, 486 U.S. at 585 (quoting *Zant*, 462 U.S. at 884–85, 887 n.24) (internal quotation marks omitted).

Finally, due process requires that courts consider the government's interest, including the function involved and the burdens that an additional procedural requirement would entail. *Mathews*, 424 U.S. at 335. Importantly, it cannot be said that the State has an interest in obtaining a death sentence. Rather, the Supreme Court has identified two government interests in this area, *inter alia*. The first is the government's interest in treating defendants with basic fairness. *See Morrissey v. Brewer*, 408 U.S. 471, 484 (1972).

The second rationale is the government's interest in maintaining a dignified judicial process. *Deck v. Missouri*, 544 U.S. 622, 631–32 (2005). This is embodied in the courtroom's formal dignity. *Id*. It "reflects the importance of the matter at issue" and "the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment." *Id*. at 631. And the forum's dignity "reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of the general public." *Id*. This interest applies with equal force during both guilt- and punishment-phase proceedings. *Id*. at 632.

The Eighth Amendment sets another floor when considering the dignity and respect afforded to death-sentencing procedures. *Wellons v. Hall*, 558 U.S. 220, 220 (2010). Specifically, the punishment-phase process should facilitate

the responsible and reliable exercise of sentencing discretion. *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (citations omitted). And the sentence imposed should reflect a reasoned moral response to the defendant's background, character, and crime. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citing *California v. Brown*, 479 U.S. 538, 545 (1987)), *abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

A federal habeas petitioner must show that the trial error resulted in actual prejudice to be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### C. Argument

Due process and the Eighth Amendment apply to Mr. Hall's capital-sentencing proceedings. The admission of the Comedy Central video violated the process due to Mr. Hall and injected unreliability at punishment in violation of the Fourteenth and Eighth Amendments. Because the demands of due process are flexible, the Court must identify the procedural protections that Mr. Hall's capital-sentencing proceedings demand. In doing so, the Court must consider the three *Eldridge* factors. In other words, it must consider 1) that the private interest affected is Mr. Hall's interest in his life; 2) the risk that admitting the Comedy Central video might erroneously deprive Mr. Hall

of his life; and 3) the value of other procedural safeguards at trial. *See Eldridge*, 424 U.S. at 335. And it must do so in a manner that comports with the Eighth Amendment's dignity and reliability requirements.

The Comedy Central video erroneously deprived Mr. Hall of his interest is his life in two different ways. First, the racist humor throughout the Comedy Central video repeatedly invokes racial prejudices. Second, the video presents Mr. Ross's assessment of Mr. Hall's character as testimony to the jury without affording Mr. Hall the opportunity for cross-examination to test its reliability. Finally, admitting the video also abridged the Due Process Clause's guarantee of fundamental fairness.

### 1. The Comedy Central video injected racial prejudice into the punishment-phase proceedings.

Early in the video, another inmate—an admitted white supremacist, *see* 125 RR 10 at 1:03–1:18—encourages Mr. Hall to tell jokes that play up stereotypes of disease-ridden Asians, *id.* at 7:37–7:50. Mr. Hall obliges, cracking: "If an Asian person catches yellow fever, would it be just called fever to that person?" *Id.* at 7:37–7:50. "Yes!" Mr. Ross exults. "That's good. That's not bad." *Id.*

Later, Mr. Ross doubles down on the humor, calling Mr. Hall "Slim Sushi." *Id.* at 16:02–17:14. In response, Mr. Hall then jokes that he is a "yellowneck," noting that others have thought this was "just wrong." *Id.* These

comments present an unacceptable risk that the jury was influenced to hand down a death sentence based on Mr. Hall's race.

The pointed racialized comments called the jury's attention to Mr. Hall's race and resultant stereotypes. Against the Eighth Amendment's mandate of heightened reliability in death penalty sentencing, the Comedy Central video introduced and inflamed constitutionally impermissible racial considerations. *See Johnson*, 486 U.S. at 584 (quoting *Zant*, 462 U.S. at 887 n.24). Racism at capital sentencing is a toxin that "can be deadly in small doses." *See Buck v. Davis*, 580 U.S. 100, 122 (2017).

### 2. The Comedy Central video inserted Mr. Ross's opinions of Mr. Hall into punishment-phase proceedings.

In the video, Mr. Ross repeatedly expressed discomfort with Mr. Hall, referring to him as "a fucking scary dude." 125 RR 10 at 15:44. These comments capitalized on Mr. Hall's seemingly aloof affect on the tape. Yet this product is attributable to Mr. Hall's neurological impairments and Mr. Ross's discomfort as he toured the dorms to speak with prisoners. *See* Claim One, *supra* and Claim Four, *infra*. Although Mr. Hall's interview with Mr. Ross never aired, even third-party reviewers of the comedy special noted that Ross is "not always at ease [in the jail], especially during the time he spends hanging out with inmates before the show or touring the facility." Contreras, Jessica, *"Where My Murderers at?" How Jeff Ross and Comedy Central Tried to Make Incarceration Funny*, WASHINGTON POST (Jun. 14, 2015),

46

https://www.washingtonpost.com/news/arts-and-entertainment/wp/2015/06/1

4/where-my-murderers-at-how-jeff-ross-and-comedy-central-tried-to-make-

incarceration-funny/.

As to the clip with Mr. Hall, the State exhibited the video as a sincere

and discrete interaction between Mr. Ross and Mr. Hall, and as an accurate

representation of Mr. Hall's character and opinions. But the video was neither

of these. Instead, the video was created for the exclusive purpose of

entertaining a television audience. The resulting footage portrays a

neurodevelopmentally disabled and mentally impaired young man who

expresses bravado after being suddenly ambushed by a camera crew and a

celebrity insult comic—all while surrounded by older, more seasoned inmates.

But paired with Mr. Ross's unexamined commentary, the video urges an

inflammatory jury response. *See Gardner*, 430 U.S. at 362 (holding due process

is violated where "the death sentence was imposed, at least in part, on the basis

of information which [petitioner] had no opportunity to deny or explain"). And

the State capitalized on this as well, quoting Mr. Hall's words in the video

throughout their closing argument at punishment. 100 RR 44, 125–26.

### 3. The State's interests cannot justify the tape's admission.

Finally, the video also undermines the State's interest in maintaining a

dignified judicial process. *See Deck*, 544 U.S. at 631–32. By injecting racialized

perceptions of Mr. Hall into the punishment phase, the State undermined the

gravity with which the jurors should consider a death sentence. Both the racial tones of the video and its unexplained context undermine the confidence that the general public should properly have in a death sentence. As a result, the video cannot comply with the responsible and reliable exercise of sentencing discretion required by the Eighth Amendment.

Moreover, the Comedy Central video undermined all constitutionally permissible state interests. The video does not meaningfully represent whether Mr. Hall is a future danger to society. Instead, it risks denying him a fundamentally fair proceeding and is incongruous with a dignified judicial process. Yet, the State pointed to this depiction of Mr. Hall and replayed excerpts in closing argument. In doing so, the State applied its own interpretation to his videotaped commentary. *See* 100 RR 125 ("They will screw you over the most petty shit. Ed's life is petty"). And they injected their own response to inflame the jury. *Id.* at 126 ("I'm sorry. I'm getting mad. This is not petty").

The introduction of this inflammatory and disingenuous evidence instead strikes a "foul [blow]" inconsistent with the State's obligations. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (reversing conviction where government inserted gratuitous evidence into proceedings, holding that "while [prosecutor] may strike hard blows, he is not at liberty to strike foul ones"). Mr. Ross's assertion that Mr. Hall was "a fucking scary dude," 125 RR 10 at

15:44, was an irrelevant opinion based on his brief exchange with Mr. Hall and purportedly nothing else.

### 4. The video had a substantial and injurious effect on punishment-phase proceedings.

To the extent the *Brecht* standard of harm applies, these themes from the Comedy Central footage, alone and combined, had a substantial and injurious effect on the jury. *See Brecht*, 507 U.S. at 637. The jury's answer to the special issues of whether 1) a person is a future danger to society and 2) mitigating circumstances weigh in favor of life, further demonstrate the video's substantial and injurious effect. *See* Tex. Code Crim. Proc. art. § 37.071.

### D. The Court can review the merits of this claim *de novo.*

The CCA dismissed Mr. Hall's Due Process Clause claim as inadequately briefed and the Eighth Amendment claim as inadequately briefed and unpreserved. *Hall*, 663 S.W.3d at 35. These bars are neither adequate nor independent in that they are neither "firmly established [nor] regularly followed," and Mr. Hall effectively complied. *See Lee v. Kemna*, 534 U.S. 362, 376, 385 (2002). Alternatively, Mr. Hall can show cause and prejudice sufficient to excuse any procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

49

**Claim Four: Counsel rendered ineffective assistance in violation of the Sixth Amendment when they failed to adequately investigate and present mitigating evidence and rebut the State's future-dangerousness case at Mr. Hall's punishment phase.**

Mr. Hall's trial counsel was ineffective because they failed to adequately investigate, identify and consult experts, prepare witnesses, present evidence, and rebut State witnesses in the punishment phase of his capital trial. These failures violated Mr. Hall's Sixth, Eighth, and Fourteenth Amendment rights. *Strickland v. Washington*, 466 U.S. 668, 685–88 (1984); *Woodson v. North Carolina*, 428 U.S. 280, 301, 305 (1976); *Jurek v. Texas*, 428 U.S. 262, 271 (1976). Mr. Hall was prejudiced by counsel's failures as there is a reasonable probability that, had counsel performed effectively, at least one juror would have answered the special issues in a way not resulting in death. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003). This claim is unexhausted.

### A. Statement of Facts

The Regional Public Defender Office (RPDO) was appointed to represent Mr. Hall in this case shortly after his arrest in 2011. 1 Amend. CR 21. Over the nearly four years leading up to Mr. Hall's trial, the trial team experienced significant turnover. This turnover affected every component of the team, from attorneys and investigators, to those assigned to work as mitigation specialists. In addition, RPDO assigned personnel from multiple office locations across

Texas to work on Mr. Hall's case. The result was a fractious and incoherent team that struggled to effectively represent Mr. Hall.

Among other shortcomings, trial counsel failed to:

- adequately investigate mitigation evidence,

- pursue red flags of mental health and neurodevelopmental diagnoses,

- secure and safeguard Mr. Hall's right to compulsory process,

- prepare lay and expert witnesses,

- develop a coherent mitigation presentation, and

- effectively present evidence and argument to the jury.

Trial counsel's overly narrow approach, among other difficulties, led to their failure to adequately investigate Mr. Hall's background. This is true even though trial counsel hired numerous expert witnesses and spent considerable funds. By failing to adequately investigate, counsel additionally failed to identify and develop relevant themes, including those implicating multiple generations of Mr. Hall's social history. Counsel's failure to investigate also precluded them from developing the factual support that defense experts needed for analyses, and it precluded counsel from adequately preparing expert testimony. The result was a punishment phase that lacked a compelling, coherent narrative and that failed to rebut the State's evidence.

### B. Legal Standard

To establish ineffective assistance of counsel in violation of the Sixth Amendment, the petitioner must show that trial counsel's performance was deficient and that he was prejudiced by trial counsel's deficiencies. *Strickland*, 466 U.S. at 687. Counsel's performance must be assessed "under prevailing professional norms." *Id.* at 688.

Counsel in capital cases have an "obligation to conduct a thorough investigation of the defendant's background" for "all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 522 (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); *see also Porter v. McCollum*, 558 U.S. 30, 39–40 (2009). Prevailing norms dictate that counsel must conduct a prompt investigation and explore all avenues leading to facts relevant to the punishment phase. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (citing 1 ABA Standards for Criminal Justice 44.1 (2d ed. 1982 Supp.)); *see also* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7, 31 HOFSTRA L. REV. 913, 1015 (2003) (*ABA Death Penalty Guidelines*); ABA Mitigation Guideline 10.11, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 HOFSTRA L. REV. 677, 689 (2008) (*ABA Mitigation Guidelines*).

The defense team should interview witnesses, retain and prepare experts, and request and review various records related to the client. *Rompilla*,

545 U.S. at 389. Counsel should seek records include medical, criminal, and correctional records, among others. *Id.*; *see* also *ABA Death Penalty Guidelines*, Guideline 10.7 [Commentary] at 1019–20, 1022–23, 1025–27. Failure to conduct a thorough investigation constitutes deficient performance. *See Wiggins*, 539 U.S. at 521–23.

Although courts must defer to trial counsel's decisions, those decisions made after a less-than-complete investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691. Where counsel truncates their inquiry down a particular investigative path, counsel's choice "must be directly assessed for reasonableness in all the circumstances." *Id.*

The petitioner is prejudiced by trial counsel's deficiencies where there is a "reasonable probability" that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 693–94. *Strickland* "specifically rejected the proposition that the [petitioner] had to prove it more likely than not that the outcome would have been altered." *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (citations omitted). Instead, a reviewing court's adjudication of an ineffective-assistance claim should ultimately focus on "the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696.

53

With respect to the punishment phase, the prejudice inquiry looks to the "'the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding[s]'"—and evaluates how the difference would have affected the punishment phase. *Porter*, 558 U.S. at 41 (quoting *Williams*, 529 U.S. at 397–98). Counsel's deficient performance prejudices the petitioner when, upon examining the new mitigating evidence, there is a reasonable probability that "at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### C. Argument

> **1. Deficiency: Trial counsel failed to conduct a thorough and constitutionally adequate investigation and failed to provide Mr. Hall with an individualized mitigation presentation and rebuttal to the State's case.**

Early in Mr. Hall's case, trial counsel had already decided what mitigation picture they would present at trial. Counsel approached Mr. Hall and the investigation with this fixed narrative in mind and retained experts that could promote it. The defense team was so focused on this narrative that it failed to investigate Mr. Hall's background beyond what that narrative required. In particular, counsel failed to conduct a multigenerational investigation into Mr. Hall's family history, the circumstances and cultural influences of his life in the Philippines, the impact of his transnational and

transcultural adoption, and the confluence of those factors and others on his life and development in College Station, Texas.

### a. Failure to Conduct a Thorough, Culturally Sensitive, and Constitutionally Adequate Investigation

The mitigation investigation in Mr. Hall's case fell far below the constitutionally required standard of care. This was largely because members of the defense team tasked with supervising and/or conducting the mitigation investigation did not have the requisite experience, training, or qualifications to investigate for the punishment phase of a capital trial. Those assigned as mitigation specialists to Mr. Hall's case were unprepared to conduct a complex, multi-generational, transnational, and transcultural mitigation investigation. They were similarly unprepared to identify relevant mental-health and mitigation themes, or to synthesize information so that it would be consistently and comprehensively presented to the jury.

Prevailing professional norms establish that counsel must retain and consult with qualified mitigation specialists to adequately identify a client's impairments and conduct the necessary investigation. On numerous occasions, the Supreme Court has considered whether defense counsel abided by these norms when determining whether counsel performed deficiently. *E.g.*, *Andrus v. Texas*, 590 U.S. 806, 818 (2020); *Bobby v. Van Hook*, 558 U.S. 4, 9–10 (2009); *Ayestas v.* Davis, 584 U.S. 28, 54–56 (2018) (Sotomayor & Ginsburg, JJ.,

concurring). Mitigation specialists are critical because they "possess *clinical* and information-gathering skills and training that most lawyers do not have." *ABA Death Penalty Guidelines*, Guideline 4.1 [Commentary] at 959 (emphasis added). The mitigation specialist is also key to "insur[ing] that the presentation to be made at the penalty phase is integrated into the overall preparation of the case." *Id.* In Mr. Hall's case, however, no member of the defense team had that experience. Counsel was ineffective for not remedying that team deficiency.

The absence of a qualified mitigation specialist contributed to counsel's failure to identify and act upon red flags that appeared in their investigation. Although counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware," *Porter*, 558 U.S. at 40, that is precisely what occurred in Mr. Hall's case. Additionally counsel failed to ensure that information was properly documented and shared across the team. This prevented the team from identifying either the fruits of its investigation or potential red flags warranting further exploration.

Repeated turnover in the mitigation specialist role exacerbated the effects of counsel's incoherence. The trial team unjustifiably restricted the scope of its investigation and failed to conduct a thorough and multi-generational investigation into Mr. Hall and his family. Rather than follow up on unearthed leads—such as ASD and other neurodevelopmental disabilities—

trial counsel limited their investigation to prejudgments and correspondingly limited their themes about Mr. Hall's life. Because of this, counsel failed to pursue red flags from the investigation they did conduct, interview family members beyond Mr. Hall's nuclear family, consider any witness's reluctance for disclosure, and examine the information they collected for a cohesive narrative. And despite multiple trips to the Philippines, trial counsel had limited visits with witnesses, confined the investigation of Mr. Hall's family to questioning of immediate family members; limited the direction and scope of the investigation before conducting requisite foundational investigation; and failed to develop significant mitigation evidence—including mental health, trauma, and protective factors—with Philippines lay witnesses. Nor did trial counsel adequately prepare these witnesses to testify at trial.

Further, the trial team neglected to hire adequate consulting and/or testifying experts to educate the trial team and the jury regarding Filipino culture. *See ABA Death Penalty Guidelines*, Guideline 4.1 [Commentary] at 957–58 (describing need in appropriate case to retain expert regarding cultural context). Nor did they hire any expert that could explain the mental and emotional impact of a transnational and transcultural adoption from the Philippines to the United States. *See id.*

57

Importantly, the trial team recognized that the issues in Mr. Hall's case were "complicated by the racial and cultural differences between the Asian[4] Mr. Hall and the white Caucasian lawyers and investigators that comprise his defense team." 3 Supp. 1 CR 25. But to fill this void, trial counsel retained Dr. Walter Quijano—a grossly unqualified and resoundingly discredited forensic psychologist. *See Buck v. Davis*, 580 U.S. 100, 121 (2017) (describing Dr. Quijano's racially prejudiced testimony). This fell far short of counsel's duty to ensure that the investigation, witness preparations, and trial testimony were culturally competent. Trial counsel's failure to retain a qualified expert constitutes ineffective assistance of counsel.

Of the witnesses in the Philippines that trial counsel did identify, they unreasonably acceded to trial court pressure that counsel select only some witnesses for travel to Texas. 21 RR 4–23. Rather than object that the trial court's limitations denied Mr. Hall his rights to compulsory process and to present necessary mitigation in his capital trial, counsel acquiesced and curtailed their list of requested prospective witnesses. 22 RR 7–40. This acquiescence was similarly deficient and deprived Mr. Hall of a full mitigation presentation.

---

[4] As described in Claim Three, *supra*, many Filipino people do not identify as Asian. Counsel's resort to this descriptor for Mr. Hall underscores that counsel needed to retain an appropriate cultural competency expert.

58

Finally, trial counsel did not thoroughly or adequately investigate Mr. Hall's background in the United States. Although trial counsel had secured extensive funds to retain experts and travel to the Philippines, funding for investigation in College Station and elsewhere in the United States came from RPDO's coffers. And because travel to College Station from various RPDO office locales required a specific expenditure of time and resources, the cost of the stateside investigation became an issue.

In 2013—while Mr. Hall's trial was pending—Brazos County declined to renew its contract with RPDO. This meant that RPDO was now expending internal resources in a county that was no longer paying into RPDO's budget. RPDO limited the ability of investigators and those attorneys working as mitigation specialists to investigate the case in College Station and surrounding areas. As a result, counsel's investigation in Texas was belated, truncated, and piecemeal. Numerous important potential witnesses were not spoken to at all. And what few leads they did develop, they did not follow up on.

Trial counsel did not request additional court funding to conduct the investigation required in Mr. Hall's case. Counsel thus did not "fulfill their obligation to conduct a thorough investigation of defendant's background." *See Williams*, 529 U.S. at 396 (citations omitted).

### b. Failure to Investigate Mental-Health Diagnoses and Retain and Then Consult with Relevant and Qualified Experts

Counsel's failures as described above had a cascading effect. It caused counsel's failure to properly scrutinize the evidence they did collect. It caused counsel's failure to amass enough evidence to identify, retain, and consult with appropriate experts. It caused counsel's failure to provide the proper materials to experts. And, at bottom, it caused counsel's failure to develop expert testimony so that the jury could receive an individualized picture of Mr. Hall's life and developmental trajectory.

Though trial counsel expended substantial court funds, they did so without the results of an appropriate baseline investigation. Trial counsel missed multiple red flags that should have been examined, including whether Mr. Hall has autism spectrum disorder (ASD) or another developmental disorder; whether he exhibited plainly identifiable brain impairments; and whether he has fetal alcohol spectrum disorder (FASD) or a related disorder linked to in-utero alcohol and drug exposure.

Numerous red flags existed that Mr. Hall had ASD or a related developmental disorder; [5] yet, counsel never investigated this possibility.

---

[5] Examples of related conditions include Pervasive Developmental Disorder-Not Otherwise Specified, Childhood Disintegrative Disorder, and Sensory Processing Disorder.

Multiple members of the trial team recognized symptoms of ASD and noted it in various team memoranda and correspondence. Nonetheless, trial counsel did not investigate whether Mr. Hall manifested symptoms of these disorders or consult with an appropriate expert to consider collected evidence and/or evaluate Mr. Hall.

Counsel was deficient for disregarding this repeatedly flagged symptomology. Indeed, counsel failed to conduct even a cursory examination into this possibility. *See Andrus*, 590 U.S. at 815–16 (counsel deficient for disregarding rather than exploring multiple red flags). Trial counsel also failed to address these topics with lay witnesses in both the Philippines and in the United States. This unreasonably narrowed the scope of their investigation in connection with neurodevelopmental disorders and mental health. Given the mitigating effect of mental-health testimony, it is plain that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 816–17 (citing *Wiggins*, 539 U.S. at 536).

Trial counsel's investigation was also deficient as it related to establishing Mr. Hall's brain functioning. Counsel expended significant resources to conduct neuroimaging of Mr. Hall. This neuroimaging included magnetic resonance imaging (MRI), positron emission tomography (PET), diffusion tensor imaging (DTI), and electroencephalogram testing (EEG). Through consultation with expert Dr. Susan Stone, trial counsel requested

that the testing be conducted to "confirm and better establish the damaged condition of the Defendant's body and brain." 3 Supp. 3 CR 493. Moreover, trial counsel described that "[t]he demonstration that Mr. Hall's brain is damaged is essential to the presentation of a high quality defense." 3 Supp. 3 CR 495. The trial court granted counsel's request to conduct this testing. 3 Supp. 3 CR 508–11.

Initially, trial counsel sent the data obtained from the scans to Dr. Ruben Gur, who was asked to conduct a quantitative analysis of the MRI and PET scans. 3 Supp. 4 CR 678. Because trial counsel did not intend to call Dr. Gur if they could avoid it, *see* Claim Fifteen, *infra*, they also relied on Dr. Richard Adler to relay Dr. Gur's conclusions to the jury. 3 Supp. 6 CR 1018; 3 Supp. 10 CR 1855. Belatedly, trial counsel obtained Dr. William Orrison to review the MRI and DTI scans. 3 Supp. 9 CR 1709. But neither Dr. Adler nor trial counsel consulted with Dr. Orrison after he had reviewed the imaging and testing conducted on Mr. Hall. Ex. 4 at 98–101. This failure to consult amounted to a deficient investigation.

Trial counsel was also deficient for failing to adequately investigate FASD. Trial counsel retained Dr. Richard Adler to examine whether Mr. Hall suffered from FASD. 3 Supp. 10 CR 1857. By retaining, consulting with, and presenting Dr. Adler's testimony, trial counsel demonstrated that they recognized the significance and import of an FASD diagnosis. But their

deficient and truncated investigation sabotaged that effort. *See Strickland*, 466 U.S. at 690–91 (where counsel truncates his inquiry down a particular investigative path, such a choice "must be directly assessed for reasonableness in all the circumstances").

Dr. Adler noted there were clear indications both that Mr. Hall had a neurodevelopmental disorder that existed before he was born and that it may have been caused by prenatal alcohol exposure. 97 RR 18–99. Nonetheless, Dr. Adler testified that he could not provide a formal FASD diagnosis because he lacked information about maternal alcohol consumption during pregnancy. 96 RR 232. He could only conclude there were "features that are consistent with what the DSM-V calls neurodevelopmental disorder prenatal alcohol exposed." *Id*. On cross-examination, Dr. Adler was even more hesitant, stating that his "conclusions do not pivot or rely on the issue of fetal alcohol itself," while stating that Mr. Hall had some "neurodevelopment disorder." 97 RR 109. Because of counsel's failure to investigate red flags of FASD or another related neurodevelopmental disorder, they were unable to provide Dr. Adler with the evidence to support an FASD diagnosis.

### c. Failure to Investigate and Challenge the State's Future-Dangerousness and Mitigation-Rebuttal Evidence at Punishment by Consulting with Appropriate Experts

Mr. Hall's counsel was ineffective in using their retained experts to challenge the State's expert witnesses in the punishment phase. This was due in part to a problem of funding. As trial began, Mr. Hall's counsel had expended much of its court funding allocated for experts. It expended the remainder of these funds on the travel and fees for the experts it called at Mr. Hall's trial. This left trial counsel in the position of being unable to examine the need for specialized, corroborative, or surrebuttal testimony in response to the State's cross-examination or State expert rebuttal testimony

Trial counsel provided their experts with copies of testimony from State expert Dr. Timothy Proctor, but advised the experts there was no funding and that they, "[i]f interested [could] read for your own purposes." Ex. 5 at 102. Trial counsel performed deficiently in failing to request additional funding so that counsel could consult further with retained experts. *See Hinton v. Alabama*, 571 U.S. 263, 273–74 (2014) (trial counsel deficient for failure to request necessary funding). Counsel could not know what they did not know. Because they had not adequately consulted with these experts regarding the State's rebuttal evidence, they could not render a strategic decision about whether to present additional testimony. *See Williams*, 529 U.S. at 395

(counsel's decisions not strategic where requisite investigation not conducted). Mr. Hall's trial counsel acted unreasonably and deficiently when they failed to adequately investigate or cross-examine the State's case at punishment.

Trial counsel failed to adequately utilize was Dr. John Edens, a psychologist specializing in clinical training. Counsel retained Dr. Edens to testify at a pre-trial hearing regarding the testing that the State's expert Dr. Proctor planned to conduct. Dr. Edens testified at that hearing regarding the Minnesota Multiphasic Personality Inventory (MMPI) and Hare Psychopathy Checklist Revised (PCL-R). 36 RR 19–20. He testified to problems with both measures, issues with PCL-R administration and scoring, and risks that merely mentioning the PCL-R would bias the jury. *Id.* at 34–73. The trial court denied counsel's request to preclude the State's expert's administration of the MMPI and PCL-R. *Id.* at 133.

Dr. Proctor ultimately testified in rebuttal at punishment that he administered multiple personality measures, including various forms of the MMPI and the Personality Assessment Inventory (PAI) as well as two measures of psychopathy. 99 RR 69–70. Dr. Proctor did not "diagnose" Mr. Hall as a psychopath because it was not supported by the test results. *Id.* at 71. But Dr. Proctor opined that Mr. Hall was exaggerating his symptoms when responding to test questions because Mr. Hall responded to these measures "in a way that is unusual with people who have genuine mental difficulties." *Id.* at

65

85, 102–03. On cross-examination, he rejected trial counsel's suggestion that overreporting was consistent with Mr. Hall's significant history of adverse childhood experiences and testified that he had consulted "multiple sources" to account for any culture-related diagnostic issues. *Id.* at 134–36. Dr. Proctor relied on characteristics he identified chiefly from MMPI reports to ultimately diagnose Mr. Hall with a personality disorder with mixed features. *Id.* at 74. Dr. Proctor rejected the PTSD, DID, and major depressive disorder diagnoses offered by defense experts. *Id.* at 72–73, 89–98, 108. Following the State's rebuttal, trial counsel presented a sole lay witness on surrebuttal before resting. *Id.* at 177.

Despite Dr. Edens's expertise, trial counsel failed to conduct an adequate and thorough investigation into Dr. Proctor's evaluations, testing, conclusions, and testimony by appropriately consulting with this already-retained expert. Counsel retained Dr. Edens chiefly for his expertise on the PCL-R in anticipation of the need to cross-examine and/or rebut Dr. Proctor on this score. But Dr. Proctor testified that he lacked sufficient PCL-R scores to "diagnose" Mr. Hall as a psychopath. *Id.* at 71. Instead, Dr. Proctor relied chiefly on data obtained from personality measures—including various MMPI forms and the PAI—to claim that Mr. Hall was exaggerating his symptoms, did not suffer from any significant mental disorder, and had a personality disorder. *Id.* at 72–77, 84–87. Because trial counsel only considered Dr. Edens as an expert

for a limited purpose—to rebut PCL-R results—they failed to adequately consult with him on other aspects of Dr. Proctor's testimony. By failing to explore Dr. Proctor's testimony with Dr. Edens, trial counsel was ill-prepared to counter any of it at trial. Counsel's failure to call Dr. Edens to testify in surrebuttal or consult with him to prepare for cross-examination of Dr. Proctor constituted ineffective assistance of counsel under *Strickland*.

Similarly, trial counsel retained but failed to adequately consult with Dr. Nancy Nussbaum, who was hired to conduct a battery of neuropsychological testing with Mr. Hall. 91 RR 118. Based on her testing, Dr. Nussbaum testified that the disparity in Mr. Hall's scores across different areas indicates "subtle organic dysfunction affecting the right hemisphere or right side of the brain." *Id.* at 128–29. In rebuttal, the State called neuropsychologist Dr. Randall Price, who reviewed Dr. Nussbaum's testing. 98 RR 165–66. Dr. Price concluded that Mr. Hall's test results appeared normal and showed no evidence of traumatic brain injury, contradicting Dr. Nussbaum. *Id.* at 166–67. The defense did not call Dr. Nussbaum back to the stand to rebut Dr. Price's opinions, nor did they further consult with her before cross-examination of Dr. Price to explore why his conclusions were wrong.

Trial counsel was deficient in being unprepared to mount a response to Dr. Price's testimony through Dr. Nussbaum. Following an initial meeting,

trial counsel spent one hour meeting with and preparing Dr. Nussbaum for her testimony. Although she had conducted two days of neuropsychological testing on Mr. Hall in February 2013, s*ee* 91 RR 141, trial counsel did not obtain these test results until three weeks before opening statements—more than two weeks after voir dire commenced. Lead counsel, John Wright, conducted direct examination of Dr. Nussbaum. Mr. Wright met with Dr. Nussbaum for thirty minutes six days before she testified. That meeting was the sole time trial counsel met with Dr. Nussbaum after she completed testing on Mr. Hall. At the time, Dr. Nussbaum had yet to complete the slideshow presentation to accompany her testimony. Counsel who cross-examined Dr. Price never met with Dr. Nussbaum at all.

By the time Dr. Price testified, counsel had expended all expert funds and declined to request more from the trial court. Ex. 5. Trial counsel therefore lacked qualified expert assistance to evaluate this testimony. Counsel was ineffective for failing to request additional funds when they were needed to appropriately investigate and defend Mr. Hall. *See Hinton*, 571 U.S. at 274–75; *see also Ake v. Oklahoma*, 470 U.S. 68, 86–87 (1985)

### d. Failure to Adequately Investigate and Impeach State Future-Dangerousness Witnesses

Trial counsel was ineffective for failing to adequately investigate and challenge the State's numerous jail snitches that it called to testify in the

punishment phase. On December 15, 2014, the State provided Mr. Hall's trial counsel with a lengthy recitation of purported unadjudicated offenses it intended to introduce at trial, most of which relied on jailhouse informant testimony. 7 Amend. CR 1635–37. Two days later, trial counsel subpoenaed jail records for those informants named in the unadjudicated offense notices. 7 Amend. CR 1638–61; 8 Amend. CR 1705–08. Trial counsel then requested a continuance, based in part on their need to "investigate the veracity" of the allegations and "to investigate the backgrounds, biases, and criminal histories of those witnesses [who are] providing the State with this information." 7 Amend. CR 1663. The trial court granted the continuance. 8 Amend. CR 1724. Trial counsel thereafter continued to subpoena and request documents pertaining to each informant witness, *e.g., id.* at 1904–18, and attempted to interview each informant. But the record suggests counsel did not actually review the materials they requested.

Trial counsel's responsibility was to "counter the State's evidence of aggravated culpability," which included "mak[ing] all reasonable efforts to learn what they could" about the informants the State intended to rely on for future dangerousness. *Rompilla*, 545 U.S. at 380–81, 385; *accord Andrus*, 590 U.S. at 818–21. And trial counsel recognized the importance of zealously countermanding the swell of informants who had "rush[ed] to testify like vultures to rotting flesh or sharks to blood." 7 Amend. CR 1663 n.1. As trial

69

counsel attested, jailhouse witnesses needed to be "managed and carefully watched." *Id.*; *see also* 100 RR 7–10 (request for Jailhouse Informant jury instruction); 15 Amend. CR 3393–96 (same).

But counsel had "acquired only rudimentary knowledge" of each informant "from a narrow set of sources," namely defense-investigator interviews and court-disposition summaries. *See Wiggins*, 539 U.S. at 524. They failed to review the court and jail files they had subpoenaed. These deficiencies are evident in trial counsel's cross-examinations, which skimmed the surface of evidence contained in their files.

For example, State's witness Zachary Dukes had attended school with Mr. Hall. Trial counsel asked Mr. Dukes about interactions with Mr. Hall at school and specifics from the recording of Mr. Dukes's interview with the District Attorney. But trial counsel never asked about Mr. Dukes's extensive mental-health history, which included psychosis. 85 RR 18–23. The record shows that counsel similarly failed to cross-examine other state-informant witnesses on matters beyond counsel's own summary documents. *E.g.*, 82 RR 242–44; 85 RR 54–64.

### 2. Prejudice: There is a reasonable probability that at least one juror would have voted for life had trial counsel performed effectively.

Trial counsel's multiple failures precluded them from uncovering a wealth of information that would have painted a substantially different and

comprehensive picture of Mr. Hall's life. This, in turn, would have affected every aspect of his punishment-phase proceeding. There is a reasonable probability that this comprehensive picture would have caused at least one juror to strike a different balance on the special issues, requiring the court to sentence Mr. Hall to life in prison. *See Wiggins¸* 539 U.S. at 537.

### a. Failure to Conduct a Thorough, Culturally Sensitive, and Constitutionally Adequate Investigation

Trial counsel would have scratched far below the surface of Mr. Hall's life had they appropriately expended resources, retained qualified mitigation specialists, and sought appropriate expertise to navigate cultural differences between themselves and Filipino witnesses. Far from presenting a trope of a young man being rescued from third-world poverty by a pious white American family, this narrative would have accurately presented the complex reality of Mr. Hall's life.

Trial counsel would have identified impactful themes, including

1) the multi-generational trauma impacting Mr. Hall's life,

2) familial and residential instability,

3) repeated head traumas, and

4) trauma and developmental disorder sequelae evident from an early age.

This information would have upended the State's arguments that Mr. Hall had experienced life in the same way as his siblings who "lived in the slums longer than the Defendant did" and others who came from "bad places" but had not been charged with capital crimes. *See* 100 RR 47–49. A culturally competent expert would have further provided testimony about the trauma of Mr. Hall's transnational and transcultural adoption.

Moreover, it would have shown a more complex picture of Mr. Hall's life in College Station, including his academic and social struggles there. It would have shown how he was subjected to a multitude of additional harms inside the Hall home that compounded his complex mental-health sequelae. This would have undermined the State's arguments that life at the Hall residence was "somewhere in the middle. . . . We're not saying they're all great; but you know what? It wasn't all bad." *Id.* at 50. And it would similarly have countered the State's arguments that nothing about the offense was related to the defense's mitigation picture by contextualizing the offense within that complex picture. *Id.* at 50–52. There is a reasonable probability that the outcome of the punishment phase would have been different had trial counsel provided the jury with a complete mitigation picture. *See Strickland*, 466 U.S. at 692–94.

### b. Failure to Adequately Investigate, Prepare Witnesses, and Present Evidence Related to Mental Illness, Neurodevelopment, and Brain Functioning

Trial counsel's failures to pursue red flags of Mr. Hall's notable impairments prejudiced him because it prevented the jury from considering Mr. Hall's individualized and real-world functional impairments. First, there is a reasonable probability that Mr. Hall's sentence would have been different if trial counsel had adequately investigated and presented evidence of Mr. Hall's ASD or related disorder. A neurodevelopmental disorder like ASD would have humanized Mr. Hall. More importantly, it would have explained evidence that the State most effectively wielded against Mr. Hall—e.g., testimony about his affect, the facts and circumstances of the capital crime, his recorded interrogations with the police, the Comedy Central video, the State's expert descriptions of his demeanor, and the statements Mr. Hall allegedly made to fellow inmates while awaiting trial in the jail.

Similarly, trial counsel's failure to consult with their retained neuroradiologist, Dr. Orrison or another qualified witness, impeded their defense of Dr. Gur's algorithmic-mapping results through their strawman witness, Dr. Adler. *See* Claim Fifteen, *infra*. Had trial counsel consulted with a qualified neuroradiologist, they would have learned that brain damage— including white-matter hyperintensities—was apparent from the UTMB scans. Ex. 6 at 103. But trial counsel failed to present this evidence. This in

turn allowed the State to suggest the jury could disregard Dr. Adler's brain-scan testimony: "And you know the MRI that's done in Texas at UTMB, the place they actually go to figure out if you have a problem or a concussion, says that the MRIs are unremarkable; and the PET scan is normal." 100 RR 46.

So too, trial counsel's deficient investigation prejudiced Mr. Hall by failing to provide sufficient evidence of in-utero alcohol exposure. This allowed State expert Dr. Proctor to conclude that Mr. Hall did not have FASD. 99 RR 97. In doing so, Dr. Proctor pointed to trial counsel's failure to show that Mr. Hall's mother consumed alcohol or drugs while pregnant with Mr. Hall. *Id.*

But witnesses in the Philippines would have testified that Mr. Hall's mother consumed alcohol and/or drugs during her pregnancies, including when she was pregnant with Mr. Hall. Family members, neighbors, and friends could have testified to this. Nonetheless, Mr. Hall's trial team either failed to talk with them or failed to ask whether Mr. Hall's mother had used alcohol or substances while pregnant—despite red flags that she had. A competent mitigation investigation would have uncovered these witnesses. Had counsel adequately investigated this issue in the Philippines and presented that evidence, the jury would have heard that Mr. Hall did have FASD instead of Dr. Adler's speculation that he might have been exposed to drugs and alcohol in utero. There is a reasonable probability that a definitive diagnosis of a neurodevelopmental disorder, instead of Dr. Adler's amorphous description,

would have resulted in a different outcome. *See Rompilla*, 545 U.S. at 392 (noting prejudice from trial counsel's failure to investigate and present evidence of "fetal alcohol syndrome").

### c. Failure to Investigate and Prepare to Rebut State Experts.

Trial counsel's failure to request additional funds to consult with their retained experts left trial counsel with a cursory-at-best understanding of all the experts' conclusions. This undermined any choices trial counsel made about the scope of their expert direct examination, cross-examination of the State's experts, or rebuttal testimony. As a result, their failure to request additional funds prejudiced Mr. Hall.

First, trial counsel allowed Dr. Proctor's damaging testimony to stand by failing to rebut it or prepare for cross-examination through Dr. Edens. Dr. Proctor's testimony relied heavily on data obtained from personality measures, including various MMPI forms and the PAI. He claimed that Mr. Hall was exaggerating his symptoms, did not suffer from any significant mental disorder, and had a personality disorder. 99 RR 72–77, 84–87. These conclusions went largely unrebutted.

Because trial counsel had only considered Dr. Edens as an expert for the limited purpose of rebutting PCL-R results, counsel was ill-prepared to counter other aspects of Dr. Proctor's testimony. Trial counsel could have used

Dr. Edens to mute Dr. Proctor's testimony in either of two ways: they could have had Dr. Edens testify in rebuttal, or they could have consulted with Dr. Edens to prepare trial counsel to cross-examine Dr. Proctor. Trial counsel's failure to do either likely impacted the outcome of punishment-phase proceedings.

Trial counsel also prejudiced Mr. Hall by failing to adequately consult with Dr. Nussbaum and/or another qualified expert regarding her or Dr. Price's testing and conclusions. Trial counsel's mitigation narrative hinged heavily on whether Mr. Hall's prematurity, malnutrition, environmental, and/or traumatic injuries had caused organic brain impairments. *See Porter*, 558 U.S. at 42–43 (holding it was error when state court did not consider mitigating effect of "brain abnormality and cognitive defects"); *Rompilla*, 545 U.S. at 392 (identifying brain damage as mitigating). And information about the functional impact of brain impairments is particularly mitigating. *See Porter*, 558 U.S. at 41 (brain abnormality testimony tied to functional impairments); *accord Rompilla*, 545 U.S. at 392 (detailing that "Rompilla 'suffers from organic brain damage, an extreme mental disturbance *significantly impairing several of his cognitive functions*'" (emphasis added)) (citation omitted).

Dr. Price testified that relying on test-score disparities across verbal and performance areas was not an appropriate way of identifying brain damage. 98 RR 166–67. But Dr. Price's testimony was wrong because it only considered

test-score disparities taken alone. Trial counsel could have had Dr. Nussbaum or another qualified expert explain that test-score disparities accompanied by something else could identify a traumatic brain injury. Specifically, test-score disparities corroborate a traumatic brain injury and its effects if accompanied either by reports of a head injury or by neuroimaging that showed evident impairment. And Mr. Hall had both.[6] 93 RR 203; 97 RR 36.

Dr. Price also testified that the variability in Mr. Hall's test scores could be attributed to a variety of benign causes, including lack of effort, underlying psychological problems, fatigue, and test anxiety. But trial counsel could have used Dr. Nussbaum or another qualified expert to counter this testimony as well. Dr. Nussbaum or another qualified expert could have explained how Mr. Hall's consistent pattern of strengths and weaknesses across measures indicated that organic injuries had caused his impairments.

Instead, the State proclaimed that Mr. Hall's sub-average scores on approximately five percent of the measures did "not suggest or support neuropsychological impairment that we would see after a traumatic brain

---

[6] As alleged above, *supra*, trial counsel was also ineffective in failing to adequately investigate and present testimony that: 1) Mr. Hall suffered from multiple head injuries and 2) neuroimaging not enhanced by algorithmic evaluation showed evidence of Mr. Hall's diffuse brain damage. Cumulation of the results of such errors "alter[s] the entire evidentiary picture" as to whether Mr. Hall's brain impairments altered his functioning. *See Strickland*, 466 U.S. at 696.

injury." 98 RR 166–68; *see also id.* at 162–63. And in closing, the State capitalized on counsel's failure to rebut Dr. Price's testimony when it urged the jury to disregard Dr. Nussbaum's testimony. The State stated that the defense "think[s] his brain is damaged because of some psychological tests. . . . Dr. Price pulls out the book and says: No. The actual book for the test says that is a misconception that was changed in the early '80s." 100 RR 45.

As the State's remarks make clear, trial counsel's lack of preparedness further permitted the State to cast the defense's experts as unreliable or less authoritative than the State's own experts' testimony. Trial counsel's failure to adequately consult with experts therefore prejudiced Mr. Hall. *See Rompilla*, 545 U.S. at 390–93 (prejudice from counsel's failure to present evidence responsive to state case for death).

### d. Failure to Adequately Investigate and Impeach State Jailhouse Witnesses for Future Dangerousness

Had trial counsel reviewed the jail and court records they had collected for each informant, they would have been able to call each witness's testimony into doubt. Indeed, cross-examination "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Trial counsel's failure to "examin[e] the readily available file . . . seriously compromis[ed] their opportunity to respond to a case for aggravation." *Rompilla*, 545 U.S. at 385.

Stanley Catalino testified that Mr. Hall offered him a homemade knife when he was having issues with other inmates. 82 RR 242. Incident reports from the jail show that Mr. Catalino had been found in possession of a large, manufactured weapon after officers intercepted a letter from him bragging about the weapon. Ex. 8 at 123–24. He admitted that the weapon was his. *Id.* at 124. In the letter, Mr. Catalino claimed that Mr. Hall also possessed a "shank" or homemade knife. *Id.* at 125. But jail staff did not find any such weapons when searching Mr. Hall's bunk and belongings. *Id.* This readily available information would have undermined Mr. Catalino's credibility to the jury.

The State's next informant, Zachary Dukes,[7] claimed in jail records that he had previously acted as an informant for the College Station Police Department and for the Drug Enforcement Administration (DEA). *E.g.*, Ex. 7 at 107 These records further disclose that he was being treated for bipolar disorder and schizophrenia but had ceased taking psychiatric medications at the time of arrest. *Id.* at 119–21. On arrest, he reported wanting to kill himself

---

[7] Mr. Dukes testified that his name was Zachary Dukes, 85 RR 8, but his jail and court records reveal that his legal name was Jeffrey Chancelor Dukes. *E.g.*, 108 RR 260. Though he testified that he was forty-one years old, he also testified that he went to school with Mr. Hall, who was twenty-two years old at the time of trial. 85 RR 8–10. Court records show Mr. Dukes was twenty-one years old. 108 RR 260.

and everyone around him. *Id.* at 116, 118 Shortly thereafter, Mr. Dukes reported to jail medical staff that he was experiencing auditory hallucinations. *Id.* at 113, 121. Jail staff prescribed chlordiazepoxide—a medication reported to cause changes in mental health, memory and sleep problems, and loss of touch with reality[8]—for substance-use withdrawal. *Id.* at 110, 112. Had they known this, the jury would have questioned Mr. Dukes's credibility and the accuracy of his testimony.

Jimmy Blackstone testified that Mr. Hall made statements relating to future dangerousness to around August of 2013. 85 RR 49–50; *see also* 7 Amend. CR 1636 (the State's notice alleged on or about August 27, 2013). Jail records show that he was in the same unit as Mr. Hall for less than four days around this time. Mr. Blackstone also testified that Mr. Hall had made his statements in front of multiple other inmates. 85 RR 50. But the State did not present any corroborating testimony. The State then attempted to bolster Mr. Blackstone's credibility by sharing that he had attained trustee status. 85 RR 49. But Mr. Blackstone wasn't elevated to trustee status until conveniently *after* his four days in Mr. Hall's unit. Information about Mr. Blackstone's

---

[8] *Chlordiazepoxide*, Medline Plus, https://medlineplus.gov/druginfo/meds/a682078.html#:~:text=Chlordiazepoxid e%20is%20used%20to%20relieve,electrical%20activity%20in%20the%20brain . (last visited Jan. 14, 2025).

trustee status would have shown his motivation to provide information to and testify favorably for the State. *See Arizona v. Fulminante*, 499 U.S. 279, 300 (1991) (recognizing jury might have found informant witness "motivated by her own desire for favorable treatment").

Mr. Blackstone also testified that he did not know about Mr. Hall's case because he could neither read nor write. 85 RR 66–67. Yet, Mr. Blackstone's jail records denote he had obtained a GED and been previously employed as an underwater welder—both facts indicating literacy. Ex. 9 at 129–30. Trial counsel's failure to impeach Mr. Blackstone's claim of illiteracy allowed the State to falsely present him as a disinterested party who could only have garnered information directly from Mr. Hall. *See Rhodes v. Vannoy*, 751 Fed. App'x. 524, 530 (5th Cir. 2018).

Mr. Blackstone also had approximately three years remaining on his probation at the time that he testified. 107 RR 14, 21, 32. But trial counsel did not question him about his probationer status, his hope for favorable treatment, or the coercive effects of his continuing relationship with the criminal legal system. *See Davis*, 415 U.S. at 317–18. This type of "particular attack" is distinct from evidence of Mr. Blackstone's prior convictions, 85 RR 47–48, as it suggests his ongoing motivations for testifying against Mr. Hall. *Davis*, 415 U.S. at 316–17. But because Mr. Blackstone's bias was not made apparent, the jury found him credible.

81

Justin Pressler's testimony about his shock probation status also left the jury with an inaccurate picture of his motivation to testify. He stated that although his charges were eligible for ten years in prison, he had been released on probation after six months of "shock probation." 88 RR 187–88. He stated that he "went to jail after I got sentenced before I ever met Gabriel [Hall]" and that the shock probation he received "was agreed upon before" he was sentenced." *Id.*

In truth, Mr. Pressler's conviction shows that the court agreed to "consider[]" shock probation after 180 days incarceration. 110 RR 94. The court ultimately considered and granted shock probation *after* Mr. Pressler had gone to jail, where he met Mr. Hall and purportedly gained useful information for the State. And though Mr. Pressler testified that no one had moved to revoke his probation, 88 RR 189, the District Attorney had done so before opting to modify the terms of probation instead. 108 RR 212–31.[9]

Counsel did not present this impeachment evidence that would have undercut the jailhouse informant testimony. As a result, the State relied heavily on it in closing argument. It asserted that the jailhouse informants had shown Mr. Hall's future dangerousness and that the jury should therefore

---

[9] Mr. Pressler's pre-sentencing report lists that DDA Baker was involved in the case in some capacity. 111 RR 16.

sentence Mr. Hall to death. 100 RR 36 (claiming Mr. Hall stated "he is going to take some people out"), *id.* at 36–37 ("he's still [sic] can wreak havoc outside of jail. Future danger? Future danger?"); *id.* at 112–15 ("He's going to kill whoever he can."). And the State bolstered the jailhouse informants' credibility by arguing that they had no reason to testify other than an altruistic desire to protect others. 100 RR 36 ("There is no reason for [Zachary Dukes] to testify other than the fact that it's the truth"), *id.* at 37 (arguing "the actual people in jail . . . have no reason to come and lie to you").

### 3. Cumulative Prejudice

The pervasive effect of trial counsel's deficiencies alters the evidentiary picture presented during the punishment phase of Mr. Hall's capital trial and undermines confidence in the death sentence. *See Strickland*, 466 U.S. at 695–96 (describing requirement that courts evaluate prejudice cumulatively); *accord Williams*, 529 U.S. at 397–98; *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009); *Dodson v. Stephens*, 611 F. App'x 168, 179 (5th Cir. 2015). If counsel had performed adequately, there is a reasonable probability that at least one juror would have concluded that Mr. Hall would not pose a future danger to society if imprisoned for life. *See Wiggins¸* 539 U.S. at 537; Tex. Code Crim. Proc. art. 37.071, § 2(b)(1). If counsel had performed adequately, there is also a reasonable probability that at least one juror would have concluded that mitigating circumstances warranted life imprisonment without parole

83

rather than death. *See Wiggins¸* 539 U.S. at 537; Tex. Code Crim. Proc. art. 37.071 § 2(e)(1). Because counsel provided ineffective assistance at punishment phase in violation of the Sixth Amendment, Mr. Hall is entitled to a new punishment phase.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

### Claim Five: The State violated Mr. Hall's due process rights when it elicited testimony from Dr. Proctor that it knew or should have known was false and misleading.

The State presented testimony from forensic psychologist Dr. Timothy Proctor during the punishment phase. Dr. Proctor had conducted multiple tests of Mr. Hall, including numerous personality measures. During his testimony, Dr. Proctor pointed to the results of these measures to prove two conclusions. First, he concluded that Mr. Hall did not suffer from any major mental disorder, including post-traumatic stress disorder (PTSD) and dissociative identity disorder (DID)—both of which defense experts had

diagnosed. Second, he concluded that Mr. Hall only had a personality disorder. Dr. Proctor expressly rejected that he had seen anything supporting the defense-proffered diagnoses in his examinations of Mr. Hall.

But this testimony was false. Data and reports from Dr. Proctor's testing show numerous diagnostically significant factors consistent with both PTSD and DID. The State was in possession of these documents; therefore, it knew or should have known that the testimony it elicited was false. And the question of whether Mr. Hall suffered from a major mental disorder—and not a treatment-resistant personality disorder—was material to both the defense and State arguments at punishment.

This claim is unexhausted.

### A. Statement of Facts

Dr. Bethany Brand testified for Mr. Hall during the punishment phase. After three days of interviews and psychological tests, she diagnosed Mr. Hall with PTSD,[10] DID, and major depression. 93 RR 194, 229; 94 RR 7. Dr. Brand testified that, when dissociated, people with DID may appear cold-blooded or lacking emotion. 93 RR 247. During her interview with him, Mr. Hall described

---

[10] Dr. Adler corroborated this diagnosis, describing impairments to Mr. Hall's amygdala—a finding consistent with PTSD diagnosis. 97 RR 45.

dissociative experiences in which he felt "like [he was] watching himself from behind like watching a movie of himself." *Id.*

These conditions exacerbated Mr. Hall's hopelessness and inability to escape from the Hall home. 94 RR 33–34. Dr. Brand observed that Mr. Hall's PTSD symptoms had improved post-arrest. *Id.* at 27. She explained that DID symptoms also tend to improve once patients learn of the diagnosis and avenues for treatment. 93 RR 243–44; 94 RR 115–56. She expected that, even in prison, Mr. Hall's conditions and symptoms would improve. 94 RR 53–56. This would place him at a lower risk of offending in prison. *Id.*

Psychologist Dr. Jolie Brams also testified on behalf of Mr. Hall. She testified to Mr. Hall's extreme trauma history, which she garnered from records and interviews of his family, friends, and acquaintances. 93 RR 24–25. She described how this complex trauma history, accompanied by parental neglect and abandonment, left Mr. Hall grossly impaired. *Id.* at 25–80. She also explained that these impairments went untreated and were exacerbated by the Halls following his adoption. *Id.* She testified to the resulting impairments that individuals like Mr. Hall were apt to experience. *Id.* at 88–109, 137–38. Like Dr. Brand, Dr. Brams described potential treatment steps available for people like Mr. Hall who have experienced such severe privations and trauma. *Id.* at 82–87. Her testimony corroborated and amplified Dr. Brand's diagnoses and findings that Mr. Hall's conditions were treatable.

Dr. Proctor, who testified on behalf of the State, reviewed records pertaining to Mr. Hall. 99 RR 57–71. He also interviewed and tested Mr. Hall. *Id.* Specifically, Dr. Proctor administered both an initial screening and a more extensive symptom-reporting measure, as well as multiple personality instruments, and two psychopathy measures. *Id.* at 66–70. He did not diagnose Mr. Hall as psychopathic, nor did he agree with Dr. Brand's PTSD and DID diagnoses. *Id.* at 71–73. Instead, he diagnosed Mr. Hall with a "mixed personality disorder [with] Cluster A traits."[11] *Id.* at 72. He further opined, "I didn't find evidence of posttraumatic stress disorder." *Id.* at 73. The State elicited the following further exchanges:

> DDA Baker: . . . you didn't see any signs of dissociative identity disorder?
>
> Dr. Proctor: No, I did not.

*Id.* at 89.

> Q: Did you find any evidence of dissociative identity disorder?

---

[11] The *Diagnostic Manual of Mental Disorders* defines "Other Specified Personality Disorder" as one where "symptoms characteristic of a personality disorder" exist but the symptoms "do not meet the full criteria for any of the disorders in the personality disorders diagnostic class." American Psychiatric Association, *Diagnostic Manual of Mental Disorders* 684 (5th ed. 2013) (DSM-V). "Cluster A includes paranoid, schizoid, and schizotypal personality disorders. Individuals with these disorders often appear odd or eccentric." DSM-V at 646. This diagnosis is typically inconsistent with PTSD and/or depressive disorders, which can mimic personality disorder symptomology. DSM-V at 648–49.

A: I did not.

Q: From your interviews with him?

A: No.

Q: Or [from] anywhere else?

A: No.

*Id.* at 94.

Q: After you've talked to him a second time and you're really looking for it, do you see anything that's on the dissociative spectrum?

A: No . . . .

*Id.* at 108.

The State pointed to Dr. Proctor's testimony in closing argument, expressly relying on his testimony to argue that because Mr. Hall had an intractable personality disorder and not a major mental disorder, he was a future danger who should be sentenced to death. *See* 100 RR 42, 53, 112, 122. Accordingly, the jury answered "yes" to Special Issue Number 1—whether there was a probability beyond a reasonable doubt that Mr. Hall would commit criminal acts of violence constituting a continuing threat to society. 15 Amend. CR 3478. The jury also answered "no" to Special Issue Number 2—whether there were sufficient mitigating circumstances to warrant a sentence of life rather than death. *Id.* at 3479.

88

### B. Legal Standard

The Fourteenth Amendment prohibits the State from eliciting false testimony or failing to correct testimony that is misleading. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Mr. Hall is entitled to relief upon showing that 1) false testimony was presented, 2) the State knew or should have known it was false, and 3) there is a reasonable likelihood that the false testimony affected the judgment. *See United States v. Mason*, 293 F.3d 826, 828 (5th Cir. 2002) (citing *Giglio v. United States*, 405 U.S. 150, 153–54 (1972)).

The State unconstitutionally uses false testimony if it "should have known" that the testimony was false. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. O'Keefe*, 169 F.3d 281, 292 (5th Cir. 1999). Whether the State intended to elicit Dr. Proctor's false statements or simply failed to correct them is immaterial; the State meets *Napue*'s criterion merely by allowing false testimony to go uncorrected. *See Napue*, 360 U.S. at 269. And the State entrenches false testimony by relying on it in closing argument or where it creates the false picture through its misleading questioning. *United O'Keefe*, 128 F.3d at 894–95 (citing *United States v. Sanfilippo*, 564 F.2d 176, 178 (5th Cir. 1977) and *United States v. Barham*, 595 F.2d 231, 243 n.17 (5th Cir. 1979)).

### C. Argument

#### 1. Dr. Proctor's testimony was false.

Contrary to his testimony that he "didn't find evidence of posttraumatic stress disorder," 99 RR 73, Dr. Proctor's testing reports show that he knew Mr. Hall was experiencing multiple clinically significant symptoms consistent with PTSD. These are reproduced in the table below:

| DSM-V PTSD Diagnostic Criteria<br>DSM-V at 271–72 | Mr. Hall's Corresponding Symptoms |
|---|---|
| **Criterion B[12]** | |
| **Recurrent, involuntary, and intrusive distressing memories** | Intrusive ideation; is troubled by past memories of bad experience. |
| **Recurrent, distressing dreams in which the context and/or affect of the dream are related to the traumatic event(s)** | Nightmares so bad they scare him. |
| **Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring** | Reliving something horrible that had happened to him. |
| **Criterion C** | |
| **Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s)** | *Questions on these measures don't appear to be responsive to this criterion* |

---

[12] Criterion A is the "[e]xposure to actual or threatened death, serious injury, or sexual violence in one (or more)" delineated ways. DSM-V at 271. Testimony about Mr. Hall's exposure to such qualifying events was presented at trial, *e.g.*, 83 RR 52–53; 84 RR 120–22, and Dr. Proctor did not dispute that these events occurred, 99 RR 118–24.

| Criterion D: | |
|---|---|
| **Inability to remember an important aspect of the traumatic event(s)** | *Questions on these measures don't appear to be responsive to this criterion* |
| **Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world** | Feeling hopeless and useless and that life is a strain, he cannot be helped, and he got a raw deal from life. |
| **Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world** | A generally harsh, negative self-evaluation. He is prone to be self-critical and pessimistic, dwelling on past failures and lost opportunities. Plagued by thoughts of worthlessness, hopelessness, and personal failure. Beliefs that others were plotting against him and talking about him and believing he was often punished without cause. |
| **Markedly diminished interest or participation in significant activities** | Described himself as no longer interested in things that he used to enjoy and having no interest in life. |
| **Persistent inability to experience positive emotions** | Described himself as feeling blue most of the time and not feeling that life is worthwhile. |
| Criterion E | |
| **Hypervigilance** | Described himself as high strung and frequently feeling as though something dreadful was about to happen and experiencing periods of great restlessness such that he cannot sit long in a chair. |
| **Problems with concentration** | Confusion. |
| **Sleep disturbance** | Fatigue and low energy; does not awaken feeling fresh and rested most mornings; feels tired a good |

|  | deal of the time; cannot typically sleep without thoughts or ideas bothering him. |

Similarly, though Dr. Proctor testified he did not see "anything on the dissociative spectrum" or "any signs of dissociative identity disorder," 99 RR 89, 94, 108, his testing results show Mr. Hall was experiencing symptoms consistent with DID:

| DSM DID Diagnostic Criteria, DSM-V at 292 | Mr. Hall's Corresponding Symptoms |
|---|---|
| **Criterion A:** ||
| **Disruption of identity that involves marked discontinuity in sense of self and sense of agency, accompanied by related alterations in affect, behavior, consciousness, memory, perception, cognition, and/or sensory-motor functioning** | Peculiar odors come to him at times; he hears strange things when he is alone; sometimes hears his thoughts being spoken aloud; hears voices and palms begin to sweat |
| **Criterion B:** ||
| **Recurrent gaps in the recall of everyday events, important personal information, and/or traumatic events that are inconsistent with ordinary forgetting** | *Questions on these measures don't appear to be responsive to this criterion* |
| **Recurrent gaps in the recall of everyday events, important personal information, and/or traumatic events that are inconsistent with ordinary forgetting** | Describes having peculiar and strange experiences; blank spells after which he did not know what was going on around him, sometimes carried on activities but later did not know what he had been doing, and at other |

| | times having attacks in which he was unable to control his movement or speech. |
|---|---|
| **Criterion C:** | |
| **The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning** | Mr. Hall likely to experience strain in relationships and characterized his reported relationships as distant because of these sequelae. |

### 2. The State knew or should have known that Dr. Proctor's testimony was false.

Prior to his testimony, the State received Dr. Proctor's testing, reports, data, and notes and turned those over to the trial court. *See* 34 RR 26, 86 RR 160–61. The State also received all the materials from Drs. Brand, Brams, and Adler before trial; the State provided those materials to Dr. Proctor for his review. *See* 86 RR 161. Accordingly, the State was well aware, or should have been aware, that Dr. Proctor had reviewed mounds of evidence supporting PTSD and DID. Yet, the State asked Dr. Proctor misleading questions to elicit false testimony about the results of Dr. Proctor's evaluation. *O'Keefe*, 128 F.3d at 894–85. And it capitalized on that testimony in closing arguments. *Id.*

### 3. Dr. Proctor's false testimony was material.

There is a reasonable likelihood that Dr. Proctor's testimony disclosing the PTSD- and DID-consistent symptomology would have affected the jury's punishment-phase verdict. *See Giglio*, 405 U.S. at 154. To sentence Mr. Hall to death, the jury had to find that there was insufficient mitigating evidence in

93

his background and character to warrant a life sentence. Tex. Code Crim. Proc. § 37.071(e)(1). Dr. Proctor's testimony was particularly relevant to this question as it encouraged the jury to doubt that Mr. Hall was suffering from treatable conditions, as Mr. Hall's experts had testified. *See* 93 RR 83–84, 87; 94 RR 50, 53–56, 242–43. Dr. Proctor's testimony instead asserted that Mr. Hall suffered from an intractable personality disorder. 99 RR 74–75 (describing personality disorders as "steady," "rather fixed," difficult to change, "who a person is"), *id.* at 144 (agreeing personality disorder can be part of who person is).

Because of the future-dangerousness and mitigation special issues, the purported intransigence of any diagnosed mental disorder is a key inquiry for Texas capital jury deliberations. Where the jury determines that the accused can be treated, it may give some effect to the mental-health mitigating evidence "within the context of the future-dangerousness special issue." *Nelson v. Quarterman*, 472 F.3d 287, 307 (5th Cir. 2006); *accord Cullen v. Pinholster*, 563 U.S. 170, 201 (2011) (recognizing evidence that accused suffers from impairments rendering him "beyond rehabilitation" may be construed as aggravating rather than mitigating). The opposite is also true. *See id*.

In closing argument, the State relied on Dr. Proctor's statements that Mr. Hall suffered from an intractable personality disorder instead of PTSD or DID. 100 RR 42, 53; *see also id.* at 42 ("And the scariest thing about [Mr. Hall]

is that there is nothing wrong with him"). The State's arguments focused on the intransigence of the personality disorder as evidence that Mr. Hall was a future danger. *Id.* at 42 ("There's no self-help books that can solve that. . . He finds pleasure in your pain. That is what he does. There's no cure for that."), 112 ("We can't change that, guys. I'm sorry. We can't change that. It's his personality. It's who he is."), 122 ("The doctors have told you . . . . That's part of who he is. That's not changing.").

The jury's verdict mirrored this argument. It first found a reasonable probability that Mr. Hall would be a future danger. This accorded with the State's arguments that Mr. Hall suffered from an untreatable personality disorder. The jury then found that the mitigation evidence—now hollowed by Dr. Proctor's false testimony—did not weigh in favor of a life sentence. Given the centrality of this mental-health evidence to the jury's consideration of the special issues, there is a reasonable likelihood that Dr. Proctor's false testimony affected the judgment. Mr. Hall is entitled to a new punishment-phase proceeding

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is

procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

## Claim Six: The State suppressed favorable evidence of Mr. Hall's mental condition.

In conducting its investigation into Mr. Hall's background and preparing the capital case for trial, the State identified and spoke with Mr. Hall's former teachers. The State's notes from these interviews show that at least one former teacher believed Mr. Hall had autism spectrum disorder (ASD) and/or learning disabilities. The State did not provide this information to Mr. Hall's counsel. But this information was favorable to Mr. Hall in that the jury could consider it in mitigation, and it was material as it would have shown impairments in Mr. Hall's functioning evident during his time living in Texas and established deficits that explained Mr. Hall's behaviors and affect.

This claim is unexhausted.

### A. Statement of Facts

On April 16, 2012, Mr. Hall's counsel filed a motion for the State to produce "all exculpatory, impeach[ing,] and mitigating evidence." 1 Amend. CR 51. Within this motion and with citation to *Brady*, Mr. Hall requested the State produce "[a]ny information that tends to diminish culpability," delineating that this included evidence favorable to punishment. *Id.* at 53–54 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)); *see also id.* at 56 (requesting "any . . .

96

mitigating evidence"). The trial court granted this motion on June 11, 2012. *Id.* at 87–91.

The trial court entered an additional discovery order on August 2, 2012, requiring the State to disclose "[a]ny exculpatory and/or mitigating evidence within the possession, custody, or control of the State." 1 Amend. CR 97. The State signed this order before it was filed, acknowledging its contents. *Id.* The court entered another order compelling production of the same on July 25, 2014. 7 Amend. CR 1507. Again, the State signed the order in acknowledgment. *Id.* On the same date, the State averred that it would voluntarily provide discovery in accordance with the Michael Morton Act. Tex. Code Crim. Proc. art. 39.14 (2014). This statute requires the State to permit the accused to make copies of "any designated documents, papers, written or recorded statements of . . . a witness." *Id.*

But sometime after July 31, 2013, in the roughly two years preceding the capital trial, the State received a list of Mr. Hall's teachers during his freshman, sophomore, and junior year from the high-school assistant principal. Ex. 10. The State began contacting these witnesses, and the notations "JP" appear on the document, indicating that District Attorney Jarvis Parsons spoke with at least five listed teachers. *Id.* Handwritten notations on the same page read "Autism" and "Learning Disabilities." *Id.* The District Attorney did not provide any information about these interviews to Mr. Hall or his counsel,

97

including mitigating or exculpatory information they learned. The State also did not provide information that any of Mr. Hall's teachers believed he had ASD and learning disabilities.

### B. Legal Standard

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence meets the materiality standard when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). This standard parallels the prejudice requirement from *Strickland* for prevailing on an ineffective assistance of counsel claim. *Id*.

### C. The State suppressed favorable evidence about Mr. Hall's mental condition.

The evidence the State withheld was favorable in that it bore relevance to the mitigation picture before Mr. Hall's capital jury as 1) witness(es) to Mr. Hall's real-world impairments and functioning and 2) diagnoses for which to evaluate Mr. Hall. Both a learning disability and/or an ASD diagnosis would have altered the picture of Mr. Hall's functioning and interactions with others.

The Individuals with Disabilities Education Act (IDEA), which is applicable in academic settings (and therefore likely the scheme with which Mr. Hall's teachers were familiar), defines a learning disability to include a disorder of the "basic psychological processes involved in understanding or using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, read, write, spell, or do mathematical calculations." 20 U.S.C. § 1401(30)(A).[13] This term includes multiple etiologies and diagnoses, including brain injuries and perceptual disabilities. *Id.* at § 1401(30)(B). The IDEA also includes under this heading a traumatic brain injury "resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance." 34 C.F.R. 300.8(c)(12).

ASD is characterized by "persistent deficits in social communication and social interaction," including impairments in social and emotional reciprocity and "failure of normal back-and-forth conversation." DSM-V at 50. It also

---

[13] Although not expressly contained in the DSM-V, learning disabilities most closely relate to the broader neurodevelopmental disorders category. *See generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 31–85 (5th ed. 2013) (DSM-V). These disorders "are characterized by developmental deficits that produce impairments of personal, social, academic, or occupational functioning." *Id.* at 31. And they range from "specific limitations of learning or control of executive functions to global impairments of social skills or intelligence." *Id.*

implicates deficits in nonverbal communication, such as "abnormalities in eye contact and body language or deficits in understanding and use of gestures" and includes "difficulties adjusting behavior to suit various social contexts." *Id*. Difficulties in nonverbal speech may "give the impression of odd, wooden, or exaggerated 'body language' during interactions." *Id*. at 54. Those with ASD also exhibit "[e]xtreme difficulties in planning, organization, and coping with change." *Id*. at 57. The IDEA echoes the DSM-V's ASD criteria, characterizing the disorder as "a developmental disability significantly affecting verbal and nonverbal communication and social interaction . . . . Other characteristics often associated . . . are . . . stereotyped movements [and] resistance to environmental change or change in daily routines." 34 C.F.R. 300.8(c)(1)(i).

Evidence of ASD or a similar disorder was important for the jury to hear in rendering its punishment verdict as "a reasoned *moral* response" in light of Mr. Hall's background and character. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). It also provided further evidence that Mr. Hall was neglected because, though at least one teacher had suggested Mr. Hall had discernable impairments, he had not received a special education referral or evaluation, let alone appropriate intervention and supports. *See* 82 RR 190–93 (Chrissy Hestor testified there is no indication in Mr. Hall's file he received counseling, special education, or similar services). And whether the evidence directly relates to the crime committed does not alter that such evidence "may

nevertheless 'be mitigating in the sense that [it] might serve as a basis for a sentence less than death.'" *McGowen v. Thaler*, 675 F.3d 482, 490 (5th Cir. 2012) (alteration in original) (quoting *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (internal citations omitted)). Texas law echoes this sentiment, permitting the accused to present (and the jury to thus consider) "evidence of the defendant's background or character . . . that mitigates against the imposition of the death penalty." Tex. Crim. Proc. art. 37.071 § 2(a)(1).[14]

### D. Evidence that at least one of Mr. Hall's former teachers believed he had autism spectrum disorder and/or a learning disability was material.

This evidence was material in that there is a reasonable probability it would have altered the jury's determination that Mr. Hall was a future danger, their perception of the mitigation marshalled in favor of a life sentence, and whether the balance of this evidence favored life over death. *See* Claim Four.

Absent such evidence, the State capitalized on Mr. Hall's evident functional deficits and instead used them to urge the jury to both find Mr. Hall a future danger and reject the mitigation evidence. The State emphasized

---

[14] Mr. Hall has raised a claim that, based on the facts of his case, the jurors were unconstitutionally led to believe that mitigating evidence needed to be tied to the offense in order to warrant consideration. *See* Claim Seventeen. To the extent this Court determines Texas's capital sentencing scheme was unconstitutionally applied to Mr. Hall because the State urged the nexus requirement abhorred in *Tennard v. Dretke*, 542 U.S. 274 (2004), it does not alter the analysis that such evidence should have been considered favorable.

Mr. Hall's affect as evidence that he "likes killing. . . . His emotions are the same. His tastes are different." 100 RR 42; *see also* 79 RR 84 (Det. Kirk Webb describing Mr. Hall's affect); *id.* at 100 (Det. Webb describing Mr. Hall's "blank stare" as evidence that he was "happy to explain what he did"). The State encouraged the jury to "watch him. We're going to go through a few clips here, and I want you to watch what the Defendant feels." 100 RR 124. And the State offered a video of Mr. Hall being interviewed by insult comedian Jeff Ross to further focus the jury on Mr. Hall's demeanor. *See* 89 RR 45. An ASD and/or learning-disability diagnosis would have rebutted the State's arguments that Mr. Hall did not have remorse or empathy because it was not outwardly visible or expressed in the way one would expect. *See* 100 RR 38. ("Dr. Proctor told you there is no remorse. None. . . . No remorse. No empathy"); *id.* at 39 ("no empathy and no remorse are personality traits. They don't change"); *id.* at 109 ("And he has never once said that he's worried about Linda Shaar, that he worried about Ed Shaar, that he cares about anything.").

Evidence that at least one of Mr. Hall's teachers noted his impairments would have also refuted the State's arguments that Mr. Hall, defense counsel, and defense experts were fabricating, biased, or plain wrong in their diagnoses. The State argued that if Mr. Hall was really impaired, "you would have issues in school. You would have issues. Something. You don't go from fourth grade to your senior year in high school with all of this and not a single teacher –

102

everyone says: Good, nice." 100 RR 121. And the State presented testimony from Ms. Hestor, the Director of Student Services at College Station Independent School District, that Mr. Hall "doesn't have any sort of educational issues *that were documented*." 82 RR 193 (emphasis added); *see also, e.g.*, 100 RR 42 ("And the scariest thing about him is that there is nothing wrong with him"); *id.* ("Chrissy Hestor [sic] told you that, the head person at College Station ISD. . . . There's nothing [in Mr. Hall's school records]"). But teachers did notice something in school; the State concealed it. Mr. Hall is entitled to a new punishment-phase proceeding.

### E. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

## Claim Seven: Counsel rendered ineffective assistance in violation of the Sixth Amendment when they failed to move to suppress Mr. Hall's confession.

Mr. Hall's adoptive father—an attorney—collaborated with detectives during their interrogations to manipulate Mr. Hall into confessing. This

confession should have been suppressed under Texas and federal constitutional law. If the confession had been suppressed, critical additional evidence would also have been suppressed as fruit of the poisonous tree. There was no strategic reason to avoid challenging the legality of the confession, and Mr. Hall's counsel were ineffective under the Sixth Amendment for failing to do so.

This claim is unexhausted.

## A. Statement of Facts

### 1. Gabriel Hall lacked prior experience with law enforcement, in contrast with his adoptive father.

Mr. Hall was born in the Philippines, where he lived until he was adopted at age eleven. He had no arrests prior to this incident, nor had he ever been investigated by the police. Mr. Hall is a person with autism spectrum or similar neurodevelopmental disorder, post-traumatic stress disorder, and dissociative identity disorder. At the time of his interrogation, Mr. Hall was 18 years old and in high school.

Wes Hall is Gabriel Hall's adoptive father.[15] He is also an attorney who had served as a justice of the peace for twelve years and routinely represented the family in legal matters. 94 RR 167; *e.g.*, 125 RR 79–83 (e.g., handling court

_____

[15] Because both the Petitioner and his adoptive father have the same last name, their first names will be used in this claim for clarity.

proceedings for adoption of another child). As a justice of the peace, Wes oversaw misdemeanor proceedings, held probable cause hearings, signed search warrants, and frequently interacted with law enforcement officers. 94 RR 167–68.

### 2. Wes orchestrated Gabriel's confession to the crime.

This crime occurred on Thursday, October 20, 2011. 78 RR 86–87. Wes and Karen Hall were out of town in San Antonio with another of their adopted children. 95 RR 66. At 3 a.m. on Friday, police arrived at the Hall residence to interview Gabriel. 95 RR 68. His sister Yana immediately called Wes. 78 RR 284. After speaking privately with Gabriel on the phone, Wes agreed to allow the police to speak with Gabriel on the condition that Wes be on speakerphone for the entire conversation. 78 RR 284–85; 95 RR 69. Gabriel denied involvement in the crime during that interview. 79 RR 70.

On Friday afternoon, Wes and Karen drove directly to the College Station police station to talk with the detectives. 95 RR 69–70. Wes already knew Detective Wilson on a first-name basis. *Id.* at 71. Detectives had not requested this interview; it was nonetheless recorded. *Id.* at 70–72.

During that discussion, Wes and Karen repeatedly expressed concern for whether Gabriel might have used any of their personal firearms to commit the crime. *See* 128 RR 37; 95 RR 71. Wes and Karen stated that they would absolutely cooperate with the police if Gabriel was a suspect. *See id.*

105

After this meeting with police, Wes knew that Gabriel was a suspect in the murder. 95 RR 88, 93. That afternoon, Wes picked up Gabriel from school. *Id.* at 88. Wes then drove Gabriel to the police station so police could collect his DNA and fingerprints. *Id.* at 88–89. Wes did not consult with Gabriel on how to interact with the police. *Id.* at 93. Gabriel likely did not know that Wes was taking him to the police station until they had arrived there. *Id.* at 103–04.

Once at the police station, Detective Wilson began to interrogate Gabriel with Wes in the room. *Id.* at 80–81. Gabriel initially continued to deny his involvement in the crime. *Id.* at 82–83. After a few minutes, Wes interrupted the police interrogation and suggested that the detectives *Mirandize* Gabriel. 95 RR 89–90. "I would hate to have anything that would be inadmissible because of some procedural problem here," Wes told police. *Id.* at 90–91.

Police *Mirandized* Gabriel. 95 RR 92. In doing so, police warned Gabriel that he was entitled to an attorney during his interrogation. 95 RR 91. Wes, an attorney, remained in the room as Gabriel was *Mirandized*. *Id.* at 89–91. After the interrogation resumed, Wes left the room. *Id.* at 92. Gabriel waived his *Miranda* rights, 123 RR 178, and he confessed shortly after, 79 RR 83.

### 3. Police relied on Gabriel's confession to obtain additional physical evidence.

After the confession, the police turned their attention to locating the weapons used in the attack. 79 RR 98–99. Initially, Gabriel stated that he had

thrown the weapons in Brothers Pond, near the victims' residence. *Id.* at 98–99. Three days after Gabriel's initial confession, Wes went with Karen's daughter, Sarah Bosse, to Brothers Pond Park, where police were already there searching the pond for the murder weapons. *See* 95 RR 94. Wes and Sarah met with Detective Wilson while there. *Id.* at 95. They discussed the case, and Wes speculated as to what might happen if "that guy makes bond." *Id.* at 96. By "that guy," Wes meant his son Gabriel. *Id.* Wes told Detective Wilson that he and Sarah were searching the house for evidence they could give police to use against Gabriel. *Id.* at 100. Detective Wilson cautioned that they could run into evidentiary issues at trial if Wes was not careful. *See* 128 RR 39. But Wes dismissed this: "We're on the same team here, Robert," Wes said. "We got him by surprise on Friday." 95 RR 97; 128 RR 39.

On the same day that Wes had that conversation with Detective Wilson, Gabriel told police that he had hidden the weapons in the garage attic at a second residence owned by the Halls that was next door to their primary home. 85 RR 92–93. Based on Gabriel's statement, the detectives secured a search warrant, 82 RR 251, searched the residence, and found the murder weapons, 85 RR 73–74.

### B. Legal Standard

To establish ineffectiveness under the Sixth Amendment, Mr. Hall must show that trial counsel's performance was deficient and that this deficient

performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is to be assessed "under prevailing professional norms." *Id*. at 688.

To establish prejudice, Mr. Hall must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Failure to file a meritorious motion to suppress can constitute ineffective assistance of counsel. *See Morris v. Thaler*, 425 Fed. App'x. 415, 422–24 (5th Cir. 2011) (remanding for an evidentiary hearing to determine whether counsel was ineffective for failing to move to suppress confession); *Smith v. Dugger*, 911 F.2d 494, 498 (11th Cir. 1990) (granting federal habeas relief from capital conviction based on *Strickland* claim for trial counsel's failure to move to suppress confession).

Under the Fifth and Fourteenth Amendments, a custodial confession may not be used against a defendant unless the confession was voluntary. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A confession is voluntary when 1) the defendant made an independent and informed choice to confess as a product of the defendant's own free will; 2) the defendant was capable of making this choice; and 3) the defendant's will was not overborne by the pressures and circumstances of the situation. *Jurek v. Estelle*, 623 F.2d 929,

937 (5th Cir. 1980). Confessions that are "the product of coercion, either physical or psychological, cannot stand." *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). Coercive police activity "is a necessary predicate to the finding that a confession is not voluntary." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (internal citation omitted).

Courts must consider the totality of the circumstances when assessing the voluntariness of a confession. *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Relevant factors may include

- the defendant's youth, *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962);

- whether the defendant is a foreigner, *Spano v. New York*, 360 U.S. 315, 323 (1959);

- the defendant's mental condition, *Connelly*, 479 U.S. at 164; and

- whether the defendant knew the interrogating officer and had a relationship of trust, *see Spano*, 360 U.S. at 323.

Any *Miranda* waiver must be knowingly, intelligently, and voluntarily made. *See Hopkins v. Cockrell*, 325 F.3d 579, 582–83 (5th Cir. 2003). To be knowing and intelligent, a *Miranda* waiver "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A court may properly conclude that a defendant waived his

*Miranda* rights only if the totality of the circumstances reveal "both an uncoerced choice and the requisite level of comprehension." *Id.*

Texas law further protects a person's right to be free from a pressured confession. Under Tex. Code Crim. Proc. art. 38.21, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion[.]" This provision is more protective than its federal corollary; it "may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period." *Oursbourn v. Texas*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008). Under the Texas provision, claims of involuntariness need not be predicated on police overreach. *Id.* And involuntary-confession claims can involve sweeping inquiries into the criminal defendant's state of mind when confessing, even if those factors were not apparent to the police. *Id.*

The *Oursbourn* decision further held that police behavior may or may not be a factor: "A confession given under the duress of hallucinations, illness, medications, or even a private threat, for example, could be involuntary under Article 38.21 and the Texas confession statute." *Id.* The CCA elaborated that "'evidence of a defendant's psychological abnormality'" has "full logical relevance under Texas law." *Id.* (citing George E. Dix, "*Voluntariness*" *and* "*Intelligence*" *of Confessions as* "*Independent*" *Texas Law Issues,* 20 TEX. TECH

L. Rᴇᴠ. 1017, 1080, 1091 (1989)) (internal quotation marks omitted); *see also Sandoval v. Texas*, 665 S.W.3d 496, 526 (Tex. Crim. App. 2022).

Even if a Texas trial court declines to suppress a confession, a defendant can still argue to the jury that the statement is involuntary and should be disregarded and may receive an instruction to that effect. Tex. Code Crim. Proc. art. 38.22 §§ 6, 7.

### C. Argument

#### 1. Trial counsel was deficient in failing to move to suppress Gabriel's confession.

Trial counsel performed deficiently by failing to adequately investigate, research, and litigate whether to suppress Gabriel's confession, based on a challenge to whether Gabriel's confession and waiver of his rights were knowingly, intelligently, and voluntarily made. *Strickland*, 466 U.S. at 688. There was substantial evidence that Gabriel's confession should have been challenged; a motion to suppress therefore would not have been "futile." *Morris*, 425 Fed. App'x. at 419 (internal citation and quotation marks omitted).

Gabriel's confession does not pass the three elements set forth in *Estelle*, listed *supra*. Gabriel did not make an independent and informed choice to confess based on his own free will. He did not do so because he was not capable of doing so. And to the extent that Gabriel was capable of voluntarily confessing, his will was overborne by the combination of police pressure and

the circumstances of his situation. In sum, Gabriel's will was overborne by the circumstance of his adoptive father serving him up for a death sentence on a silver platter.

In other words, Gabriel's confession was the product of psychological coercion, as was his waiver of his rights under *Miranda*. The totality of the circumstances supports this conclusion. Gabriel was eighteen years old; his youth therefore cautioned a particular susceptibility to coercion. As a transnational adoptee, Gabriel is and was a foreigner. And, as his erratic behavior indicates on the confession tape, Gabriel had a fragile mental condition.

But most importantly, Gabriel had a relationship of trust with Wes. *See Spano*, 360 U.S. at 323; *Hopkins*, 325 F.3d at 584 (police officer's friendship with Hopkins created relationship of trust and officer's conduct "went beyond mere emotionalism, trickery or confusion and passed the line into the sort of lying that deprives a defendant of the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them" (internal quotation and citation omitted)). He trusted Wes as a parent to protect him from exposure. After he was *Mirandized*, he trusted Wes—an attorney and former justice of the peace—to protect his legal interests. And because Wes knew Detective Wilson, Gabriel's trust extended to the detective, as well.

Wes's later assertion that he was not functioning then as Gabriel's attorney is irrelevant. *See* 95 RR 100. And, under Texas law, it similarly does not matter whether police overreached their authority when interrogating Gabriel. *See Oursbourn*, 259 S.W.3d at 172. Rather, what matters is how someone in Gabriel's shoes would have understood Wes's role leading up to and during the interrogation.

Gabriel's as-yet-undiagnosed mental illness and developmental disorder rendered him more susceptible to both his adopted father's influence and police questioning. Under Texas law, all the subjective factors of Gabriel's mental illness and his ensuing perception of his interrogation are relevant in determining whether his statement was free from "compulsion or persuasion." Tex. Code Crim. Proc. art. 38.21; *see Oursbourn*, 259 S.W.3d at 172. This is true regardless of whether police were aware of those mental facts. *Oursbourn*, 259 S.W.3d at 172, 181–82. Given his adopted father's secret collaboration as essentially an agent of the police, while pretending to Gabriel to be present as his defender, Gabriel's statement was involuntary and his waiver of *Miranda* was not voluntarily, knowingly, and intelligently made.

Trial counsel had no strategic reason for failing to move to suppress Gabriel's confession. Doing so would have resulted in a tremendous pre-trial outcome for their client. Even if the trial court had denied the motion, trial counsel could have argued to the jury that Gabriel's confession was not

voluntary and should be disregarded, and they could have received an instruction to that affect. *See* Tex. Code Crim. Proc. Ann. art. 38.22 §§ 6, 7. Trial counsel's failure to litigate this issue constitutes deficient performance under *See Strickland*. 466 U.S. at 688.

## 2. Trial counsel's failure to move to suppress the confession prejudiced Gabriel.

If trial counsel had moved to suppress Gabriel's confession, there is a reasonable probability that the motion would have been granted. The prejudice in both the guilt and punishment phases of trial is unmistakable. *See Strickland*, 466 U.S. at 694.

The charges against Gabriel would have been reduced or altogether dismissed if trial counsel had successfully moved to suppress Gabriel's confession. This is because all the additional evidence that flowed from the confession would also have been suppressed as fruit of the poisonous tree. *See Wong Sun v. United States,* 371 U.S. 471, 484 (1963). This includes: Gabriel's second confession, in which he revealed the location of the weapons; police discovery of the weapons; and all statements Gabriel made to other inmates while incarcerated in jail. *See Morris*, 425 Fed. App'x. at 422 (citing *Wong Sun*, 371 U.S. at 484) (observing that successful motion to suppress the confession would have resulted in suppression of additional evidence as fruit of poisonous tree). This would have derailed the State's case against Gabriel, likely

resulting in a dismissal of all charges. *See Smith*, 911 F.2d at 497 ("failure to move to suppress the confessions was *extremely* prejudicial to Smith because Smith's confessions constituted the primary evidence in the state's case" and "[w]ithout the confessions, conviction for first degree murder was probably impossible" (emphasis in original)) (internal citations omitted).

For punishment, the recorded confessions likely constituted the most harmful evidence that the prosecution urged the jury to consider when arguing that Gabriel would be a future danger. *E.g.*, 100 RR 43.

Given the strength of the omitted motion to suppress, there is a reasonable probability that the outcome of the guilt and punishment phases would have been different had trial counsel litigated this issue. *See Strickland*, 466 U.S. at 694. Accordingly, his conviction and sentence must be vacated.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

**Claim Eight: The State unconstitutionally struck people of color from the jury, and the state courts failed to scrutinize the rationales proffered for these strikes as required by *Batson v. Kentucky*.**

The State impermissibly struck three prospective jurors based on race.[16] Trial counsel objected to each of these strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the State proffered purported race-neutral reasons in response. 61 RR 39–40, 42–44, 49, 50–52; 63 RR 69–71. Nonetheless, the trial court ultimately denied each *Batson* claim. 61 RR 48,54; 63 RR 72. In doing so, the trial court stated only that it found that the stated reasons were race neutral. 61 RR 48,54; 63 RR 72. But the trial court failed to scrutinize the proffered rationales as required by *Batson*. The result was that the strikes were unconstitutionally exercised, and Mr. Hall was denied a constitutionally adequate adjudication of his *Batson* claims.

Mr. Hall raised this error as Claim Thirteen on direct appeal. *See* Brief of Appellant at 180–91, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 23, 2019). It was adjudicated on the merits. *Hall v. Texas*, 663 S.W.3d 15, 40–43 (Tex. Crim. App. 2021). As detailed below, § 2254(d) does not apply because the state court adjudication was neither fair nor full. In the alternative, Mr. Hall

---

[16] Mr. Hall only raises a *Batson* claim as to Jurors 89 and 100. He shows that the trial court failed to properly conduct a step-three *Batson* adjudication as to Jurors 80, 89, and 100.

can meet § 2254(d) because the state court decisions relied on unreasonable factual determinations and unreasonably applied *Batson* and progeny.

### A. Statement of Facts

The State peremptorily struck Prospective Juror 80. 61 RR 39. Mr. Hall asserted that this strike was racially motivated because Prospective Juror 80 was a Black male whom the State had disparately questioned. *Id.* at 39–40. The State volunteered its rationales for the strike, claiming that Prospective Juror 80

1) answered "no" when asked if he was in favor of the death penalty;

2) would raise the burden of proof in a capital case;

3) had a girlfriend who was studying psychology, such that he would be disinclined to sentence someone with mental illness to death; and

4) "actually waved at the Defendant and said hello" when introduced.

*Id.* at 42–44.

Mr. Hall asked the trial court to keep Prospective Juror 80 until the end of voir dire so that the court could examine whether the prospective juror had been disparately questioned. *Id.* at 44–45. Instead, the trial court denied the *Batson* claim on the spot, stating "I'm going to find that there are race-neutral reasons," and excusing Prospective Juror 80. *Id.* at 48.

Immediately thereafter, the State accepted Juror H.M.—making a point to note on the record that she was a Hispanic female—before proceeding to

117

strike Prospective Juror 89, another Hispanic female. *Id.* at 49. Mr. Hall again raised a *Batson* challenge. *Id*. And he again requested that the trial court hold the struck prospective juror until the end of voir dire so that the court could consider whether the State was disparately questioning minority prospective jurors throughout voir dire. *Id*.

The State defended its strike by pointing to its recent acceptance of Hispanic Juror H.M. *Id.* at 50. It then stated that Prospective Juror 89

1) had been a psychology major;

2) felt that the death penalty was not appropriate for defendants with some mental health issues; and

3) had worked at Child Protective Services (CPS).

*Id.* at 50–52. The State added that they had spoken with Prospective Juror 89's former CPS coworkers and learned information suggesting that she would "not [be] a good juror in this case." *Id.* at 52. The State asserted that this was because "the Defense is going to do something about Karen Hall and the way she treated the children in the household." *Id*.

Mr. Hall renewed his request that the court examine the State's disparate questioning at the close of voir dire proceedings. *Id.* at 53. He also requested to question the former co-workers that the State alleged it had talked to. *Id*. The trial court suggested that perhaps counsel could instead cross-examine the State or review their jury selection notes. *Id*. Though the

118

State agreed to this request, the trial court immediately rescinded the offer, stating that the *Batson* challenge "will be denied. I find there are race-neutral reasons for the strike." *Id.* at 53–54.

During voir dire the next day, Mr. Hall objected to the State's strike of Prospective Juror 100, a Black woman. 63 RR 69. Mr. Hall again asserted that the State's strike violated *Batson. Id*. The State counted out eight rationales for its strike, stating that Prospective Juror 100

1) said the best argument against the death penalty is mental illness;

2) left the questionnaire blank regarding cases that would warrant the death penalty;

3) stated that no case would warrant the death penalty, even after further consideration;

4) stated life without parole (LWOP) would be the appropriate punishment for killing an auditorium full of people;

5) wanted to know what made someone commit capital murder;

6) was worried about someone being wrongfully convicted;

7) would increase the burden of proof on the State; and

8) would not consider the background of the accused.

*Id.* at 70–71.

Mr. Hall clarified that Prospective Juror 100 had been confused about the burden of proof, and that she had ultimately agreed that the burden of

proof on the State was not 100 percent. *Id.* at 71–72. Counsel again requested that the trial court review disparate questioning of this juror as compared to non-minority jurors. *Id.* at 72. The trial court denied the *Batson* objection without further question or comment, stating that "I find those are all race-neutral reasons. I overrule your *Batson* objection." *Id.*

### B. Legal Standard

The Fourteenth Amendment "forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (internal quotation marks omitted). Strikes motivated in whole or in part by race "cast[] doubts over the obligations of the parties, the jury, and indeed the court to adhere to the law throughout the trial." *Powers v. Ohio*, 499 U.S. 400, 412 (1991). A racially motivated strike calls the integrity of the courts into question; it "invites cynicism respecting the jury's neutrality," and undermines confidence in the ultimate adjudication. *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (*Miller-El II*) (quoting *Powers*, 499 U.S. at 412).

Where a defendant objects at *Batson* step one and makes out a *prima facie* case that the State's strikes were exercised on an impermissible basis, the State must next offer a race-neutral basis for striking the juror in question. *Foster v. Chatman*, 578 U.S 488, 499–500 (2016). At step three, the trial court must determine whether the defendant has proven purposeful discrimination. *Snyder*, 522 U.S. at 477.

Neither trial nor appellate courts may turn a blind eye to "all of the circumstances that bear upon the issue of racial animosity" in reviewing *Batson* claims. *Id.* at 478. The Supreme Court has identified an inexhaustive list of evidence a court should consider in conducting its step-three inquiry. This list includes a prosecutor's misrepresentations when defending his strikes, comparative juror analysis, and any other relevant circumstances. *Flowers v. Mississippi*, 588 U.S. 284, 301–02 (2019) (citations omitted).

Although prosecutors may err on occasion when providing step-two rationales, "a series of factually inaccurate explanations for striking black prosecutive jurors can be telling." *Id.* at 314. Specifically, these misrepresentations are one indication that race is the true motivation for the strike. *See Foster*, 578 U.S. at 510, 512; *accord Flowers*, 588 U.S. at 302. But without inquiring into this evidence, courts are unlikely to produce "actual answers to suspicions and inferences" that racial discrimination motivated the strike. *Johnson v. California*, 545 U.S. 162, 172 (2005).

Moreover, evidence tends to prove purposeful discrimination when a "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve." *Miller-El II*, 545 U.S. at 241. In applying comparative juror analysis, courts must be mindful that jurors need not be "products of a set of cookie cutters." *Id*. at 247 n.6. Instead, comparative juror analysis aids in the trial court's assessment of

121

"what is really going on" in assessing the actual reasons for the challenged

strikes. *Reed v. Quarterman*, 555 F.3d 364, 380-81 (5th Cir. 2009). Where a

federal habeas litigant demonstrates that the State's strike of a single juror

was motivated by purposeful discrimination, he is entitled to relief. *Miller-El

II*, 545 U.S. at 235, 266.

### C. Argument

A proper step-three evaluation under *Batson* would have shown that the

State struck prospective Jurors 89 and 100 due to their race. This is for two

reasons. First, the State misrepresented the record during *Batson*'s second

step, in which it offers race-neutral reasons to support its peremptory strikes.

These misrepresentations support a step-three conclusion that the State's

proffered reasons were pretextual. Second, the State's proffered race-neutral

reasons do not stand up to a comparative juror analysis.

**1. In response to Mr. Hall's *Batson* claims, the State
repeatedly misrepresented the record.**

*1) Misrepresentations as to Prospective Juror 80:*

Although Mr. Hall does not raise a *Batson* claim regarding Prospective

Juror 80, the State's misrepresentations regarding this juror evince efforts to

conceal invidious discrimination. At *Batson* step two with regards to this

prospective juror, the State averred that it had exercised this strike because

Prospective Juror 80 "actually waved at the Defendant and said hello

yesterday, which is unlike any other jurors we've seen." 61 RR 43. But the record does not reflect that this occurred. When trial counsel introduced Mr. Hall to Prospective Juror 80, he asked "So he's the Defendant?" to clarify and then nodded in response to defense counsel's statement that Mr. Hall was the accused. 59 RR 39. The record does not reflect that Prospective Juror 80 ever waved at or spoke directly to Mr. Hall.

The State's additional assertions at *Batson* step two are similarly belied by the record. The State asserted that it struck Prospective Juror 80 because he stated he was not in favor of the death penalty and would raise the burden on the State in a capital case. 61 RR 42, 44. To the contrary, Prospective Juror 80's questionnaire denotes that he "believe[s] that the death penalty is appropriate in some murder cases, and I could return a verdict in a proper case which assessed the death penalty." 2 Supp 10 CR 2386. His remaining responses regarding the death penalty noted that it lacks deterrent effect, *e.g.*, *id.* at 2386, 2389, but recognized that the death penalty is the "legal way" for victims to seek revenge, *id.* at 2388; *see also id.* at 2387, 2392. And under this premise, he expressed no qualms about voting for the death penalty. *Id.* at 2393.

**2)** *Misrepresentations as to Prospective Juror 89:*

The State chiefly grounded its strike of Prospective Juror 89 in her feelings about mental-health diagnoses and treatment. Amongst these explanations, the State claimed she had stated that a life sentence would be appropriate for offenders with mental-health concerns. 61 RR 51. But this was an overbroad characterization of Prospective Juror 89's views.

Rather, Prospective Juror 89 stated that her concern was limited to people who "maybe don't realize what they're doing and the gravity of what they're doing." 60 RR 21. She further elaborated that she was referring to people who cannot distinguish right from wrong or people who "need[] another caregiver with them to help them make any decision because they didn't understand how it affected another." *Id.* at 32. These statements demonstrate that she would consider a life sentence for people with a narrow subset of diagnoseable mental illnesses—not, as the State characterized, for any person with a mental-health concern.

Prospective Juror 89's questionnaire underscores that she did not think all mental-health evidence justified a life sentence. She described that she meant only "*some* with mental health issues—they deserve punishment but not the death penalty." 2 Supp 11 CR 2679 (emphasis added). Additionally, she described being in favor of the death penalty because "some crimes are so

124

extreme and some criminals . . . have no remorse or empathy for their actions or the effect on others." *Id.* at 2678.

### 3) Misrepresentations as to Prospective Juror 100:

In response to Mr. Hall's *Batson* challenge regarding Prospective Juror 100, the State averred that it had struck the juror because she stated the best argument against the death penalty was mental illness, had left the questionnaire blank when asked what cases might deserve the death penalty, later stated that she believed no case warranted capital punishment, believed LWOP was appropriate for someone convicted of killing an auditorium full of people, questioned why someone would commit capital murder, expressed concern about an innocent person being convicted, would increase the burden on the State to prove its case and; would not consider the background of the accused. 63 RR 70–71. These explanations are belied by the record.

The State asked Prospective Juror 100 to explain her questionnaire response that the best argument against the death penalty was that the person was mentally ill. *See* 2 Supp 13 CR 3024. She explained that her response was meant to implicate those who were insane at the time of the crime. 63 RR 35. The State's questioning on this subject ceased less than a transcript page later, suggesting that it accepted this explanation. *See id.* at 35–36; *see also Miller-El II*, 545 U.S. at 244 (2005) (where prosecutorial representation may have

125

been misunderstanding, "we expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike").

The State also asserted that Prospective Juror 100's blank questionnaire section concerning what cases might deserve the death penalty suggested that she was unwilling to vote for death. 63 RR 70. This similarly defies credulity. Had the State believed that her blank questionnaire section equated with reluctance, they would have moved to strike the juror for cause. But the State did not.

Moreover, when the State questioned Prospective Juror 100 about her blank response, she replied that she would "have to hear [about the crime] and then make that decision [about whether to apply the death penalty] then." *Id.* at 17. She later stated that she was "okay" with the death penalty, *id.* at 18, and "[i]t could be" the appropriate punishment for a capital murder, *id.* at 29. She advised that she "would have to hear more information" to determine whether death or LWOP would be appropriate in a given case. *Id.* at 21–22. Far from excluding the death penalty from consideration, Prospective Juror 100's response shows she would determine the propriety of the punishment in each case.

Again, the State mischaracterized the record, claiming that Prospective Juror 100 stated that LWOP would be the appropriate punishment for a person

126

convicted of killing an auditorium full of people. *See id.* at 70–71. Prospective Juror 100 actually stated only that LWOP would be the *minimum* appropriate punishment for a person convicted of a mass killing. *Id.* at 17.

The State also flagged Prospective Juror 100's response to the questionnaire where she stated that she wanted to know "what made someone commit capital murder." *Id.* at 71. The State asserted that this meant "that she was looking for some cause or some reason why somebody does something and [would] keep looking for that even if it wasn't in the evidence." *Id.* But to the contrary, Prospective Juror 100 expounded on her response to this question during voir dire. She explained that she meant that "[w]hen a person loses their life, that's just sad to me." *Id.* at 20. Her response was meant to express grief "when a human life is taken," *id.*, not sympathy with the accused.

The State also claimed that Prospective Juror 100 "was worried about somebody being innocently convicted" and that she "would increase the burden of proof on the State." *Id.* at 71. But during questioning, Prospective Juror 100 stated that, although she was concerned about wrongful convictions when she was younger, this was no longer a paramount concern for her. *Id.* at 18. Instead, she expressed that she "would just want people to be treated fairly." *Id.* at 19. She did not suggest that she would increase the burden on the State.

Prospective Juror 100  initially stated that she believed the law required the State to prove its case to 100 percent certainty, but then accepted that the

law only required proof beyond a reasonable doubt.[17] *Id.* at 60. She moreover agreed that she would be able to find a defendant guilty of capital murder based on the testimony of a single eyewitness "if they proved it beyond a reasonable doubt." *Id.* at 30–31. Her responses to both State and defense counsel questioning show her ability to follow the law as to the requisite standard of proof.

Finally, the State claimed that it struck Prospective Juror 100 because she would not consider the background of the defendant in making the appropriate sentencing determination. *Id.* at 71. This is also not so. Instead, the record shows that Prospective Juror 100 initially did not understand the role of mitigation in capital sentencing. *Id.* at 52–57. Nor did she understand why facts and circumstances of the defendant's background outside of the offense would be relevant to sentencing. *Id.* But after defense counsel explained that this fulsome consideration was consistent with the law, Prospective Juror 100 agreed she could consider a defendant's background. *Id.* at 57. And when the State expressly asked if she would consider background

---

[17] When questioning other jurors, the State took issue with the court considering juror responses to defense without having first explained the applicable law to the juror. *E.g.,* 71 RR 77–78. The State's willingness to rely on similarly unwitting juror responses in validating its purported race-neutral rationales is marked. The Supreme Court has identified such "trickery" during voir dire as circumstantial evidence that a *Batson* violation has occurred. *Miller-El II*, 545 U.S. at 261–62.

evidence when answering special issue number 2, Prospective Juror 100 agreed that she could consider the defendant's "character, background, [and] personal moral culpability." *Id.* at 34.

### 2. Comparative juror analysis shows the State exercised its strikes on racial grounds.

#### 1) *Prospective Juror 89:*

The State reported it struck Prospective Juror 89 because she had been a psychology major in college, felt that a life sentence would be appropriate for offenders with mental-health concerns, and had formerly worked for CPS. 61 RR 50–52. The State's resort to these rationales ignores Prospective Juror 89's actual statements on the record.

Although she had received a bachelor's degree in psychology, Prospective Juror 89 reported that her thoughts and feelings about mental-health diagnoses did not come from that experience. 60 RR 20–21. She testified that she took her psychology courses a "long time ago," and her questionnaire bears out that she had completed her undergraduate degree more than a decade prior to trial. *Id.* at 21; 2 Supp. 11 CR 2696.

Comparatively, Juror J.D., a white woman, had also obtained a bachelor's degree in psychology. 2 Supp. 25 CR 6367. At 28 years old, her college experience, and thus psychology education, were far more recent than Prospective Juror 89's. 2 Supp. 25 CR 6349. Juror J.D. also disclosed personal

mental-health experiences: "I received treatment for depression from May 2011 to November 2014. I was discharged from treatment by a medical professional. . . . I believe [mental health] professionals are necessary and provide many services to aid people in having a more stable life." *Id.* at 6363– 64. But whereas the State asked Prospective Juror 89 numerous questions about her thoughts and experiences as to mental-health professionals and treatment, 60 RR 20–24, the State only asked Juror J.D. whether she could listen to psychological testimony and give it the same weight as she would give to other witnesses. 75 RR 171.

Like Prospective Juror 89, Juror J.D. had worked at CPS. 2 Supp. 25 CR 6365. But Juror J.D. had worked there less than three years ago, *id.*, whereas Prospective Juror 89 had left CPS employment more than six years prior, 2 Supp 11 CR 2694. Moreover, Prospective Juror 89 had left the child protection field entirely—by the time of trial, she worked as an enrollment director and academic advisor for engineering students. 2 Supp. 11 CR 2693.

By contrast, Juror J.D. worked as a Child Support Officer for the Attorney General at the time of trial. 2 Supp. 25 CR 6364. She also frequented websites for Scotty's House[18] and the Child Abuse Awareness Alliance online.

---

[18] Scotty's House is a non-profit Child Advocacy Center serving seven Texas counties that reports "collaborat[ing] with Child Protective Services (CPS) and law enforcement officials on every case . . . and providing victims of child abuse

*Id.* at 6370. On the other hand, Prospective Juror 89 only listed that she checked Facebook and an online newsletter unrelated to child welfare. 2 Supp 11 CR 2699. Despite the State's alleged concerns that a CPS affiliation might show excessive sympathy towards Mr. Hall's adoption and "parental issues," the State only asked Juror J.D. briefly about how her CPS experience might impact her jury service. *See* 75 RR 145–74; *see also Miller-El II*, 545 U.S. at 246 (rejecting State's proffered rationale as "makeweight" where they did not question prospective juror on matter). Nonetheless, the State certainly questioned Prospective Juror 89, a Hispanic woman, about her experience and whether it would "bleed over into [her] feelings about the law." 60 RR 23.

### 2) Prospective Juror 100:

The State's laundry list of eight rationales for striking Prospective Juror 100 similarly fails to withstand closer scrutiny. Like Prospective Juror 100, white Juror K.M. left numerous areas blank in response to questions regarding imposition of the death penalty. *See* 2 Supp 5 CR 1185–87. She also stated that she would hold the State to a higher burden—to prove its case beyond the shadow of a doubt. 54 RR 51. And she believed in "giv[ing] mercy to everybody." 54 RR 52.

---

and/or neglect with safety, healing, and justice." Scotty's House, https://www.scottyshouse.org/ (last visited Dec. 24, 2024).

Juror I.V. was a white male. 2 Supp. 3 CR 735. Like Prospective Juror 100, Juror I.V. stated he would disagree with the death penalty in cases of mental illness, *id.* at 743, and wanted to know the defendant's background and "what triggered them" to commit the charged crime, 51 RR 45–48. He described that he would only apply the death penalty in "special cases," 51 RR 37, and expressed reluctance because "innocent people could be sentenced to death," having read Innocence Project publications. 2 Supp. 3 CR 736; *see also* 736, 739. at 740. The State did not ask him about either of these assertions. He also expressed that 18 year olds "don't have the discernment that an adult person or older person would have" and are "more easily influenced" by others. 51 RR 39.

### 3. Other relevant circumstances further support a finding of invidious intent.

The State seated Juror H.M immediately after defense counsel made the first *Batson* challenge. 61 RR 49. In so doing, the State highlighted, "we'd like to note for the record that Ms. [H.M.] is a Hispanic female." *Id*. In the next breath, the State moved to strike Prospective Juror 89. *Id*. Defense counsel then raised his second *Batson* challenge. *Id*.

But the State simply pointed to its newly accepted minority juror, H.M., stating that "just for the record, Ms. [H.M.], the last juror, is a Hispanic female. We just accepted her." *Id*. at 50. The State's tokenizing of H.M. suggests its

132

overall focus on race during voir dire. This focus "plainly belie[s] . . . that [the State] exercised its strikes in a 'color-blind' manner." *Foster*, 578 U.S. at 513. And it suggests that not only was the State tracking juror race, but they were exercising strikes to "obscure the otherwise consistent pattern" of discriminatory strikes. *Miller-El II*, 545 U.S. at 250; *see also Flowers*, 588 U.S. at 307. This is one post-*Batson* effect of which the Supreme Court has cautioned. *Miller-El II*, 545 U.S. at 239–40; *see also Batson*, 476 U.S. at 105 (Marshall, J., concurring).

The State's laundry-listing of as many as eight proffered race-neutral reasons at step two (*e.g.,* 63 RR 70–71) is similarly suspect. *See Foster*, 578 U.S. at 502; *Johnson v. Finn*, 665 F.3d 1063, 1075 n.6 (9th Cir. 2011). This tactic, whereby prosecutors spout forth a litany of rationales for a given strike in the wake of a *Batson* challenge, shields proffered rationales from scrutiny by raising the odds that at least one espoused rationale will remain unrebutted.

This process also renders comparative juror analysis more difficult. A majority-race seated juror may have two or even three similarities to a particular minority-race struck prospective juror. But when the State lists five, six, or seven rationales, it becomes nearly impossible to find any comparator jurors. Thus, when the state "laundry lists [] 'whatever-neutral' explanations to plug into the second step," it reduces the *Batson* analysis to a "three-step *danse macabre*" which is destined to fail. *Casarez v. Texas*, 913 S.W.2d 468,

133

489 (Tex. Crim. App. 1994) (en banc) (McCormick, J., dissenting) (citations omitted), *on reh'g* (Dec. 13, 1995). Laundry listing at *Batson*'s step two is so well suited to insulating strikes from scrutiny that the technique is "even taught at CLE seminars." *Id.*

### 4. The trial court's step-three rubberstamping of the State's proffered rationales fell short of constitutionally required scrutiny.

*Batson*'s step three is critical to effectuate constitutional protections against invidious discrimination in jury selection. This step is "designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson*, 545 U.S. at 172 (citing *Batson*, 476 U.S. at 97–98 & n.20). The trial court must "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977)). But upon hearing the State's proffered race-neutral reasons, the trial court here only determined that the *stated* rationales were "race-neutral." 61 RR 48; *see also id.* at 54; 63 RR 72. Far from fulfilling *Batson*'s promise, the trial court's rulings show that it failed to subject the proffered rationales to the scrutiny *Batson* requires.

At step three, the trial court must assess whether the State's proffered rationale are persuasive and whether there is evidence of "purposeful discrimination." *Johnson*, 545 U.S. at 171 (citing *Purkett v. Elem*, 514 U.S. 765,

768 (1995)). The trial court may not shirk this responsibility by rubberstamping the State's proffered race-neutral reasons or ignoring readily available evidence of discriminatory motives. *See Batson*, 476 U.S. at 95 ("[T]he trial court *must* undertake a 'factual inquiry' that 'takes into account *all* possible explanatory factors' in the particular case." (emphasis added)(citations omitted)). This resort to evidence beyond the State's proffered reasons is key to any *Batson* analysis.

But that did not happen in this case. Far from probing the record, the prospective jurors' responses at voir dire, or even responses in the written questionnaires, the trial court demurred to the rationales that the State proffered. The trial court examined only whether the rationales proffered were implicated by race: "I'm going to find that there are race-neutral reasons, and [Prospective Juror 80] is going to be excused." 61 RR 48. The trial court gave similar perfunctory rulings on the two additional *Batson* challenges that Mr. Hall made. *Id.* at 54 ("I find there are race-neutral reasons for the strike" of Prospective Juror 89); 63 RR 72 ("I find those all are race-neutral reasons. I overrule your Batson objection" following strike of Prospective Juror 100).

Importantly, the trial court's actions consistently refused to examine the "relevant circumstances" that the United States Supreme Court has found particularly probative at step three. This demonstrates that the trial court did not actually examine the proffered step-two reasons. After Prospective Juror

135

80 was struck, Mr. Hall requested that the court "review the questioning by both sides up to now in [the prospective juror's] voir dire session." 61 RR 40; *see also id.* at 49–50; 63 RR 72. The parties each time offered to admit the relevant juror questionnaire for court review. 61 RR 42, 49–50; 63 RR 70.

Mr. Hall's counsel then urged the trial court to examine the State's questioning of minority-race prospective jurors to assess disparate treatment. 61 RR 44–48, 53–54; 63 RR 72. But each time the trial court simply denied the *Batson* motion without further scrutiny. 61 RR 48, 54; 63 RR 72. Because the State claimed to have spoken with former coworkers of Prospective Juror 89, Mr. Hall asked to question those former coworkers. 61 RR 52–54. And, although the trial court originally acceded that counsel could question the State and examine their jury selection notes, it ultimately denied the *Batson* motion without allowing any of the questioning or examination that it had offered only a moment earlier. *Id.*

The trial court's inquiry thus fell far short of what *Batson* requires. It failed to probe beyond proffered reasons to determine whether they were the actual reasons for striking minority-race jurors. It was never the law that "any facially neutral reason sufficed to answer a *Batson* challenge." *Miller-El II*, 545 U.S. at 240. Indeed, "[s]ome stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand." *Id*. As such, *Batson*

136

"requires the judge to assess the plausibility of [the proffered reason] in light of all evidence with a bearing on it." *Id.* at 251–52. The trial court failed to adjudicate Mr. Hall's *Batson* claims at step three. Had it done so, it would have determined the State's strikes were motivated by race. Mr. Hall's Fourteenth Amendment rights were violated by the State's exercise of racially motivated strikes. Because the State violated *Batson*, Mr. Hall is entitled to a new trial. *See id.* at 235, 266.

### D. The Court can review the merits of this claim *de novo.*

Mr. Hall presented this claim to the state courts as Claim Thirteen on direct appeal. *See* Brief of Appellant at 180–91, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 23, 2019). 28 U.S.C. § 2254(d) deference does not apply to this claim because the state court did not afford Mr. Hall a full and fair opportunity for review. See *Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). He is therefore entitled to *de novo* review of this claim.

In the alternative, the Court can review this claim on the merits. Mr. Hall can meet § 2254(d) as to Juror 89 and the allegation that the trial court conflated steps two and three. He can also show that the CCA declined to adjudicate the claim as to Juror 100 on the merits. In adjudicating this claim, the CCA distinguished between the allegation that the trial court had conflated *Batson* steps two and three and the allegation that the State violated *Batson*. *Hall*, 663 S.W.3d at 40. The CCA adjudicated the former on the merits,

but Mr. Hall can meet § 2254(d). He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *E.g.*, *Batson*, 476 U.S. 79; *Johnson*, 545 U.S 162; *Miller-El II*, 545 U.S. 231. He can also meet § 2254(d)(2) because the state court's decision is based on an unreasonable determination of the facts based on the record before it.

The CCA also adjudicated the latter claim—that the State had violated *Batson*—on the merits but only as to Juror 89. *Hall*, 663 S.W.3d at 42–43. Mr. Hall can also meet § 2254(d) as to this claim. He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *E.g.*, *Batson*, 476 U.S. 79; *Johnson*, 545 U.S 162; *Miller-El II*, 545 U.S. 231. He can also meet § 2254(d)(2) because the state court's decision is based on an unreasonable determination of the facts based on the record before it.

The CCA, however, declined to adjudicate the allegation that the State had violated *Batson* in striking Juror 100. *Hall*, 663 S.W.3d at 42 n.6. Because the CCA declined to rule on this claim about Juror 100, Mr. Hall can rebut the presumption that the state court adjudicated it on the merits, and this Court can review that allegation *de novo. Johnson*, 568 U.S. at 301–02.

**Claim Nine: Counsel rendered ineffective assistance in violation of the Sixth Amendment when they failed to object to the State's gender-based peremptory strikes.**

The State struck 9 female potential jurors. 50 RR 253; 54 RR 295; 58 RR 56; 61 RR 49, 259; 63 RR 69; 68 RR 123; 72 RR 36; 73 RR 225. Trial counsel did not object to these strikes, claiming they were waiting for additional invidiously discriminatory strikes to object. 58 RR 56. This failure to object was deficient and deprived Mr. Hall of litigating meritorious *J.E.B.* claims at trial and/or on direct appeal. This claim is unexhausted.

### A. Statement of Facts

After the State exercised its first 3 strikes against female prospective jurors, 50 RR 253; 54 RR 295; 58 RR 56, trial counsel asked the court to "take note on this" and advised that a "a gender-based *Batson*" claim was possible. 58 RR 56. Trial counsel described that they declined to make a "gender-based *Batson*" claim at that time because they were waiting for a "pattern . . . to develop." *Id*. Though the State continued to disproportionately strike female jurors, trial counsel never objected that the State was unconstitutionally striking potential jurors based on their gender. At the conclusion of voir dire, the State had used 9 of its 11 peremptory strikes to remove women from the jury in Mr. Hall's case.

### B. Legal Standard

Trial counsel has a duty to bring knowledge and skill to bear upon his client's case. *Strickland v. Washington*, 466 U.S. 668, 688 (1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)). Counsel's ignorance about the law is a "quintessential example" of unreasonable and deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (citing *Williams v. Taylor*, 529 U.S. 362, 395 (2000) and *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986)). Where trial counsel fails to make a meritorious motion or objection, the question is whether the state of the law should have put counsel on notice that the motion or objection was warranted. *Kimmelman*, 477 U.S. at 385.

In *J.E.B. v. Alabama*, 511 U.S. 127 (1994), the Supreme Court extended *Batson*'s prohibition against racially motivated peremptory strikes to the gender context.[19] Under *J.E.B./Batson*, an objection or motion is warranted where the pattern of strikes gives rise to the inference of discrimination. *Flowers v. Mississippi*, 588 U.S. 284, 307 (2019) (citations omitted). But the pattern of strikes is by no means the sole evidence that raises an inference of invidious discrimination. *See id.* at 301–02 (citing *Foster v. Chatman*, 578 U.S. 488 (2016); *Snyder v. Louisiana*, 552 U.S. 472 (2008); *Miller-El v. Dretke*, 545

---

[19] To the extent that this claim applies *Batson*'s framework, Mr. Hall incorporates his discussion from Claim Eight, *supra*, by reference.

U.S. 231 (2005) (*Miller-El II*); *Batson v. Kentucky*, 476 U.S. 79 (1986)). Indeed, "the Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder*, 552 U.S. at 478 (internal quotation marks and citations omitted); *accord Batson*, 476 U.S. at 95. A prima-facie *J.E.B.* challenge—like a *Batson* challenge—is therefore a low bar; counsel can rely on "'any other relevant circumstance'" to raise the necessary inference. *Johnson v. California*, 545 U.S. 162, 169 (2005) (quoting *Batson*, 476 U.S. at 96).

A defendant is prejudiced by trial counsel's deficiencies if there is a reasonable likelihood that the result of the proceeding would have been different had the motion been made. *Kimmelman*, 477 U.S. at 387. In the voir-dire context, a defendant is prejudiced if there is a reasonable likelihood that the court would have sustained the *Batson* motion. *Nelson v. Davis*, 952 F.3d 651, 679 (5th Cir. 2020) (citing *Eagle v. Linahan* 279 F.3d 926, 943 (11th Cir. 2001))(requiring showing that *Batson* claim would have shown strikes based on invidious discrimination); *Scott v. Hubert*, 610 Fed. App'x 433, 434–35 (5th Cir. 2015) (citing *Strickland*, 466 U.S. at 697).

### C. Argument

#### 1. Trial counsel was deficient in failing to make *J.E.B.* objections.

The State's 9 strikes of female potential jurors formed a pattern that gave rise to an inference of gender discrimination. These strikes warranted an

objection under *J.E.B./Batson*. But the State's pattern of gender-motivated strikes was not the sole evidence to show a *J.E.B./Batson* violation. Rather, a *Batson* objection was warranted after the State first struck a female prospective juror. And by the time trial counsel discussed raising a gender-based *J.E.B./Batson* claim, the State's three strikes of female prospective jurors was a relevant circumstance, alone enough to make a prima-facie challenge of invidious gender discrimination. *See Miller-El II*, 545 U.S. at 240–41; *see also Johnson*, 545 U.S. at 169 (citations omitted).

Trial counsel was mistaken in their belief that a pattern of discriminatory strikes needed to emerge before they could object under *J.E.B./Batson*. *See Snyder*, 552 U.S. at 478; *Batson*, 476 U.S. at 95. The state of the law should have put defense counsel on notice that a *Batson* objection was warranted after the State struck any of the 9 female prospective jurors. Mr. Hall's counsel therefore provided a quintessential example of unreasonable and deficient performance.

Moreover, trial counsel's attempts to retain the State's stricken female jurors demonstrate that counsel lacked a strategic reason for acquiescing and failing to object on *J.E.B.* grounds. *See*, *e.g.*, 50 RR 248–51 (declining to agree to excuse female Prospective Juror 18); 54 RR 295 (declining to question female Prospective Juror 47); 61 RR 49–54 (making *Batson* race challenge to strike of female Prospective Juror 89).

142

### 2. Mr. Hall's *J.E.B.* claim was meritorious.

The State used 11 strikes to remove 9 women and 2 men from the jury. 50 RR 253; 54 RR 295; 58 RR 56; 61 RR 49, 259; 63 RR 69; 68 RR 123; 72 RR 36; 73 RR 225. The State used 81% of their strikes against women. This is the kind of disparity that "[h]appenstance is unlikely to produce." *See Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) (*Miller-El I*). But an analysis of the State's disparate questioning of comparable jurors is even more revealing than this pattern. Together, these statistics demonstrate that the State's strikes were motivated by gender. *See Flowers*, 588 U.S. at 301–02 (listing statistical evidence, disparate questioning, and comparative juror analysis as relevant *Batson* factors).

### a. The State used an accusatory script with female jurors.

The State used a more probing and skeptical script when questioning female prospective jurors than it used for male prospective jurors. This questioning pattern aids the State's manufacture of pretextual rationales for the strike. *See Batson*, 476 U.S. at 97. By asking a lot of questions about a juror's background, "a prosecutor can try to find some pretextual reason—any reason—that the prosecutor can later articulate to justify" a discriminatory strike. *Flowers*, 588 U.S. at 310.

Disparate questioning may also frustrate attempts at comparative juror analysis. This is because disparate questioning can produce a record that is "resistant to characteristic-by-characteristic comparisons" of struck versus seated jurors. *Id.* The State's script for female prospective jurors focused disproportionately on individual responsibility for the sentencing determination and more heavily scrutinized their ability to consider a death sentence.

### 1) *Individualized Responsibility for the Ultimate Punishment:*

The State's script for female jurors emphasized that they bore individual responsibility for answering the special issues in a way that would result in a death sentence. They used the following script disproportionately with nearly every female prospective juror:

- "Could you do it if you took the oath and go back and do all that one more time and make that decision? . . . [D]o you feel like you're capable of doing that?" 50 RR 243 (female Prospective Juror 18);

- "[C]an you answer these questions in a death penalty case in a way that would lead to that result? . . . So you could honestly answer that question even understanding the gravity of the situation and what that would mean?" 54 RR 281–82 (female Prospective Juror 47);

144

- "Can you answer that question honestly understanding that the answer to the question would mean that a person would be executed for the crime they committed?" 58 RR 40 (female Prospective Juror 67);

- "[Y]ou could answer that question yes, knowing that that's one step closer to the death of another human being? . . . Can you answer this question no, there's not a sufficient mitigation—or there's not sufficient mitigation to warrant life rather than death, knowing that that answer at that point would be the final step? . . . Can you answer that question if it's going to end the life of another human being?" 60 RR 32, 37–38 (female Prospective Juror 89);

- "If you find—if you listen to the facts and you believe there's a probability the Defendant would commit criminal acts of violence that would constitute a continuing threat to society, could you answer that special issue yes or no depending on the facts?" 61 RR 33 (female Prospective Juror 97);

- "[C]an you answer these questions in a way that would end the life of another human being? . . . [C]an you answer that question no, knowing all those things; and you know what the impact of that verdict means, that that would be a death sentence at that time? . . . Could you answer those questions in such a way that would end the life of another human

being? Because that's what we're asking you to do." 63 RR 233–34
(female Prospective Juror 100);

- "Do you feel like you could answer this question knowing that a yes
answer to this would put you one step closer to that death penalty? . . .
[A]nd if there isn't a mitigating circumstance, that you could answer this
question?" 68 RR 106, 108 (female Prospective Juror 125); and

- "[C]an you answer that question knowing that you are sentencing this
defendant to death?" 73 RR 200 (female Prospective Juror 199).

The State asked similar individualized-responsibility questions of the female
jurors it seated. 61 RR 86–87 (Juror M.P.); 72 RR 95–98 (Juror P.B.); 75 RR
169–71 (Juror J.D.); 75 RR 109–10 (Juror C.A.). This shows that this emphasis
resulted from gender and not the State's perception that the struck
venirewomen were unfavorable.

By contrast, the State's script for questioning male prospective jurors
about their ability to consider the evidence and impose the death penalty was
far more muted. As shown below, it also removed any individual responsibility
for the determination:

- "And then you decide, is there a mitigating circumstance? Okay? Is it
mitigating or not mitigating, right? And then if you decide that there's
a mitigating circumstance, does it reduce the defendant's moral
blameworthiness? Is it sufficient, right? Is it sufficient to warrant a

146

life sentence? Do you see how that process works?" 46 RR 166–67 (male Juror H.B.);

- "Does that seem like a fair way to do things to make sure we're double checking right up to the end and looking to see is there anything to mitigate in favor of life rather than death?" 51 RR 36 (male Juror I.V.);

- "[I]s there anything that would warrant a sentence of life rather than death in the context of does it reduce the Defendant's moral blameworthiness? Do you understand what I'm talking to you about?" 62 RR 106 (male Juror A.A.); and

- "Is there anything there that's sufficient to warrant life rather than death, okay? . . . So just kind of to walk you through how that might work." 69 RR 34 (male Juror B.B.).

### 2) Skepticism that Female Jurors Could Vote in a Way that Results in Death:

The State expressed doubt that female prospective jurors could answer the special issues in a way that would result in a death sentence. Female Prospective Juror 18 stated that, although she would not want to sentence someone to death, she could do it if she took the oath. 50 RR 242–43. Yet the State persisted, urging her to "tell [it] her feelings," before asking whether she was "capable" of answering the special issues in a way that would result in

death and whether she could "answer these questions truthfully." *Id.* at 242–44.

Female Prospective Juror 67 told the State that she believed she could answer the questions in a manner resulting in death. Yet, the State insisted that she had "to answer truthfully." 58 RR 40. The State then asked, "I just need to know at your core if the answer to [special issue two] is no that you could be honest with the evidence and not let anything just that's not brought to you sway you to do something that's not the true answer?" *Id.* at 40–41.

Female Prospective Juror 125 had originally stated she would be comfortable answering questions in a way leading to a death sentence. But the State doubted her, too, stating "I'm just trying to get the root of making sure that each one of these things is something you feel like you can actually participate and do or it's something you say, My feelings are going to impair my ability to do that, and I don't feel comfortable taking the oath." 68 RR 107–09; *see also* 54 RR 281–82 (female Prospective Juror 47); 60 RR 39 (female Prospective Juror 89); 71 RR 114–15 (female Prospective Juror 154).

The State questioned the female jurors it seated similarly. 58 RR 89–91 (female Juror H.M.); 60 RR 171–72 (female Juror R.G.); 61 RR 83–87 (female Juror M.P.); 72 RR 104–06, 110–12 (female Juror P.B.); 75 RR 163–66, 169–71 (female Juror J.D.); 75 RR 100–03, 112–14 (female Juror C.A.) This

demonstrates that the disparity was a product of gender and not the seated jurors' apparent favorability to the State.

The State lacked similar skepticism with male prospective jurors, even those who expressed concerns about the death penalty. For example, seated male Juror H.B. expressed concern about Texas's inconsistent application of the death penalty. 46 RR 152. He also expressed concern about wrongful convictions as evident from Innocence Project exonerations. *Id.* at 153, 176–78; 2 Supp. 1 CR 129, 131–32, 135. Moreover, he opined that the death penalty lacked deterrent effect. 2 Supp. 1 CR 128, 131.

But the State, after explaining Texas's capital sentencing scheme, asked if he understood how the process worked and had questions about it. 46 RR 166–69. This disparity, wherein the State didn't question a juror who expressed concern about the death penalty, held true for other male prospective jurors. *Compare* 2 Supp. 3 CR 735, 738–40, 743 (Juror I.V. expressing concerns that innocent people could be death sentenced and that the death penalty does not deter in most cases) *and* 2 Supp. 13 CR 3056, 3060 (Juror A.A. describing himself as "hesitant" to return death verdict and that he does not believe the death penalty deters crime), *with* 54 RR 35–36 (asking Juror I.V. if scheme "make[s] sense" and "seem[s] like a fair way to do things") *and* 62 RR 106 (asking Juror A.A. if he understands sentencing scheme and could apply it).

### b. Comparison of struck female to seated male jurors shows discriminatory intent.

When struck female prospective jurors are compared to seated male jurors, the similarities are difficult to ignore. Features that could provide a gender-neutral reason for the State's strike of a female prospective juror are echoed, if not more pronounced, in male jurors who the State did not strike.[20] Such side-by-side comparison "is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241.

The State struck female prospective jurors who expressed that the death penalty should be reserved for the most extreme cases. Prospective Juror 67 stated she was in favor of the death penalty under certain conditions and that it "can't be taken lightly" because of the punishment's severity. 58 RR 21. She expressed, however, that she could give the penalty in some cases, particularly acts of "cold hearted murder," multiple murders, and serial murders. 2 Supp 9 CR 2028. She furthered answered that the death penalty was used too seldomly and believed life without parole (LWOP) was appropriate only where there were extenuating circumstances or where the accused expressed remorse. *Id.* at 2030, 2033.

---

[20] To the extent female jurors' unfavorable characteristics appear more pronounced, Mr. Hall asserts that disparate questioning formed the backdrop for many of these over-pronouncements. *Flowers*, 588 U.S. at 310.

Female Prospective Juror 89 expressed similar views. She described the death penalty as appropriate for extreme or heinous crimes and crimes where the defendant lacks remorse. 60 RR 20. In these cases, she opined, society should refrain from spending tax dollars "to allow them to live better than law abiding persons living in poverty." 2 Supp. 11 CR 2678. She described that "some criminals are convicted of crimes so heinous they do not deserve to continue living." *Id.* at 2679. She also recognized that for "*some* with mental health issues," LWOP would be appropriate. *Id.* (emphasis added).

And female Prospective Juror 125 described that, although she had been raised in an abolitionist country and had been opposed to the death penalty upon her arrival in the United States, she believed the United States was "the best country in the world." 68 RR 88. She further described that "I think if you want to live in[] a safe and[] effective society and get all the amazing benefits from being in this great country, then you have to respect the [death penalty] process." *Id.* at 89. She described being "comfortable" answering questions in a way that would result in a death sentence. *Id.* at 107–09.

On the other hand, seated male expressed greater concerns about the death penalty. Juror H.B. described his issue with capital punishment "in that Texas historically has a very bad record of how they plan the death penalty" and described the penalty's "inconsistent application." 46 RR 152–53. He

described that the punishment lacked deterrent effect and was misused in some counties. 2 Supp. 1 CR 128, 131–32.

Juror I.V. similarly expressed that he agreed with the death penalty in "special cases," 51 RR 37, focusing on those related to drugs, theft, and gangs, as well as mass murderers, 2 Supp. 3 CR 737. However, he disagreed with the death penalty for those with mental illness and could "accept" LWOP in those cases. *Id.* at 743. Juror I.V. also raised concerns about wrongful convictions, and about the need to consider a defendant's background and "special events" that could trigger "uncontrolled moments in their lives." 51 RR 46, 48; 2 Supp. 3 CR 739.

Finally, Juror A.A. described that he would not take the death penalty decision lightly because "it's a soul" and the spirit is "sacred." 62 RR 85–86; 2 Supp. 13 CR 3056, 3068.

The State conducted limited follow up with these death-hesitant male jurors before ultimately accepting them onto the jury. They asked Juror H.B. broadly about "the law of capital murder," but asked almost no follow-up questions when Juror H.B. stated that capital punishment was problematic in some places. *See* 46 RR 152–53. Instead—and inconsistently with the State's questioning of female jurors—the State resolved any concerns with H.B.'s

responses by suggesting to H.B. that he "just wanted to be sure" of guilt. *Id.* at 153.[21]

The State asked Juror I.V. only one question about his responses on this topic, suggesting to Juror I.V. that his responses expressed that he was willing to keep an open mind about cases where death wouldn't be appropriate. 51 RR 36–37.

And the State coached Juror A.A. by suggesting he could apply the death penalty appropriately, rather than scrutinizing his expressed reluctance. 62 RR 107–08. These efforts stand in stark contrast to the State's extensive scrutiny of prospective female jurors.

The State's disparate treatment and strikes of female prospective jurors demonstrate that they impermissibly exercised these strikes based on gender. Trial counsel's mistake of law prevented them from raising *J.E.B.* objections as the State struck 9 female prospective jurors. Had they done so, his objections would have been sustained. Alternatively, these objections would have provided grounds for reversal on direct appeal. Mr. Hall was therefore

---

[21] By contrast, the State asked female prospective jurors numerous questions about whether they would subject evidence to greater scrutiny. It specifically did so of those who expressed the need for greater certainty of guilt in a capital case. *E.g.*, 54 RR 275–79 (female Prospective Juror 47); 68 RR 96–99 (female Prospective Juror 125).

prejudiced by trial counsel's failures in this regard. He is entitled to a new trial before a jury empaneled without invidious discrimination.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

## Claim Ten: Alternate jurors participated in deliberations in violation of Mr. Hall's Sixth and Fourteenth Amendment rights.

At the conclusion of guilt-phase proceedings, the jury retired to deliberate. Per the trial court's instructions, the two alternate jurors were to be held in a separate room from the deliberating jury and remain there until the verdict was reached. They did not do so, but instead entered the jury room and offered their opinions about Mr. Hall's guilt. This extraneous influence upon the jury and resulting verdict denied Mr. Hall his Sixth Amendment right to a fair and impartial jury as well as due process of law. This claim is unexhausted.

### A. Statement of Facts

Despite the court's instruction to the contrary, the alternate jurors participated in and influenced guilt-phase jury deliberations. Following guilt-phase closing arguments, the trial court identified the two alternates, J.D. and E.D., then excused the twelve remaining jurors to deliberate. 81 RR 38. The court then requested that the bailiff escort the two designated alternates to another room and advised that the court would provide some books or something else to "occupy some of your time reading" while waiting for the jury to reach a verdict. *Id.* at 39. The court advised the alternate jurors to "remain in that room and keep the door closed" other than using the bathroom but did not ask a bailiff to remain with either the deliberating jurors or alternates. *Id.* at 38–39.

Heather Montoya, who served as a juror on Mr. Hall's capital trial, reports that the two alternates were in fact present in the room while the jury was deliberating. Ex. 11 at 135 ¶ 4 Moreover, because of the possibility that a juror would need to be replaced at some point before punishment-phase deliberations, the jurors asked the alternates to discuss their opinions about Mr. Hall's guilt during deliberations. *Id.* The alternates did so before the jury rendered their guilt-phase verdict. *Id.*

The alternates thereafter remained with the jury over the course of the three-week punishment phase presentation. The court allowed the alternates

to go home when the jury retired to begin punishment-phase deliberations, though it kept them on standby in case they were needed. 100 RR 129–31.

### B. Legal Standard

The participation by alternates in jury deliberations amounts to an extraneous influence that violates the Sixth Amendment and the Due Process Clause. *Parker v. Gladden*, 385 U.S. 363, 364 (1966). In a criminal proceeding, participation in deliberations by alternate jurors is presumptively prejudicial. *United States v. Olano*, 507 U.S. 725, 739 (1993); *see also United States v. Acevedo*, 141 F.3d 1421, 1424 (11th Cir. 1998) (where alternate jurors actually engage in deliberations, that is sufficient to demonstrate prejudice). Alternate juror presence in the jury room during deliberations prejudices the accused where the alternates have "actually participated in the deliberations, verbally or through 'body language'" or their presence creates a "'chilling' effect" on the actual jurors. *Olano*, 507 U.S. at 739.

### C. Argument

In Mr. Hall's case, the alternate jurors actually participated in his guilt-phase deliberations. The alternates' participation during guilt-phase deliberations is inherently prejudicial. Mr. Hall was entitled to a jury composed of twelve—not fourteen. Tex. Const. art. 5 § 13; *see also* Tex. Code Crim. Proc. art. 36.22; Tex. R. App. Proc. 21.3. Once an alternate opened his or her mouth to discuss the case during guilt-phase deliberations, it is impossible

156

to tell whether "the final verdict did not reflect the independent judgment of the jurors rendering the verdict, but instead reflected an amalgamation of the judgments of every juror who participated at some point during the jury's deliberations." *Acevedo*, 141 F.3d at 1425–26. Because of this violation of both his Sixth Amendment and Due Process Clause rights, Mr. Hall is entitled to a new capital trial.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

## Claim Eleven: Counsel rendered ineffective assistance in violation of the Sixth Amendment when counsel mistakenly believed that the law prevented Mr. Hall from pleading guilty.

Counsel mistakenly believed that Mr. Hall could not plead guilty without the State's consent to such. That belief, however, was mistaken. Because trial counsel mistakenly believed that there was no way around the State's extensive guilt-phase presentation, the jury sat through days of largely unrebutted and graphic testimony and exhibits.

This claim is unexhausted.

## A. Statement of Facts

In the first argument in closing, trial counsel attempted to point jurors to "the whole story." 81 RR 30. But counsel had failed to present any guilt-phase case at all. Counsel did not call any witnesses, did not introduce any exhibits, and cross-examined just three of the State's witnesses. Meanwhile, the State presented 22 witnesses and introduced 308 exhibits. Counsel's direction to the jury in argument did not align with their actions at trial because counsel had prepared no guilt-phase theory of the case.

The State's evidence against Mr. Hall was robust. Law enforcement described a violent crime scene. *E.g.*, 78 RR 127; 79 RR 61, 175–85. The medical examiner testified to severe wounds. *See*, *e.g.*, 78 RR 176, 180, 186. The State showed numerous photographs of the crime scene and of the Shaars' wounds. *See, e.g.,* 78 RR 174–77; 79 RR 142–66; 122 RR 33, 35, 47, 51, 53, 55. Mr. Hall had confessed to the offense. 123 RR 178. But throughout the State's multi-day evidence presentation, trial counsel largely remained silent.

Notably, counsel did not object to Mrs. Shaar's improper victim-impact testimony about her three children with Mr. Shaar and their "six healthy, beautiful grandchildren," their 50-year marriage, and Mr. Shaar's Navy career. 80 RR 167, 168–69. Nor did counsel object to the State's improper argument at

guilt that Mr. Hall was a future danger because he had allegedly planned to commit further offenses. 81 RR 134.

Had Mr. Hall pleaded guilty, it would have prevented the jury from being exposed to days of unchallenged evidence of a violent offense. Counsel, however, believed that Mr. Hall could not enter a guilty plea without the State's consent. That belief was wrong. Mr. Hall did not need the State's permission to plead guilty.

### B. Legal Standard

Mr. Hall incorporates by reference the legal standard governing ineffective assistance of counsel claims as set out in Claim Four, *supra*. Additionally, "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014). Thus, an attorney performs deficiently when he fails to pursue a strategy because he mistakenly believes that the law does not permit that strategy. *Id.* at 274; *Williams v. Taylor*, 529 U.S. 362, 395 (2000).

Both the Supreme Court and Fifth Circuit have emphasized that attorney representation at the plea stage is critical. This is because of the impact that the decision to accept or decline a plea may have on further proceedings. *See Lee v. United States*, 582 U.S. 357, 364 (2017); *Lafler v. Cooper*,

566 U.S. 156, 164–65 (2012); *Anaya v. Lumpkin*, 976 F.3d 545, 552–53 (5th Cir 2020).

### C. Argument

#### 1. Counsel's mistake of law constitutes deficient performance.

Counsel here believed that Mr. Hall could not plead guilty without the State's consent in a Texas capital case. This drove the decision to proceed to a guilt-phase trial. However, this belief was erroneous under CCA precedent that was well settled before counsel's appointment in Mr. Hall's case. *See Fuller v. Texas*, 253 S.W.3d 220, 225–27 (Tex. Crim. App. 2008) (rejecting argument that Tex. Code Crim. Proc. art. 1.13 prohibits guilty plea in capital case); *Williams v. Texas*, 674 S.W.2d 315, 318–19 (Tex. Crim. App. 1984).

Counsel had no theory for this phase. Instead, they just conceded guilt at voir dire, 44 RR 239, and at opening statement, 78 RR 86. Counsel's ensuing silence throughout the State's guilt case shows that counsel lacked a comprehensive plan for a cohesive presentation that included both guilt and punishment. This lack of strategy became apparent during guilt-phase closing argument, where counsel attempted to provide the jury with information about "what happened in [Mr. Hall's] life that laid the path that led him to commit the acts on October 20th, 2011. 81 RR 28. The State repeatedly objected as counsel attempted to provide facts not offered in the guilt-phase proceedings.

*Id.* at 30–31. In sustaining these objections, the court admonished counsel that "This is not opening statement at the next phase. . . . This is final argument at the first phase." *Id.* Counsel's efforts to introduce their punishment-phase evidence in closing shows they lacked a guilt-phase strategy. And this lack of strategy was premised on counsel's ignorance of the law. Because of counsel's mistake of law, counsel could not formulate or give effect to any theory of the case that focused on "an explanation" for the crime. *Id.* at 29. Counsel's ignorance of the law on this "fundamental" issue constitutes deficient performance. *Hinton*, 571 U.S. at 274.

### 2. Mr. Hall was prejudiced by trial counsel's mistake of law.

Prejudice is clear-cut. Their deafening silence through the State's case shows that counsel had no other theory of the case at guilt. Because of counsel's mistaken belief of law and the absence of any other strategy, counsel was unable to give effect to their theory of the case: that Mr. Hall was guilty but deserving of a sentence less than death.

Furthermore, a guilty plea shows acceptance of responsibility, which provides powerful mitigating evidence. The capital-murder trial of Arturo Garza provides one recent example of how a guilty plea can affect capital

sentencing outcomes.[22] And the Supreme Court has emphasized the soundness of a guilty plea in a capital murder trial as it focuses the jury on sentencing only. *Florida v. Nixon*, 543 U.S. 175, 190–91 (2004). Here, the State made Mr. Hall's apparent lack of remorse a central theme of its case for death. 100 RR 43 ("Was he remorseful? Was he sorry? No."). A guilty plea would have provided powerful rebuttal evidence and undercut much of the State's case.

Counsel failed to obviate the State's graphic case at guilt because they erroneously believed that Mr. Hall could not plead guilty without the State's permission. Counsel's deficient performance prejudiced Mr. Hall, and he is therefore entitled to a new trial.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

---

[22] Eleanor Dearman, *Arturo Garza Sentenced to Life in Prison Without Parole*, CALLER TIMES, March 14, 2019, https://www.caller.com/story/news/crime/2019/03/14/arturo-garza-gets-life-killing-pregnant-girlfriend/3162687002/

**Claim Twelve: Counsel's statement to the jury panel that Mr. Hall "killed Mr. Shaar" violated Mr. Hall's Sixth Amendment right to counsel; counsel did not have Mr. Hall's consent to concede guilt.**

Counsel's statement conceded Mr. Hall's guilt before an impartial jury had been selected. Because this concession was tantamount to the objectives of counsel's representation—whether to maintain innocence or proceed to trial—counsel's failure to obtain Mr. Hall's consent was ineffective assistance in violation of the Sixth Amendment.

This claim is unexhausted.

### A.   Statement of Facts

Mr. Hall incorporates here by reference all facts alleged under Claim Eleven, *supra*. Counsel told the jury panel that "Gabriel Hall killed Mr. Shaar and he badly wounded his wife, Linda Shaar." 44 RR 239. Counsel emphasized that this was "the first thing" that they wanted the jury to know. *Id*. Counsel thus conceded Mr. Hall's guilt prior to even selecting a jury. Counsel, however, acted without Mr. Hall's consent, thus violating his Sixth Amendment right to make that fundamental decision about his case.

### B. Legal Standard

The Sixth Amendment right to counsel includes a defendant's "right to make the fundamental choices about his own defense." *McCoy v. Louisiana*, 584 U.S. 414, 428 (2018). Indeed, "certain decisions regarding the exercise or waiver of basic trial rights" are so critical that an attorney cannot make that

decision for the defendant. *Florida v. Nixon*, 543 U.S. 175, 187 (2004). Moreover, "The right to defend is given directly to the accused." *Faretta v. California*, 422 U.S. 806, 819–20 (1975). The Sixth Amendment's counsel provision "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *Id.* at 820. The decision to concede guilt belongs firmly to the defendant, *McCoy*, 584 U.S. at 422–23, along with the decision to plead guilty, forego trial by an impartial jury, and other similar rights, *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Counsel may thus not concede a defendant's guilt or forego the right to a fair trial by an impartial jury without at least "consult[ing] with the defendant and obtain[ing his] consent to the recommended course of action." *Nixon*, 543 U.S. at 187.

### C. Argument

Mr. Hall did not agree to concede guilt to the jury panel. Nor did Mr. Hall agree to taint the panel and relieve the State of its burden of proof before an impartial jury could be seated. Upon information and belief, counsel did not consult with Mr. Hall on these issues at all and acted unilaterally. Counsel thus failed to fulfill his obligation to both consult and obtain consent from Mr. Hall before conceding guilt and abdicating Mr. Hall's right to an impartial jury. *See Nixon*, 543 U.S. at 187, 189. In doing so, counsel violated Mr. Hall's Sixth Amendment right to counsel. Because counsel's concession of guilt violated Mr. Hall's "Sixth Amendment secured autonomy" to make this

fundamental decision, this type of error is structural and not subject to harmless-error or prejudice determinations. *McCoy*, 584 U.S. at 427.

In the alternative, should this Court determine instead to evaluate counsel's failure to consult and obtain consent under *Strickland*'s ineffectiveness standard, Mr. Hall can establish deficiency and prejudice. Counsel had a duty to consult with Mr. Hall and obtain his consent on trial objectives and critical decisions. *See Nixon*, 543 U.S. at 187; *see also Haynes v. Cain*, 298 F.3d 375, 382 (5th Cir. 2002). Counsel's failure to do so constitutes deficient performance.

As to prejudice, the *Cronic* framework governs. Because counsel failed to consult with Mr. Hall about conceding guilt to the jury panel, prejudice is presumed. *See United States v. Cronic*, 466 U.S. 648, 659 (1984); *Barbee v. Davis*, 728 Fed. App'x. 259, 264 (5th Cir. 2004) ("[T]he *Strickland* standard applies to cases in which counsel informs the client of her strategic decision to concede guilt and focus on the penalty phase."). Mr. Hall is accordingly entitled to a new trial.

Even if Mr. Hall needed to demonstrate prejudice, he could do so here. Counsel's ineffectiveness prejudiced Mr. Hall in two ways. First, it tainted the entire panel and sacrificed Mr. Hall's Sixth Amendment right to an impartial jury. When asked whether they had formed an opinion on guilt, several potential jurors answered during individual voir dire that they had, based on

counsel's earlier statement. 70 RR 10; 73 RR 47–48, 193. Second, counsel's statement relieved the State of its burden of proof before even the selection of an impartial jury.

Counsel's errors undermined the confidence of the jury's decisions. And if counsel had not tainted the jury during voir dire—and undermined counsel's own credibility in the process—there is a reasonable probability that the outcome of the guilt-innocence and/or the punishment phase would have been different. See *Strickland*, 466 U.S. at 694; *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). These factors rendered Mr. Hall's trial fundamentally unfair, thus establishing prejudice. *See Strickland*, 466 U.S. at 686; *see also Weaver v. Massachusetts*, 582 U.S. 286, 294-95 (2017).

### D. This claim is unexhausted.

This claim was not presented to the state court on direct appeal or in state habeas. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court and exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). Should, however, this Court determine that this claim is procedurally defaulted, Mr. Hall can establish cause and prejudice to excuse that default because he is not at fault for the failure to present this claim to the state court. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

**Claim Thirteen: Counsel told the jury panel that Mr. Hall was guilty of capital murder, in violation of Mr. Hall's Sixth Amendment right to counsel.**

Trial counsel failed to consult with Mr. Hall about whether to blurt out his guilt to the jury panel. This failure violated Mr. Hall's Sixth Amendment right to counsel.

This claim is unexhausted.

### A.   Statement of Facts

Counsel unequivocally stated to the jury panel that Mr. Hall was guilty of capital murder:

> The first thing I want to do after I introduced our team and Gabriel Hall is I want to tell you this: Gabriel Hall killed Mr. Shaar and he badly wounded his wife, Linda Shaar.

44 RR 239. The State immediately objected to this statement as a violation of the court's in limine ruling prohibiting counsel from expressing any opinion as to the guilt or innocence of Mr. Hall. 44 RR 239–240; *see* 10 Amend. CR 2274. The trial court sustained the State's objection and warned counsel to not violate the court's ruling again. 44 RR 240–42. The trial court further instructed the jury to disregard counsel's statement. *Id.* at 242.

As made clear by venire members' later answers on individual voir dire, counsel's statement tainted their impartiality. For example, when asked about their prior knowledge of the case, several venire members answered that they had no prior knowledge of the case or had not formed an opinion as to

167

Mr. Hall's guilt or innocence until counsel's statement to the panel that Mr. Hall was guilty of capital murder and of further attacking the victim's wife. 70 RR 10 (answering "well, the attorney when we were at the courthouse"); 73 RR 47–48 (answering that had already decided on guilt because of "the things that were said when we were being picked for the jury – or when we came to jury duty."); *id.* at 193 (answering "there's already kind of been a throw out of guilt" based on counsel's statement, when asked juror whether would hold State to burden of proof).

Counsel's statement that Mr. Hall had "killed Mr. Shaar and [] badly wounded his wife, Linda Shaar" thus committed venire members to an opinion on Mr. Hall's guilt, relieved the State of its burden of proof, and deprived Mr. Hall of access to a fair trial by an impartial jury.

### B. Legal Standard

Counsel's "presence is essential because they are the means through which other rights of the person on trial are secured." *United States v. Cronic*, 466 U.S. 684, 653 (1984). The Sixth Amendment conception of counsel is thus closely intertwined with the further right to a fair trial by an impartial jury. *Id.* at 658 ("the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial"); *Strickland v. Washington*, 466 U.S. 668, 685 (1984) ("Thus, a fair trial is one in which evidence subject to adversarial testing is presented

to an impartial tribunal for resolution of issues defined in advance of the proceedings."). Counsel plays a critical role in ensuring a defendant's Sixth Amendment right to a fair trial by an impartial jury, including through counsel's role in jury selection. *See Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006).

Relatedly, "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690; *see Cronic*, 466 U.S. at 656–57 ("The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing."). Indeed, a defendant's apparent guilt does not relieve counsel of his duty to hold the State to its burden of proof. *Cronic*, 466 U.S. at 656-57 n.19 ("Even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt.").

In short, "[t]hat a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command" of the Sixth Amendment right to counsel. *Strickland*, 466 U.S. at 685. Where counsel deprives the defendant of the further right to a fair trial by an impartial jury and entirely relieves the State of any burden, the

defendant has in effect been deprived of counsel as guaranteed by the Sixth Amendment.

### C. Argument

#### 1. Counsel's statement effectively deprived Mr. Hall of counsel in violation of the Sixth Amendment.

Here, counsel's statement to the panel that Mr. Hall had "killed Mr. Shaar and [] badly wounded his wife, Linda Shaar" in effect deprived Mr. Hall of the effective assistance of counsel in violation of the Sixth Amendment. *Cronic*, 466 U.S. at 657 (describing Sixth Amendment violated where "the [trial] process loses its character as a confrontation between adversaries"). As made clear by several potential jurors' opinions that Mr. Hall was guilty, counsel's blunt statement tainted the panel and hindered access to an impartial jury. Counsel's statement further relieved the State of its burden of proof and rendered the adversarial process illusory.

The timing of counsel's statement—to the panel—exacerbates its effect on Mr. Hall's Sixth Amendment right to a fair trial by an impartial jury especially egregious. Whereas circumstances may arise where counsel may strategically concede guilt at trial, no such reasoning applies here. Counsel's statement that the defendant "killed" the victim and "badly wounded" another occurred before Mr. Hall's Sixth Amendment right to an impartial jury was secured. This concession occurred at a stage of trial which permitted no

argument and no evidence. Counsel's actions here cannot be credited as strategy. Doing so would endorse counsel's decision to decimate a Mr. Hall's Sixth Amendment guarantee to a fair trial by an impartial jury.

### 2. Prejudice is presumed because Mr. Hall was in effect deprived of counsel.

Counsel's statement deprived Mr. Hall of the Sixth Amendment right to a fair trial by an impartial jury. Counsel further abandoned any pretense to the adversarial process that is at the heart of our conception of a fair trial. Mr. Hall was thus deprived of the very "substance" of the Sixth Amendment right to counsel. *Cronic*, 466 U.S. at 655. Prejudice is therefore presumed. *Id.* at 659.

Because Mr. Hall was deprived of the right to counsel in violation of the Sixth Amendment, he is entitled to a new trial.

### 3. In the alternative, Mr. Hall can show he was prejudiced.

If the Court determines that Mr. Hall must establish prejudice from counsel's actions, he can do so here. *See Strickland*, 466 U.S. at 687. Counsel's ineffectiveness prejudiced Mr. Hall in two ways. First, it tainted the panel and harmed Mr. Hall's access to an impartial jury. When asked whether they had formed an opinion on guilt, several potential jurors answered during individual voir dire that they had based on counsel's statement. 70 RR 10; 73 RR 47–48, 193. Second, and relatedly, counsel's statement relieved the State of its burden

of proof before even selecting an impartial jury. Both factors rendered Mr. Hall's trial fundamentally unfair, thus establishing prejudice. *See Strickland*, 466 U.S. at 686; *see also Weaver v. Massachusetts*, 582 U.S. 286, 294–95 (2017).

### D. This claim is unexhausted.

This claim was not presented to the state court on direct appeal or in state habeas. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court and exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). Because a state court avenue for relief exists, any procedural default of this claim would be premature. Should, however, this Court determine that this claim is procedurally defaulted, Mr. Hall can establish cause and prejudice to excuse that default because state habeas counsel was ineffective for failing to present this substantial claim for relief. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

**Claim Fourteen: Counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment in failing to move for a change of venue based on the effect of pre-trial publicity on potential jurors.**

Trial counsel was ineffective for failing to move for a change of venue from Brazos County, and Mr. Hall was prejudiced by this failure. *See Strickland v. Washington*, 466 U.S. 668 (1984). This was a high-profile, highly

publicized case in a relatively small community. It should have been imperative for Mr. Hall's trial team to have the case moved into a different venue to secure unbiased jurors. This claim is unexhausted.

### A. Statement of Facts

This was a high-profile case that had a profound effect on the Brazos County community, the seat of Texas A&M University. 78 RR 77–79. The deceased victim, Ed Shaar, was a Navy veteran and retired Texas A&M professor. 79 RR 19; 80 RR 169; 99 RR 149; 10 Amend. CR 2256. The surviving victim, Linda Shaar, had been Ed Shaar's wife for nearly 50 years at the time of his death. 80 RR 168.

Mr. Hall's adoptive mother, Karen Kruse Hall, testified that she considered herself to be a victim along with the Shaar family. 95 RR 124. Mrs. Hall's father, Ed Kruse, is an A&M alumnus and the retired President and CEO of Blue Bell Creameries. 87 RR 135–36. Mrs. Hall ran an international mission and adoption agency in Brazos County. 89 RR 15. Her husband, Wes Hall, was an attorney who had previously served as a justice of the peace for 12 years. 94 RR 167–68. Wes Hall was also Mr. Hall's adoptive father.

The crime resulted in a "massive" police manhunt. 78 RR 79–80. As defense counsel described in their opening statement, "This is a case about pain and fear and anger. This is a case about the pain and fear inflicted on

Edwin and Linda Shaar." *Id.* at 85–86. Counsel further described, "This is about the ripple effect of that pain and fear and anger that this crime sparked in their family, in their friends, and *in this entire community as a whole.*" *Id.* (emphasis added). In closing argument, the State emphasized the effects of this crime on the community. They described that the community had been "powerless to understand, and to foresee and see what was coming." 100 RR 107. The State then personalized its message, reminding the jurors that they each were members of the community, and following the crime, "We were powerless." *Id.* The State then offered a more personal anecdote, "I pulled up to my house last night. I got out of my car at about 1:00 o'clock in the morning after getting ready to do this, and the first thing I did was lower my garage [door]." The State concluded that, "[this event changed our community forever." *Id.*

The crime's pervasive impact on the community—which was bombarded by media coverage—was evident at the start of jury selection. On the first day, September 27, 2015, the court summonsed 250 potential jurors. 44 RR 15. The court asked the prospective jurors to complete written questionnaires, which had questions regarding the publicity they had seen or heard about the case, as well as their familiarity with persons connected to it. S*ee generally* 2 Supp 1–28 CR (completed questionnaires). After the court and counsel conducted

174

general voir dire, the court called back potential jurors for individual voir dire over the ensuing twenty-two days. *See generally* 46–47, 49–64, 67–76 RR.

Before individual voir dire began, trial counsel filed a Motion to Conduct Initial Individual Jury Voir Dire Regarding the Effect of Publicity upon Deliberations Before Other Questioning. 10 Amend. CR 2256–60. That motion described the "large amount of publicity and word of mouth discussion about this case" in the community. *Id.* at 2256. It requested that the court question prospective jurors about pre-trial publicity before permitting further voir dire. *Id.* at 2257–60. During the first day of individual voir dire, it quickly became evident that it would be difficult to seat an unbiased jury in Brazos County. Trial counsel even noted, "I think we have a number . . . large number, Judge, of people who are going to be potential cause [] challenges" for hearing pre-trial publicity. 46 RR 22–23. They approximated this number was 12 to 15 of the first 50 prospective jurors. *Id.*

At the next day of individual voir dire—after yet another potential juror discussed what she had previously heard about the case—the judge *sua sponte* stated: "Well, I mean, they [trial counsel] have asked for change of venue here, and I still have that under advisement." 49 RR 67. Trial counsel responded, "I

haven't actually filed that, but you read our minds."[23] *Id.* They further stated, "I think a change of venue motion might become perfectly ripe in this case if it continues . . . . We're in the information-gathering stage of the change of venue. I can tell the Court if this pattern continues, we are very likely to file that motion." *Id.* at 67–68, 69.

In the following days and weeks, the court removed for cause a stream of additional potential jurors who had been biased by pre-trial publicity and/or were connected to the people and institutions involved in the case. *E.g.*, 50 RR 113–14; 47 RR 64–67; 49 RR 42–43 (pre-trial publicity); 49 RR 60–61 (connection to schools Mr. Hall attended); 50 RR 81 (connection to Texas A&M); 52 RR 8 (connection to the Shaars); 54 RR 57 (connection to judge or prosecution); 54 RR 226 (connection to Texas A&M); 56 RR 82–85 (connection to judge or prosecution); 2 Supp. 1 CR 46; *id.* at 101 (connection to schools Mr. Hall attended); 2 Supp. 3 CR 707 (connection to the Halls). In fact, the court had to summons three additional jury panels to attempt to seat twelve jurors and two alternates. 76 RR 7. But counsel never moved to change venue, despite this evidence of a continuing pattern, and despite having already drafted the motion.

---

[23] The court believed that trial counsel previously stated that they were "headed in that direction" of filing for a change of venue, though trial counsel did not confirm this. 46 RR 70–71. No such statement appears on the record.

### B. Legal Standard

Mr. Hall incorporates by reference the legal standard for ineffective assistance of counsel claims set forth in Claim Four, *supra*, as though set forth fully herein. Specifically, counsel is deficient for failing to file a motion for change of venue where a change of venue was warranted and supported in fact and law. *See Kimmelman v. Morrison*, 477 U.S. 365, 384–87 (1986).

In Texas, "[a] change of venue may be granted . . . on the written motion of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted," where "there exists . . . so great a prejudice against him that he cannot obtain a fair and impartial trial . . . ." Tex. Code Crim. Proc. art. 31.03 (repealed 2025). When "pretrial publicity is so pervasive and prejudicial as to create a reasonable probability that an impartial jury cannot be empaneled even with the most careful voir dire," "a change of venue is compelled by the Fourteenth Amendment's due process clause." *Narvaiz v. Texas*, 840 S.W.2d 415, 428 (Tex. Crim. App. 1992) (citing *Rideau v. Louisiana,* 373 U.S. 723 (1963)).

A defendant is prejudiced by trial counsel's failure to seek a change of venue where, because of counsel's failure, the defendant proceeds to trial in a prejudicial atmosphere. Prejudice may be presumed where the record shows that the trial took place in an inherently prejudicial atmosphere pervaded by

"vivid, unforgettable information . . . particularly likely to produce prejudice." *Skilling v. United States*, 561 U.S. 358, 384 (2010). Where a jury's utter corruption is not obvious, a habeas petitioner may instead show prejudice by demonstrating that the jurors seated in his case were biased in a manner attributable to the pre-trial publicity. *Moore v. Johnson*, 225 F.3d 495, 504 (5th Cir. 2000).

### C. Argument

#### 1. Trial counsel was deficient in failing to investigate and file a motion for change of venue.

Under Texas law, a motion for change of venue was both justified and necessary in Mr. Hall's case, and trial counsel were deficient for failing to seek a change of venue. As evidenced by the written questionnaires and individual voir dire of the potential jurors, trial counsel would have had no difficulty in securing the affidavits required under article 31.03 to substantiate a change of venue motion.

Trial counsel described themselves as being in the "information-gathering stage" early during individual voir dire. Nonetheless, counsel advised that if the "pattern continues," and a significant number of prospective jurors advised they were impacted by pre-trial publicity, trial counsel were "very likely to file that motion." 49 RR 69. But the pattern did continue; the court required that multiple additional jury panels be brought in because

numerous potential jurors had been exposed to pre-trial publicity. 74 RR 115; 76 RR 7, 92. Having seen the extent to which pre-trial publicity biased potential jurors, counsel should have filed a motion for change of venue during the individual voir dire process. This motion would have been deemed timely. *See Faulder v. Texas*, 745 S.W.2d 327, 338 (Tex. Crim. App. 1987) (noting that art Tex. Code Crim. Proc. art. 28.01 pre-trial timeliness requirements are inapplicable to motion for change of venue given constitutional considerations). Yet, despite this pattern and the court's remark that a motion for change of venue was warranted, trial counsel did not file one.

Changing venue would have enabled counsel to seat a jury in Mr. Hall's case that was not biased by pre-trial publicity. Trial counsel had ample basis to seek a change of venue, and their recognition at trial that they would do so if the "pattern continues" shows they had no strategic reason for failing to do so. *See Strickland*, 466 U.S. at 681.

### 2. Mr. Hall was prejudiced by counsel's failure to litigate a change of venue.

Had Mr. Hall's counsel filed a motion for change of venue, there is a reasonable probability that it would have been granted. The court's *sua sponte* comments indicate that it anticipated counsel would be filing such a motion. 49 RR 67. There is a reasonable probability that the motion would have been granted.

At the outset, the size and characteristics of the community from which the court would summon the jury suggested that it would be difficult to empanel 12 impartial jurors. *See Skilling*, 561 U.S. at 382. At the time of trial, Brazos County had a population of 215,891.[24] The student enrollment at Texas A&M at the time was roughly 25% of the county's overall population.[25] A&M's physical presence was similarly impactful. Texas A&M's College Station campus is one of the largest college campuses in the United States.[26] After Mr. Hall's arrest and as his case proceeded to trial, Texas A&M opened its new baseball complex, sponsored by and affixed with the Blue Bell name.[27] Texas A&M's omnipresence—given Mr. Shaar's ties to the institution, and its own ties to Karen Hall (who did not support Mr. Hall)—permeated the environment in which the trial took place.

---

[24] Texas State Library & Archive Commission, *Population Estimates for Texas Counties, 2010-2017: Arranged in Descending Order*, https://www.tsl.texas.gov/ref/abouttx/popcnty201011.html.

[25] Texas A&M, Office of Academic and Business Performance Analytics, *Historical Enrollment*, https://abpa.tamu.edu/getattachment/d341b8a7-7925-46b2-9602-6a10ad79cb13/Overall_Enrollment_Historical.pdf.

[26] Texas A&M University, *History and Development*, https://catalog.tamu.edu/undergraduate/general-information/history-development/ (last visited Jan. 31, 2025).

[27] 12th Man Foundation, *Blue Bell Foundation*, https://12thman.com/facilities/blue-bell-park/2 (last visited Jan. 31, 2025).

Coverage also included significant details of Mr. Hall's confession and "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. The day after Mr. Hall's arrest, the front page of the local paper carried his adoptive father, Wes Hall's, statements conceding Mr. Hall's guilt shortly after the arrest. Ex. 12 at 137–38, Michelle Casady, *Teen Jailed in Man's Death*, BRYAN-COLLEGE STATION EAGLE, Oct. 22, 2011, at A1, A4.[28] Further coverage showed that Karen and Wes Hall, despite their affluence, were not supporting their adopted son; they refused to provide funds for his defense and did not appear at pre-trial proceedings in the case. Ex. 12 143–44, Maggie Kiely, *Court Appoints Lawyer for Hall*, BRYAN-COLLEGE STATION EAGLE, Nov. 3, 2011, at A1, A6. By contrast, the coverage described Mr. Shaar as a "hero," with one acquaintance detailing that "he couldn't have asked for better neighbors" than the Shaars. Ex. 12 at 137–38, Casady, *Teen Jailed*, *supra* at A4. The coverage further detailed salacious details of the offense—namely that Mr. Hall had confessed and that he had made efforts to conceal his involvement, both by denying his role and by covering his fingertips with super glue. Ex. 12 at 139–40, Rosalee Getterman, *Teen Says He Killed CS Man*, BRYAN-COLLEGE

---

[28] This and other newspaper articles cited in this claim are included in the exhibits filed with this petition (for the convenience of the court).

181

STATION EAGLE, Oct. 23, 2011, at A1, A4; *see also* Ex. 12 at 141–42, Maggie Kiely, *Hall Cites "Killer Instinct*," BRYAN-COLLEGE STATION EAGLE, Oct. 28, 2011, at A1, A5 (recounting detailed confession). A week after the homicide, the local paper's front page bore a detailed description of Mrs. Shaar's 9-1-1 call and testimony from the lead detective Kirk Webb describing Mr. Hall's "killer instinct." Ex. 12 at 141–42, Kiely, *Hall Cites "Killer Instinct*," *supra*, at A1, A5; *see also* Ex. 12 at 146, *Grand Jury Indicts Student*, BRYAN-COLLEGE STATION EAGLE, Dec. 21, 2011, at A7; Ex. 12 at 147, Maggie Kiely, *Defense Wants Delay in Capital Murder Trial*, BRYAN-COLLEGE STATION EAGLE, May 3, 2013, at A7. A subsequent front-page headline described Mr. Hall's "violent tendencies." Maggie Kiely, *Documents Lay Out Violent Tendencies of Gabriel Hall, Suspect in Murder Trial*, BRYAN-COLLEGE STATION EAGLE, Aug. 25, 2013, at A1.

The newspaper also detailed facts not admitted at trial. For example, the local paper reported that Mr. Hall had sought DNA testing and, in particular, had sought to test samples to look for sperm—a revelation suggesting that Mr. Hall had implicated Mr. Shaar in a sexual relationship. Ex. 12 at 160, Maggie Kiely, *Judge Rules on DNA Testing in Murder Case*, BRYAN-COLLEGE STATION EAGLE, Oct. 29, 2013, at A5; *see also* Ex. 12 at 159, *Evidence List Finalized in Capital Murder Trial*, BRYAN-COLLEGE STATION EAGLE, Oct. 5, 2013, at A9.

Around the same time, the local paper's front page detailed that Brazos County would no longer subscribe to the Regional Public Defender Office (RPDO) program for representation in capital cases. Ex. 12 at 157, Maggie Kiely, *County Cuts Ties to Public Defender*, BRYAN-COLLEGE STATION EAGLE, Sept. 22, 2013, at A1. The article shared that, as of 2013, trial counsel had already expended approximately $427,000 in county funds on Mr. Hall's case, with one District Judge commenting that he had been "taken off guard by the enormity" of a similar expenditure in another local RPDO-represented capital case. Ex. 12 at 157, Kiely, *County Cuts Ties*, *supra* at A4; *see also* Ex. 12 at 155, Maggie Kiely, *Hall Murder Trial Could Be Delayed up to a Full Year*, BRYAN-COLLEGE STATION EAGLE, Aug. 28, 2013, at A1, A8 (detailing "[s]o far, about $353,000 in county funds has been paid out to the defense in Hall's case"); Keily, *Documents Lay Out*, *supra*, at A5 (same); Ex. 12 at 151, Maggie Kiely, *Delay Sought in Murder Trial*, BRYAN-COLLEGE STATION EAGLE, Aug. 6, 2013, at A1, A5 (describing depositions conducted in the Philippines to save taxpayer expense). In summer 2013—well before trial commenced—the local paper detailed that Mr. Hall's biological father had been convicted and imprisoned for murder, and that the State intended to introduce evidence of unadjudicated offenses that Mr. Hall had supposedly committed. Many of these were not ultimately admitted during the trial's punishment phase. *See* Ex. 12 at 149,

183

Maggie Keily, *Travel for Hall Trial in the Works*, BRYAN-COLLEGE STATION EAGLE, July 3, 2013, at A1, A7; Keily, *Documents Lay Out*, *supra*, at A5.

Because of the community size and characteristics, the seated jurors were more likely to be prejudiced against Mr. Hall. *See Skilling*, 561 U.S. at 382. Jurors M.H. and M.P. had attended Texas A&M. 2 Supp 6 CR 1263; 2 Supp. 12 CR 2783. Juror M.H. also knew District Attorney Jarvis Parsons from the community and had spoken alongside him at a press conference about domestic violence. *Id.* at 1266. Juror R.S. worked at Texas A&M and had done so for more than a decade. 2 Supp. 4 CR 841. Juror H.B. had worked at A&M for 18 years until his retirement 8 years prior. 2 Supp. 1 CR 144. Juror H.M. worked at the same grocery store where Mr. Hall had worked before his arrest. 59 RR 67.

The jurors in Mr. Hall's case were so prejudiced by pretrial publicity that trial counsel's failures denied Mr. Hall a fair and impartial jury. Seated jurors had heard about the case from media coverage, and numerous jurors displayed pre-trial knowledge garnered from the media, but the trial court closed its inquiry after the juror stated the media would not influence their verdict. For example, though Juror E.D. professed knowledge of the case from the news, the information he relayed was inconsistent with the State's case at trial. 76 RR 25–26. The trial court did question him as to whether he had formed an opinion about Mr. Hall's innocence. However, it did not inquire whether he

184

would be able to set any inconsistencies aside and rely on the evidence presented if he later recalled information or found something in the trial inconsistent with his recall.[29] *See id.* Similarly, though Jurors M.H. and M.P. stated that they had formed some opinion about Mr. Hall based on the information each had read or heard in the media, both jurors believed they could set those opinions aside. 54 RR 56–57; 61 RR 58–59; 2 Supp 12 CR 2767; *see also* 52 RR 27 (Juror R.S. acknowledging prior case knowledge); 2 Supp. 3 CR 737 (Juror I.V. knew about case from TV and websites); 2 Supp. 10 CR 2447 (Juror H.M. read about case); 2 Supp 19 CR 4997 (Juror P.B. reports hearing about the case on TV); 2 Supp 25 CR 6201 (same for Juror C.A.). But the trial court failed to admonish these jurors about how to handle conflicts between the evidence presented and the facts the media had reported.

The media coverage continued as trial began.[30] *See Skilling*, 561 U.S. at 383. On the eve of trial, the local newspaper again broadcast the cost of Mr. Hall's trial. It detailed that according to the Brazos County Auditor, trial

---

[29] Although the court designated Juror E.D. as an alternate, he nevertheless participated in guilt-phase deliberations. *See* Claim Ten, *supra.*

[30] The record reflects that the court provided the jury with a handbook that contained an admonition to not consult media coverage about the case, 120 RR 10, but the court directed the jurors' attention to a different section of the handbook, not including this admonition, and only one time at the outset of the trial, 87 RR 74.

counsel had thus far spent nearly $822,000 defending Mr. Hall. Ex. 12 at 161, Jake Walker, *Hall Trial Moving Ahead*, BRYAN-COLLEGE STATION EAGLE, July 1, 2015, at A9. And the local newspaper featured a live blog of the proceedings on its website. *See* Ex. 12 at 164, Jake Walker, *Adoptive Mother Accused*, BRYAN-COLLEGE STATION EAGLE, Sept. 24, 2015, at A1. Other articles included, for example, information about insult comedian Jeff Ross's interview of Mr. Hall and trial counsel's attempts to suppress it because it purportedly showed Mr. Hall "'making light of the crime.'" Ex. 12 at 162, Jake Walker, *Evidence in Question*, BRYAN-COLLEGE STATION EAGLE, Aug. 21, 2015, at A7, A9. Notably, this coverage of Mr. Hall's statements—which the State sought to admit during the trial's punishment phase—was published even before guilt-phase opening statements. *See* 78 RR 74 (jury sworn Sept. 8, 2015).

Trial counsel's failure to file a change of venue motion prejudiced Mr. Hall. The pervasive and prejudicial publicity both before and during Mr. Hall's trial rendered the trial nothing more than a "hollow formality" in violation of Mr. Hall's due process rights. *See Rideau*, 373 U.S. at 726. Moreover, information disclosed by jurors during voir dire and press coverage continuing throughout trial shows that jurors were prejudiced by this media exposure. *Moore*, 225 F.3d at 504.

### D. This claim is unexhausted.

This claim is unexhausted. Mr. Hall anticipates filing a motion to stay and abey these federal habeas proceedings so that he may return to the state court to exhaust this and any other unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 278–79 (2005). If the Court determines that this claim is procedurally defaulted, Mr. Hall can also establish cause and prejudice to excuse that default. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

## Claim Fifteen: Trial counsel rendered ineffective assistance when they failed to adequately consult with and call for the testimony of retained expert Dr. Ruben Gur.

Prior to trial, counsel retained Dr. Ruben Gur, a psychologist specializing in neuroimaging, to review data obtained from testing conducted on Mr. Hall. Trial counsel's decision to not call Dr. Gur as a witness at trial was unreasonable and not the product of a constitutionally adequate investigation. Mr. Hall was prejudiced by counsel's failure in this regard.

This claim was presented in state court as Claim Six in Mr. Hall's state habeas petition and adjudicated on the merits. *Ex Parte Hall*, No. WR-86,568-01, 2024 WL 467871, at *2 (Tex. Crim. App. Feb. 7, 2024). Mr. Hall can satisfy section § 2254(d) because the state court's adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established federal law and that was based on an unreasonable determination of the facts light of the state court record.

### A. Statement of Facts

At the punishment phase, counsel presented the testimony of Dr. Richard Adler, a clinical and forensic psychiatrist, who had evaluated Mr. Hall. 86 RR 58. Dr. Adler testified to both the behavioral imaging and quantitative analysis that Dr. Ruben Gur had conducted. *Id.* at 65, 66. Because Dr. Adler had not conducted these aspects of the testing, he consulted with Dr. Gur to "make sure not only did I understand the findings, but [that] I have incorporated them and presented them in a way that is accurate and complete." *Id.* at 70. But the record reflects that Dr. Adler spoke with Dr. Gur only one time and for an hour. SHCR 105. This consultation did not occur until after Dr. Adler had already testified to Dr. Gur's conclusions at punishment phase. *See* 97 RR 31–57 (Dr. Adler testimony Oct. 2, 2015); SHCR 105.

Similarly, trial counsel spent a total of one hour consulting with Dr. Gur. SHCR 103, 105. Counsel's first call with Dr. Gur was on April 25, 2013, more than two years before Mr. Hall's trial. *Id.* at 103. At the time of this phone call, Dr. Gur had yet to generate a report. *Id.* at 95–99, 103. Counsel did not consult again with Dr. Gur until after they rested at punishment. *Id.* at 105; 98 RR 129. Even then, trial counsel spent only thirty minutes speaking with Dr. Gur. SHCR 105.

As punishment phase proceedings commenced, trial counsel asserted that they did not need to present Dr. Gur's testimony. At this time, trial counsel had not spoken with Dr. Gur in more than two years, including after they received his report. *See* 86 RR 109. Trial counsel maintained that they only intended to present Dr. Adler because he could sufficiently testify to Dr. Gur's conclusions. *See id.* The State indicated that it would object to Dr. Adler "being the strawman to get all of Dr. Gur's data" before the jury. *Id.* Trial counsel requested that the State preview whether they would object to Dr. Adler's testimony to Dr. Gur's conclusions. *Id.* at 112. The record does not reflect further discussion on this issue; Dr. Adler testified to Dr. Gur's conclusions, and the State did not object. *See* 97 RR 6–100. Having evaded the potential hearsay objection for which they were braced, defense counsel rested without calling Dr. Gur. *See* 98 RR 129.

In state habeas proceedings, Mr. Hall argued that trial counsel should have presented Dr. Gur's expert testimony at the punishment phase. At the evidentiary hearing on the matter, trial counsel John Wright revealed that they had retained Dr. Gur despite knowing that the expert had significant credibility problems and should not testify. SHRR 13, 18–22. Mr. Wright testified that counsel's credibility concerns stemmed from: 1) cases from other jurisdictions where Dr. Gur's testimony had been found not credible and 2)

recommendations from his "expert on experts," Dr. Cecil Reynolds, that Dr. Gur would not make a good witness. *Id.* at 11, 18–19, 27–30.

Despite these concerns, trial counsel chose to retain Dr. Gur. Counsel used Dr. Adler as the straw man to explain Dr. Gur's complex algorithmic mapping and resultant conclusions and withstand cross-examination on these subjects. And although Dr. Gur's testing and conclusions were beyond Dr. Adler's expertise. SHRR 29–31, 33–34. After Dr. Adler testified to Dr. Gur's conclusions without drawing an objection from the State, trial counsel did not believe there were any lingering concerns as to whether Dr. Gur's conclusions had been presented. SHRR 13-14. Counsel rested without calling Dr. Gur.

### B. Legal Standard

Mr. Hall incorporates the legal standard governing ineffective assistance of counsel claims as set forth in Claim Four, *supra*, and incorporates it here.

### C. Argument

#### 1. Trial counsel failed to investigate and consider whether Dr. Gur's testimony became necessary as trial unfolded.

Though courts must defer to trial counsel's decisions, decisions made after a less-than-complete investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Where counsel truncates his inquiry down a particular investigative path, this choice

"must be directly assessed for reasonableness in all the circumstances." *Strickland*, 466 U.S. at 691. Counsel's decision not to call Dr. Gur (or a similarly qualified expert) was based on a truncated and deficient investigation.

Mr. Wright testified that, following Dr. Adler's testimony, counsel decided not to  call Dr. Gur in part because they "didn't want the baggage" of calling an expert who could be easily impeached. SHRR 14. But trial counsel was aware when they retained Dr. Gur years earlier that his credibility had been questioned in other jurisdictions. *Id.* at 13, 18–22. Despite this awareness, they did little to explore alternatives. They relied on Dr. Reynolds's assessment of Dr. Gur, instead of meeting with Dr. Gur to determine his effectiveness as a witness. *Id.* at 27. And because they relied on this determination at the outset, they made no effort to determine whether they could call Dr. Gur to testify, if needed.

Moreover, counsel did not examine whether there were other witnesses who could conduct the same or similar testing. Nor did they inquire how Dr. Gur might respond to questions about other jurisdictions' credibility findings. *See id.* at 28 (counsel testifies they did not interview Dr. Gur or get sense of how he would play to jury). Trial counsel testified that they did not have concerns about whether Dr. Adler ably covered Dr. Gur's conclusions. But counsel could not have known if they should have concerns because they had

191

not consulted with Dr. Gur to know the extent of what he could provide. *Id.* at 13–14; 1 SHCR 103, 105. They thus could not make an informed determination about how the scope of Dr. Adler's testimony compared with Dr. Gur's range of conclusions. Trial counsel had to keep their fingers crossed that: 1) the State would not object to Dr. Adler serving as a straw man for Dr. Gur's conclusions and that 2) Dr. Adler would be able to convey these conclusions fully and competently to the jury, and defend them against the State's cross-examination. Having succeeded at the former, trial counsel lacked information to determine the latter. Counsel's decision not to call Dr. Gur was not the product of an informed investigation and was therefore deficient.

### 2. Mr. Hall was prejudiced by trial counsel's failures.

As a forensic psychiatrist, Dr. Adler conducted physical and neurological evaluations of Mr. Hall. 97 RR 6–8. For neuroimaging, however, he relied on consultations with other experts who conducted the testing and furnished Dr. Adler with ultimate conclusions. *Id.* at 1–32, 51, 123. Dr. Adler had not conducted similar brain imaging without Dr. Gur's assistance. *Id.* at 129. This meant that Dr. Adler was not only less versed in the scientific foundations of the testing, but less facile with the results of Mr. Hall's testing.

On cross-examination, Dr. Adler's lack of familiarity with Dr. Gur's behavioral imaging and algorithmic mapping became apparent. For example, when asked which area of the brain was tasked with grip strength (a

neurological test on which Mr. Hall had scored poorly), Dr. Adler testified that it was "probably" the pre-central gyrus and drew a circle as to where that structure was "probably" located on an image of Mr. Hall's brain. *Id.* at 123–24. He was unable to answer questions about which structures are responsible for empathy and sympathy. *Id.* at 132. And he was unable to respond to questions about why a dead fish would show results when subjected to functional magnetic resonance imaging (fMRI).[31] *Id.* at 132–33. In closing argument, the State reiterated Dr. Adler's lack of expertise to ridicule the neuroimaging testing, "And in fact, the test that they gave—the one that Dr. Adler, their expert—the one with the fish brain up here, talked about?" 100 RR 45; *see also id.* at 46 ("And you know that the MRI that's done in Texas at UTMB . . . says that the MRIs are unremarkable"), *id.* at 117 (same).

Dr. Adler's inexperience with conducting and evaluating neuroimaging results moreover permitted the State to present the jury with a false

---

[31] Unlike a traditional MRI, an fMRI tracks blood flow in various parts of the brain, thereby showing activity in various parts of the brain. Cleveland Clinic, *Functional                    MRI                    (fMRI)*, https://my.clevelandclinic.org/health/diagnostics/25034-functional-mri-fmri (last visited Jan. 4, 2025). The "dead salmon" study highlights why researchers should use statistically valid models to eliminate background noise from fMRI results. *See* Mun Keat Looi, *A Deep Flaw Has Been Discovered in Thousands of Neuroscience Studies. So Why Aren't Neuroscientists Freaking Out?* QUARTZ, https://qz.com/725746/a-deep-flaw-has-been-discovered-in-thousands-of-neuroscience-studies-so-why-arent-neuroscientists-freaking-out.

interpretation of Dr. Gur's data. In response to cross-examination, Dr. Adler testified that the activity shown on a positron emission tomography (PET) scan of Mr. Hall's brain may indicate that Mr. Hall was thinking about killing people to relax himself. 97 RR 133. That the frontal lobe, rather than the pleasure-seeking portion, of the brain fluoresced during this testing demonstrates that Dr. Adler's testimony was inaccurate. *See id.* at 64. Were Mr. Hall fantasizing about killing people, the pleasure-seeking area of the brain—the amygdala—would be fluorescing. *See*, *e.g.*, 11 Amend. CR 2550.

The State also used Dr. Gur's absence to denigrate the foundations of the behavioral imaging conducted. The State asserted that Dr. Gur's testing was only supported by "three articles that say it's good," and that all the supporting articles were authored by Dr. Gur himself. 97 RR 128. The State then used this to argue in closing that Dr. Gur's imaging lacked *any* scientific basis. 100 RR 116 ("[T]his isn't some super special thing. This is taking what Dr. Nussbaum said was subtle signs and what Dr. Price said is totally normal and putting colors to it to make it look: Whoa, what's going on?"), *id.* at 117 ("This is not some earth-shattering science. And if it was, you would have heard from Dr. Gur."). Trial counsel's failure to call Dr. Gur at trial thus prevented the jury from understanding the significance of the analysis he had conducted and failed to refute the State's denigration of the analysis. Mr. Hall is thus entitled to a new punishment phase.

### D. The Court can review the merits of this claim *de novo*.

Mr. Hall raised this claim as Claim Six in his state habeas application. SHCR 73–80. The trial court ordered a hearing on this claim, and Mr. Hall called trial counsel John Wright and Jim Drummond to testify. SHRR 7, 75. Following this hearing, the trial court recommended the claim be denied, and the CCA denied relief. *Ex Parte Hall*, 2024 WL 467871, at *2.

28 U.S.C. § 2254(d) deference does not apply to this claim because the state court did not afford Mr. Hall a full and fair opportunity for review. *See Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). Following his hearing testimony, Mr. Wright approached the court, reminded it that he intended to seek appointment in capital cases in that very same court, and asked it to keep him in mind when making such appointments. 2 SHRR 30. Such statements, on the heels of Mr. Wright's testimony, and juxtaposed with Texas Code of Criminal Procedure article 26.052 (which requires counsel be removed from the list of those eligible for capital-case appointments upon a finding of ineffectiveness), "inherently creates an incentive for a trial lawyer to misstate what his motivations and actions were at the time of a trial if that lawyer desires further appointment." 2 SHRR 10. As Mr. Wright's statements during the state habeas hearing and to the trial court following his testimony demonstrate, he would not—and arguably could not—be forthcoming when responding to allegations of his ineffectiveness. Because this conflict impacted

the evidence that could be adduced at the state habeas hearing, Mr. Hall is entitled to *de novo* review of this claim.

Although this claim was adjudicated on the merits, Mr. Hall can meet both § 2254(d)(1) and § 2254(d)(2). He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *Hinton v. Alabama*, 571 U.S. 263 (2014); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Strickland*, 466 U.S. 668. He can also meet § 2254(d)(2) because the state court's decision is based on an unreasonable determination of the facts based on the record before it.

**Claim Sixteen: Mr. Hall's death sentence violates the Eighth and Fourteenth Amendments because science and statistics show that the future-dangerousness assessment is fundamentally unreliable.**

Texas is the only state to espouse a future-dangerousness assessment as part of its death-penalty scheme. [32] However, this future dangerousness determination injects arbitrariness and unreliability into capital sentencing in violation of the Eighth and Fourteenth Amendments. This claim was raised as

---

[32] In 2019, Oregon removed future dangerousness from its capital sentencing scheme, striking language identical to Texas's future-dangerousness provision from the Oregon statute. *See* OR. REV. STAT. 163.150(1)(b)(B) (amended Sept. 29, 2019).

Claim Six on direct appeal, but the CCA declined to adjudicate it on the merits. This Court can therefore review this claim *de novo*.

### A. Statement of Facts

Additional evidence since the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), establishes that it is functionally impossible for the adversarial process to meaningfully assess future dangerousness. Studies show error rates as high as 90 to 95% in Texas future dangerousness assessments. Carla Edmondson, *Nothing is Certain But Death: Why Future Dangerousness Mandates Abolition of the Death Penalty*, 20 LEWIS & CLARK L. REV. 857, 898 (2016); Jaymes Fairfax-Columbo & David DeMatteo, *Reducing the Dangers of Future Dangerousness Testimony: Applying the Federal Rules of Evidence to Capital Sentencing*, 25 WM. & MARY BILL RTS. J. 1047, 1060 (2017); Jessica L. Roberts, Note, *Futures Past: Institutionalizing the Re-Examination of Future Dangerousness in Texas Prior to Execution*, 11 Tex. J.C.L. & C.R. 101, 121 (2005) (citations omitted). And actuarily, there are very low rates of expected violence for Texas inmates convicted of capital murder and serving life sentences. *See* Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants*, 90 J. CRIM. L. & CRIMINOLOGY 1251, 1261, 1264 (2000) (overall likelihood of inmate-on-inmate homicide 0.02% and likelihood of aggravated assault on a correctional officer at 0.1%). Together, these studies show that actual instances of future

197

dangerousness are rare; correspondingly, it is virtually impossible to accurately predict them.

Unsurprisingly, the future-dangerousness inquiry generates a lot of false positives; predictions regularly misidentify non-dangerous defendants as dangerous. One study examined the prison conduct of 155 Texas inmates convicted of capital murder, where State experts had testified to their violent propensities at trial. John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 L. & HUM. BEHAV. 55, 61 (2005). Of these 155, 65 had been executed by the time of the study, 42 remained on death row, and 48 were no longer on death row.[33] *Id.* Of the 155, none committed homicide in prison, and only 8 (5.2%) had committed a serious assaultive act. *Id.* at 62. The overwhelming majority had only minor infractions, and over 20% had no write-ups at all. *Id.* at 62–63; *see also* Brittany Fowler, *A Shortcut to Death: How the Texas Death-Penalty Statute Engages the Jury's Cognitive Heuristics in Favor of Death*, 96 TEX. L. REV. 379, 383–85 (2017).

Another study compared 92 former Texas death-row prisoners (who later became general population inmates) to other capital-murder defendants who

---

[33] Of these, 2 were exonerated, and the remaining were resentenced to life or a term of years in prison. Edens et al, *supra* at 61 n.10.

were sentenced to life. Inmates originally sentenced to death were no threat to institutional order; they had a slightly lower rate of assaultive misconduct than those never deemed a future danger. And the former death row inmates' rate of violent prison misconduct was lower than that of the general prison population. *See* James W. Marquart, Sheldon Ekland-Olson & Jonathan Sorensen, *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 L. & SOC'Y REV. 449, 461 (1989).

Additional studies show that jurors cannot meaningfully distinguish which defendants will pose a future danger from those who will not. The first study tracked 72 male federal capital defendants whose trials involved a jury finding about likely future violence. Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 PSYCHOL. PUB. POL'Y & L. 223, 232–34 (2009). Jurors labeled 34 of these defendants "future dangers." *Id.* at 234. Yet those defendants and the 38 not so labeled had virtually identical rates of subsequent violence. *Id.* at 236 (Table 3). In other words, juror speculation was wrong 97% of the time. *Id.* at 240; *see also* Edmondson, *supra*, at 910–11. A second study examining 115 Oregon inmates convicted of capital murder similarly found that the death sentenced had identical violence rates (5.9 incidents per year per 100 inmates) to capital offenders sentenced to life. Thomas J. Reidy, Jon R. Sorensen & Mark D. Cunningham, *Probability of*

*Criminal Acts of Violence: A Test of Jury Predictive Accuracy*, 31 BEHAV. SCI.
L. 286, 292–98 (2013); *see also* Edmondson, *supra*, at 908–10.

### B. Legal Standard

The Supreme Court sanctioned the modern-era Texas death penalty
statute in *Jurek v. Texas*, 428 U.S. 262 (1976). There, the Court found that the
fact that a future-dangerousness "determination is difficult, however, does not
mean that it cannot be made." *Id.* at 274–75. Seven years later, the Supreme
Court remained unconvinced that future-dangerousness determinations were
so unreliable that their use in capital sentencing determinations violated the
Eighth Amendment. *Barefoot*, 463 U.S. at 899–902.

Because the death penalty is "different in kind from any other
punishment imposed under our system of criminal justice," it cannot be
imposed under sentencing procedures that create a substantial risk that it will
be inflicted "in an arbitrary and capricious manner." *Gregg v. Georgia*, 428 U.S.
153, 188 (1976). To guard against this, the Supreme Court has established that
accurate sentencing information is indispensable "to a reasoned determination
of whether a defendant shall live or die by a jury of people who may never
before have made a sentencing decision." *Id.* at 190. The sentencer has "a vital
need for *accurate* information about a defendant and the crime he committed
in order to be able to impose a *rational* sentence in the typical criminal case."
*Id.* (emphasis added).

But the Supreme Court's decision in *Gregg* must be understood in conjunction with its later ruling in *Barefoot*. The *Barefoot* Court considered whether psychiatrists, who struggle to reliably predict future dangerousness, may opine on this factor in a capital trial. 463 U.S. at 898–903, 905–06. The justices concluded that expert future-dangerousness predictions appear accurate about one-third of the time. *See id.* at 899-901 & n.7. The Court ultimately affirmed the lower court's holding that this future-dangerousness testimony was admissible because, "at least as of now," the adversarial process could be trusted "to sort out the reliable from the unreliable evidence." *Id.* at 901.

### C. Argument

The demonstrable inaccuracy and random application of future-dangerousness determinations in capital sentencing renders them unconstitutional. As the only state requiring a future-dangerousness assessment as part of its death-penalty scheme, Texas's sentencing procedures create a substantial risk that death will be inflicted in an arbitrary and capricious manner. Jurors cannot accurately predict who will pose a future danger in a prison setting. Cunningham, et al, *Capital Jury Decision-Making*, *supra* at 233–39; Reidy et al, *Probability of Criminal Acts of Violence*, *supra* at 296–300. The choice of whether the jury will find the accused to be a future danger results in the capricious death-sentencing of defendants in a manner

that is cruel, unusual, and violative of the Eighth Amendment. *See Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring) ("The petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed.").

This growing body of evidence further indicates that—contrary to the Supreme Court's belief in *Barefoot*—the adversarial process fails to sort out this unreliable evidence. And the numbers have worsened since *Barefoot*; jurors correctly assess future dangerousness as rarely as 5% of the time. *E.g.*, Edmondson, *supra*, at 898. Texas's sentencing statute, which expressly focuses juror deliberations on future dangerousness in capital cases, *see* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1), amplifies the risks of unreliability. Texas's outlier status in this regard underscores this factor's unreliability. *See Penry v. Lynaugh*, 492 U.S. 302, 339–40 (1989) (listing other states' rejections of "mental age" sentencing consideration as evidence of unreliability); *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (examining "wide acceptance" of individualized sentencing in other states as evidence of reliability). This cannot comport with Eighth Amendment standards of heightened reliability.

Nor is the future-dangerousness special issue protected by its similarities to other dangerousness assessments, such as those used for pre-trial detention or involuntary mental commitments. The balance the *Barefoot* Court struck in sanctioning future-dangerousness assessments in the capital

context could not account for these newer studies demonstrating abject unreliability. 463 U.S. at 897–98 (citations omitted).

Against this new backdrop of unreliability, comparisons with other contexts in which future dangerousness is assessed lose much of their value. Both pre-trial detention and involuntary commitment proceedings focus on *current* not speculative *future* dangerousness. *United States v. Salerno*, 481 U.S. 739, 744, 748 (1987); *United States v. McKown*, 930 F.3d 721, 728 (5th Cir. 2019) (citing 18 U.S.C. § 4246(d)).

And both are temporary assessments—the pre-trial detention evaporates when the criminal case is adjudicated, and an involuntary commitment ceases where the rationale for such measures cease to exist. *O'Connor v. Donaldson*, 422 U.S. 563, 574–76 (1975). Moreover, an involuntarily committed person "has the right to treatment, periodic review of his condition, and immediate release when no longer deemed to be a danger to himself or others." *Addington v. Texas*, 441 U.S. 418, 422 (1979) (citing *Texas v. Turner*, 556 S.W.2d 563 (1977)). By contrast, because the death penalty is different in finality from both other contexts, "there is a corresponding difference in the need for reliability." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The now-known inherent unreliability of future dangerousness cannot be reconciled with the Eighth Amendment's dictates applicable to death penalty proceedings.

203

### D. The Court can review the merits of this claim *de novo*.

Mr. Hall raised this claim as Claim Six on direct appeal. In its review of Mr. Hall's direct appeal, the CCA declined to rule on the merits of Mr. Hall's claim on the ground that the issue should be resolved by the Legislature. *Hall v. Texas*, 663 S.W.3d 15, 38 (Tex. Crim. App. 2021) ("The normative character of the future-dangerousness special issue means that concerns over its predictive accuracy 'should be addressed to the Legislature' rather than this Court." (citations omitted)). Because the CCA dd not adjudicate this claim on the merits, § 2254(d) does not apply, and the Court can review this claim *de novo*.

In the alternative, should the claim be deemed to have been adjudicated on the merits, Mr. Hall can meet both § 2254(d)(1) and § 2254(d)(2). He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. *See Woodson*, 428 U.S. 280; *Gregg*, 428 U.S. 153. He can also meet § 2254(d)(2) because the state court's is decision is based on an unreasonable determination of the facts based on the record before it.

## Claim Seventeen: Mr. Hall's jury was unconstitutionally instructed that it should not consider mitigation lacking a nexus to the crime.

The trial court instructed Mr. Hall's jury that it could only consider "evidence that a juror might regard as reducing the defendant's moral

blameworthiness" in determining whether there were "sufficient mitigating circumstances" to justify a life sentence. 15 Amend. CR 3466–67. This "moral blameworthiness" language is mandated by Texas Code of Criminal Procedure, article 37.071 § 2(f)(4) (§ 2(f)(4)). In Mr. Hall's case, the State seized upon this language to argue that any mitigation had to relate to the commission of the capital crime. This statutory language was unconstitutionally applied in Mr. Hall's case in violation of the Eighth Amendment. Specifically, the State's voir dire questioning and argument informed jurors that, pursuant to § 2(f)(4), they could not consider any mitigating evidence divorced from the offense. *Tennard v. Dretke*, 542 U.S. 274 (2004). Mr. Hall raised this claim as Claim Twelve on direct appeal and it was adjudicated on the merits. Mr. Hall can satisfy § 2254(d) and is entitled to *de novo* review of this claim.

### A. Statement of Facts

In discussing mitigating evidence during voir dire, the State repeatedly drew prospective jurors' attention to § 2(f)(4)'s "moral blameworthiness" language and linked it to mitigation tied to the offense. *See*, *e.g.*, 46 RR 165; 47 RR 27. Repeatedly, the State tied "mitigation" to the charged offense via a scenario in which a hypothetical defendant kills a man who assaulted his daughter. For example, purportedly to "highlight how that [the moral blameworthiness instruction] would work," the State offered this illustration:

[T]here's a gentleman who's 40 years old. Worked his whole life.

205

Never had a problem. He has one daughter. She's his world. And he goes to work every day to put food on [the] table, and he comes home and finds that his daughter is near death's door. He finds her on death's door . . . brutally attacked, raped by three men. Takes her to the hospital. And in brief moments of consciousness, she's able to identify who those three men [are]. As soon as he knows she's stable, he goes home.

And right then he in his mind knows absolutely what he's doing. He gets his gun. So this is a premeditated act. He gets his gun. He goes straight to the first guy's house. He kicks in the door and he shoots him dead.

And as he reloads the gun, he walks out the door, gets in his car, headed to the second house, okay? Right then the police stop him.

51 RR 32–33; *see also* 53 RR 30-32, 134–36; 56 RR 35–37.

The analogy improperly implied the precise "nexus" requirement repudiated in *Tennard*. The putative mitigating circumstance (the defendant's rage and grief) bore a direct causal connection to the murder. Citing *Tennard*, trial counsel objected to the State's repeated use of the same hypothetical. 50 RR 38–47; 51 RR 32, 56; 52 RR 44. The trial court permitted the State to continue using this hypothetical but granted the defense a running objection. 46 RR 47–49.

At punishment, the State continued to urge that evidence only mitigated when it had a nexus to the crime. In examining its primary mental-health expert Dr. Proctor, for example, the State questioned whether, with respect to of Mr. Hall's background, Dr. Proctor "[c]ould . . . find any connection between the Philippines and Ed and Linda Shaar?" 99 RR 142. The State similarly

206

asked Dr. Proctor whether, in his overall evaluation of Mr. Hall's mental health, he had found "any connection at all with Ed and Linda Shaar in this entire case?" I *d.* at 142; *see also*, *e.g.*, *id.* at 110–11 (pointing out, through Dr. Proctor, that while evaluation disclosed Mr. Hall had some "personality issues," those "issues" suggested no "reason somebody would commit a murder like this").

Most significantly, the State urged this nexus requirement in characterizing Mr. Hall's mitigation presentation. They asked Dr. Proctor whether, assuming Mr. Hall had post-traumatic stress disorder (PTSD), he had "see[n] anything [in evaluating Mr. Hall] that would lead you to believe that there was some triggering event at that Shaar residen[ce] that created . . . *Was there a trigger here where he was reliving a flashback or something like that*?" 99 RR 143 (emphasis added). This questioning clearly communicated to the jury that, even if they agreed with the defense mental-health experts that Mr. Hall suffered from PTSD, they should not consider that disorder a basis for sparing his life unless it could be tied *directly* to the attack on the Shaars.

Trial counsel objected to the "moral blameworthiness" instruction—both pre-trial and again at the punishment phase—as violating *Tennard*. Counsel argued that it rendered jurors likely to disregard aspects of the case in mitigation for Mr. Hall where such evidence was not offered to excuse the crime. 16 Amend. CR 3428. The statutory language tying "blameworthiness"

to which mitigating evidence the jury may consider at sentencing "encourages, if it does not require the jurors to disregard evidence unrelated [to] the instant offense." *Id.*

At punishment-phase closing argument, the State pressed this "blameworthiness" language to urge the jury not to consider evidence lacking a direct connection to the crime. The State reminded the jury about mitigation hypotheticals that it had offered at voir dire as examples of those that "decrease[] moral blameworthiness," specifically identifying, "[i]f it's a crime of passion," when "emotion takes over" and "a fit of rage" causes violence. 100 RR 39–40.

Again, the State urged jurors to consider mitigating evidence alongside the circumstances of the offense by asking "[w]hat circumstance drove him to this?" *id.* at 41. Against this backdrop, the State pressed the jury to find "there are none," (i.e., mitigating circumstances) because Mr. Hall never said, "Karen Hall is the reason why I did this." *Id.*; *id.* at 42 (neither "anger" nor a "rage problem" triggered the crime against the Shaars); *id.* at 52 (arguing that Mr. Hall's traumatic background in the slums of the Philippines "is not sufficient mitigation" because "if it was, then all of them [who endured similar experiences] would be going around hurting people," *i.e.*, the experience would have had the same causal impact on their behavior).

In summing up its initial closing argument, the State offered a strikingly clear example of mitigation as requiring a causal link to the crime. It argued

that "the answer to [the mitigation special issue] is that there is nothing *sufficient to warrant what he did to Ed Shaar*, and there's nothing *sufficient to warrant what he did to Linda Shaar*." 100 RR 54 (emphasis added). The State's final summation returned to the theme that Mr. Hall's alleged mitigating circumstances failed to show a "line between Gabriel Hall and Ed and Linda Shaar. There is not a line. There's not a connection." *Id.* at 118. And the State further urged the jury to not consider evidence of Mr. Hall's upbringing because it "doesn't answer Ed and Linda Shaar; . . . [Mr. Hall] has never once said that that had anything to do with Ed and Linda Shaar, and [the defense's] experts even admit [it]." *Id.* at 120. In short, the State made clear to the jury that it should confine its review of mitigation only to evidence linked directly to the offense: "This is he is a future danger, but then you go back and you look at this and you say: Is there mitigation? And it is based on this crime. The question is: How do we sentence the Defendant in this crime?" *Id.* at 117.

### B. Legal Standard

A State must not prohibit "the sentencer from considering any relevant mitigating evidence that the defendant proffers in support of a sentence less than death . . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Tennard*, 542 U.S. at 285 (internal citations, parallel citations, and internal quotation marks omitted). The question for an as-applied

209

statutory challenge is thus "whether there is a reasonable likelihood that the jury instructions," in the context of the entire trial, "precluded the jury from giving full consideration and full effect to the defendant's mitigating evidence." *Nelson v. Quarterman*, 472 F.3d 287, 315–16 (5th Cir. 2006); *see also Sandstrom v. Montana*, 442 U.S. 510, 514 (1979) ("for whether a defendant has been accorded his constitutional rights depends on the way in which a reasonable juror could have interpreted the instruction"). In *Tennard*, the Supreme Court rejected the Fifth Circuit's nexus-to-the-crime test used to define "constitutionally relevant mitigating evidence." 542 U.S. at 289, 281 (internal quotation marks omitted).

A claim that the State precluded the jury from giving "full effect to a capital defendant's mitigating evidence" is not subject to harmless error analysis. *Nelson*, 472 F.3d at 314; *accord Johnson v. Texas*, 509 U.S. 350, 367 (1993). Nor may an appellate court "substitute its own moral judgment for a moral judgment that the jury was unable to make." *Nelson*, 472 F.3d at 315. Instead, because this error "deprives the jury of a vehicle for expressing its reasoned moral response to the defendant's background, character, and crime, which precludes it from making a reliable determination that death is the appropriate sentence," a defendant so harmed is entitled to a new punishment-phase proceeding. *Id.* at 314–15 (internal citations and quotation marks omitted).

210

### C. There is a reasonable likelihood that Mr. Hall's jury understood the scope of mitigation to be limited to evidence with a nexus to the crime.

Mr. Hall's challenge that § 2(f)(4) was unconstitutionally applied in his capital trial is cognizable within this Circuit's precedent upholding the general constitutionality of the "blameworthiness" language.[34] *See Nelson*, 472 F.3d at 294; *Franklin v. Lynaugh,* 487 U.S. 164, 184–185 (1988) (O'Connor, J., concurring in judgment) (although *Jurek* held Texas statute facially constitutional, as applied challenge remains available). And it is reasonably likely—given the State's arguments from nose to tail urging the jury to discount any mitigating evidence not directly tied to the offense—that the jury believed itself precluded from considering the bulk of the mitigation case presented.

Section 2(f)(4)'s plain language requires jurors to consider mitigating evidence where "a juror might regard [the evidence] as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). As the Fifth Circuit has described, that language is further modified by § 2(e)(1)'s delineation that jurors may consider "the circumstances of the

---

[34] The Fifth Circuit has previously rejected facial attacks to Texas's definition of mitigating evidence. *See, e.g., Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011).

offense, the defendant's character and background, and the personal moral culpability of the defendant." *Blue*, 665 F.3d at 665 (citing Texas Code Crim. Proc. art. 37.071 § 2(e)(1)). But the balance to be struck between these two provisions is weighted by the moral blameworthiness language of § 2(f)(4). "Moral" is generally understood to connote the choice between "good and bad *conduct*" or "right and wrong *behavior*." Moral, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). Black's Law Dictionary similarly defines "blame" as akin to culpability or responsibility. Blame, *id.* "[C]areful attention to the words actually spoken to the jury" shows that § 2(f)(4) centers on culpability. *See Sandstrom*, 442 U.S. at 514.

The State relentlessly pressed its interpretation throughout trial. It specifically argued that Mr. Hall's trauma in the Philippines, his mental illness, and the abuse he experienced in his adopted family were insufficiently connected to the commission of the crime to be considered as mitigation. 99 RR 142 (background); *id.* at 142–43 (mental illness); 100 RR 41, 51-52, 120 (emotional abuse in adopted family). Alongside § 2(f)(4)'s at-best-ambiguous moral blameworthiness language, the State's arguments that the jury should disregard non-nexus evidence in mitigation "carried with it the imprimatur of the Government" and increased the likelihood that the jury "trust[ed] the Government's judgment rather than its own view" of what the law required. *United States v. Young*, 470 U.S. 1, 18–19 (1985). And the jury did not receive

a written instruction that the language of the jury charge should govern over the State's arguments. 15 Amend. CR 3465–69. Together these circumstances sent a message to the jury that the bulk of Mr. Hall's mitigation case was beyond their consideration. In other words, it is reasonably likely that Mr. Hall's jury believed that a nexus limitation existed here, given the prosecutor's arguments. *See Tennard*, 542 U.S. at 288–89 (finding likelihood that jury misunderstood law, stressing that "the prosecutor's comments pressed exactly the most problematic interpretation of the special issues"). Thus, Mr. Hall's Eighth Amendment rights under *Tennard* were violated.

Thus, the conclusion that there is a reasonable likelihood that Mr. Hall's jury understood the law to restrict the scope of mitigation it could consider ends the inquiry into the Eighth Amendment violation. Mr. Hall is thus entitled to a new punishment phase.

### D.  This Court can review the merits of this claim *de novo*.

Mr. Hall raised this claim as Claim Twelve on direct appeal and it was adjudicated on the merits. *See* Brief of Appellant at 169-79, *Hall v. Texas*, No. AP-77,062 (Tex. Crim. App. July 8, 2019); *Hall v. Texas*, 663 S.W.3d 15, *43 (Tex. Crim. App. July 23, 2019). Although the state court adjudicated this claim on the merits, Mr. Hall can meet both § 2254(d)(1) and § 2254(d)(2). He can meet § 2254(d)(1) because the state court adjudication resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established federal law. *See Tennard*, 542 U.S. 274 (2004). He can also meet § 2254(d)(2) because the state court's is decision is based on an unreasonable determination of the facts based on the record before it.

## PRAYER FOR RELIEF

WHEREFORE, Gabriel Paul Hall, requests that this Court consider his Petition for Writ of Habeas Corpus and grant the following remedies and such other relief as the Court deems appropriate:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and be relieved of his unconstitutional sentence of death;

2. Allow Mr. Hall leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his conviction and sentence;

3. Conduct an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases; and

4. Grant such other relief as law and justice require.

DATED: February 4, 2025      Respectfully submitted,

JASON D. HAWKINS
Federal Public Defender

JEREMY SCHEPERS
Supervisor, Capital Habeas Unit

 /s/ *Rachel G. Schaefer*
Rachel G. Schaefer (CA298354)**
Texas State Bar No.: 24140659

 /s/ *Joe Hamrick*
Joe Hamrick (FL47049

 /s/ *Adriana Victoria Inojosa*
Adriana Victoria Inojosa
Southern District No.: VA 94813)
Assistant Federal Public Defenders

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
rachel_schaefer@fd.org

*Counsel for Gabriel Hall*

215

# EXHIBIT INDEX

Exhibit 1            Mark D. Cunningham et al., *Capital Jury Decision Making-Limitations*, 15 PSYCHOL., PUBLIC POL'Y & L. 223 (2009)

Exhibit 2            John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel?,"* 29 L.& HUM. BEHAV. 55 (2005)

Exhibit 3            Thomas J. Reidy et al., *Probability of Criminal Acts of Violence: A Test of Jury Predictive Accuracy, 31* BEHAV. SCI. & L. 286 (2013)

Exhibit 4            Dr. William Orrison, Invoices for August and October 2015

Exhibit 5            Email Message from John Wright & Dr. Timothy Proctor (Oct. 7, 2015)

Exhibit 6            Mr. Gabriel Hall UTMB Radiology Report, MRI Brain & Stem (March 4, 2013)

Exhibit 7            Excerpts – Brazos County Sheriff's Office (BCSO) Classification Records of Jeffrey Dukes

Exhibit 8            Excerpt – BCSO Stanley Catalino (Dec. 18, 2014)

Exhibit 9            Excerpts – BCSO Jimmy Blackstone

Exhibit 10           Excerpt of Email Message between Bill Hicks, College Station Independent School District and District Attorney Jarvis Parsons (July 31, 2013)

Exhibit 11           Declaration of Juror Heather Montoya (Jan. 23, 2025)

Exhibit 12           Bryan-College Station Eagle Articles

## VERIFICATION BY ATTORNEY

I, the undersigned, am an attorney at the office appointed by this Court pursuant to 18 U.S.C. § 3599 to represent Petitioner Gabriel Hall in these proceedings. Our office has met with Mr. Hall, consulted with other staff in the Federal Defender's Office regarding the case, and we have directed experts and investigators regarding the circumstances of Mr. Hall's conviction and sentence of death. It is in that capacity that I verify this Petition. I declare under penalty of perjury that the foregoing allegations in this Petition are true and correct to the best of my knowledge and that this Petition for Writ of Habeas Corpus is being filed using this Court's CM/ECF system on February 4, 2025.

Subscribed by me February 4, 2025,
in Dallas, Texas.

*/s/ Rachel G. Schaefer*
Rachel G. Schaefer

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Petition for a Writ of Habeas Corpus has been served by CM/ECF upon counsel for Respondent on February 4, 2025:

Jacey Winget
Criminal Appeals Division
Office of the Attorney General
P.O. Box 12548
Capitol Station
Austin, TX 78711
jacey.winget@oag.texas.gov

*/s/ Rachel G. Schaefer*
Rachel G. Schaefer